The Law Offices of Avrum J. Rosen, PLLC
Attorneys for Debra Kramer, Trustee
38 New Street
Huntington, New York 11743
631 423 8527
Avrum J. Rosen
Fred Kantrow

UNITED STATES BANKRUPTCY COURT                    RETURN DATE:  **4/24/12**
EASTERN DISTRICT OF NEW YORK                      TIME:  **9:30 a.m.**
------------------------------------------------------------x
In re:

SHAHARA KHAN,                                     Chapter 7

                              Debtor.             Case No.: 10-46901-ess
------------------------------------------------------------x
DEBRA KRAMER as Trustee of the Estate
Of Shahara Khan,

                              Plaintiff,

                                                  Adv. Pro. No. 11-1520-ess
        -against-

TOZAMMEL H. MAHIA,

                              Defendant
------------------------------------------------------------x

**NOTICE OF TRUSTEE'S APPLICATION SEEKING THE ENTRY OF AN ORDER
IMPOSITING MONETARY SANCTIONS AS AGAINST KARAMVIR DAHIYA, ESQ.
AND THE DAHIYA LAW OFFICES, LLC
PURSUANT TO 28 U.S.C. 1927 AND 11 U.S.C. §105**

        **PLEASE TAKE NOTICE THAT** Debra Kramer, the trustee and the plaintiff herein (the

"Trustee" or the "Plaintiff"), by her attorneys, The Law Offices of Avrum J. Rosen, PLLC, shall

move before the Hon. Elizabeth S. Stong, United States Bankruptcy Judge, on **APRIL 24, 2012

at 9:30 a.m.** or as soon thereafter as counsel may be heard, for the entry of an Order imposing

monetary sanctions as against Karamvir Dahiya, Esq., and the Dahiya Law Offices, LLC,

pursuant to 28 U.S.C. § 1927 and 11 U.S.C. § 105, at the United States Bankruptcy Court, 271

1

Cadman Plaza East, Brooklyn, New York 11201 in Courtroom 3585.

**PLEASE TAKE FURTHER NOTICE** that objections, if any, to the relief sought in the Application must conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, as modified by any administrative orders entered in this case, and be filed with the Bankruptcy Court electronically in accordance with General Order #462, by registered users of the Bankruptcy Court's case filing system and, by all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (PDF), WordPerfect, Microsoft Word, DOS text (ASCII) or a scanned image of the filing, with a hard copy delivered directly to Chambers, and be served in accordance with General Order #462, and upon The Law Offices of Avrum J. Rosen, PLLC, 38 New Street, Huntington, New York 11743 and the Office of the United States Trustee,  271 Cadman Plaza East, New York 11201, so as to be received by no later than **April 17, 2012.**

**PLEASE TAKE FURTHER NOTICE** that only TIMELY FILED responses may be considered by the Court.

Dated: Huntington, New York
      March 24, 2012

                    The Law Offices of Avrum J. Rosen, PLLC
                    Attorneys for the Trustee

          BY:    S/Avrum J. Rosen
                  Avrum J. Rosen
                  38 New Street
                  Huntington, New York 11743
                  631 423 8527
                  ajrlaw@aol.com

The Law Offices of Avrum J. Rosen, PLLC
Attorneys for Debra Kramer, Trustee
38 New Street
Huntington, New York 11743
631 423 8527
Avrum J. Rosen
Fred Kantrow

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

RETURN DATE:  **4/24/12**
TIME:  **9:30 a.m.**

-----------------------------------------------------------------x

In re:

SHAHARA KHAN,

                         Debtor.

Chapter 7

Case No.: 10-46901-ess

-----------------------------------------------------------------x

DEBRA KRAMER as Trustee of the Estate
Of Shahara Khan,

                    Plaintiff,

     -against-

TOZAMMEL H. MAHIA,

                    Defendant

Adv. Pro. No. 11-1520-ess

-----------------------------------------------------------------x

### TRUSTEE'S APPLICATION SEEKING THE ENTRY OF AN ORDER IMPOSITING MONETARY SANCTIONS AS AGAINST KARAMVIR DAHIYA, ESQ. AND THE DAHIYA LAW OFFICES, LLC <u>PURSUANT TO 28 U.S.C. 1927 AND 11 U.S.C. §105</u>

TO:  THE HONORABLE ELIZABETH S. STONG
      UNITED STATES BANRKUPTCY JUDGE

       Debra Kramer, the chapter 7 trustee (the "Trustee") of the bankruptcy estate of Shahara

Khan (the "Debtor"), by and through her counsel, The Law Offices of Avrum J. Rosen,

PLLC, respectfully submits this application, seeking (i) the entry of an Order imposing

monetary sanctions as against Karamvir Dahiya, Esq., ("Dahiya") and the Dahiya Law

Offices, LLC ("DLO") pursuant to section 1927 of title 28 of the United States Code and

1

11 U.S.C. §105, and respectfully states as follows:

1.      Dahiya and DLO have sued the Trustee for "abuse of process" and some sort of unspecified "constitutional tort". However, they state that the defendant Tozammel H. Mahia has not consented to the jurisdiction of this Court, and will only consent to those claims being heard by the District Court.

2.       It is black letter law that an action for abuse of process cannot be brought until the complained of action has been determined in the defendant's favor.  Despite that fact, Dahiya and DLO have sued trustees on at least five (5) occasions for "abuse of process" as counterclaims in actions to recover either preferences or fraudulent conveyances.  This is done without any legal basis for the actions.  Indeed, as is discussed *infra,* Dahiya and DLO have already lost on this precise issue before the Honorable Alan S. Trust. See *Pryor v. Satangelo*, Adv. Pro. No. 11-9096 (Decision of Judge Trust), annexed hereto as Exhibit "A".

3.      Despite refusing to consent to this Court's jurisdiction, they have brought suit without complying with the *Barton* Doctrine, *Barton v. Barbour,* 104 U.S. 126, 131 (1881); *Lebovits v. Scheffel ( In re Lehal Realty Associates),* 101 F.3d 272, 276 (2d Cir. 1996)*; Peia v. Coan*, 2006 U.S. Dist. LEXIS 12811.   That doctrine prohibits suit against a trustee or her attorneys without leave of the appointing court. Dahiya is aware of the relevant law.   Most recently, he asserted a counterclaim against trustee Robert Geltzer in *In re: Leonid Chatkhan*; Adv. Pro No. 11-1017-cec.  In *Chatkhan*, Dahiya sought permission to sue trustee Geltzer under the *Barton* Doctrine (albeit, even there he did not obtain consent before

2

commencing the action).  In this case, however, Dahiya ignored that rule of law and simply sued the Trustee.  A copy of those pleadings is annexed hereto as Exhibit "B".

4.      Dahiya and DLO also ignore the fact that an essential element of "abuse of process" in a civil matter is the pleading of special damages.   The counterclaim in this case is devoid of any special damages.  Indeed, it alleges only the sort of damages which are expressly not recoverable under such a claim. *In re: Eerie World Entertainment, L.L.C.* 2006 Bankr. LEXIS 770. As Judge Gropper held:

> The third element that must be pleaded in an action for malicious prosecution in New York is special damages. New York courts have defined special damages as injury or interference with the plaintiff's person, property or business that entails "some concrete harm that is considerably more cumbersome than the physical, psychological, or financial demands of defending a lawsuit." *Engel v. CBS, Inc., 93 N.Y.2d 195, 205, 711 N.E.2d 626, 631, 689 N.Y.S.2d 411, 417 (1999).* Special damages must exceed "the damages normally attendant upon being sued." *Honzawa, 268 A.D.2d at 329*; see also *Campion Funeral Home, 569 N.Y.S.2d at 521.* Cases in New York hold that where the prior action is civil rather than criminal, the complaint must allege special damages in the form of "some interference with plaintiff's person or property, for example, by way of some remedy such as attachment, arrest or injunction." *Molinoff, 99 A.D.2d at 529.*

5.      There is no basis in either law or fact for Dahiya and DLO to have filed an abuse of process claim against the Trustee at this time, or even at any time, as there are no cognizable damages from the perceived injury.

6.      The counter-claims were filed in bad faith for other reasons as well.  The trustee's duties are set forth in section 704 of title 11 of the United States Code (the "Bankruptcy Code").  Among those duties, the Trustee is obligated to collect and

3

Case 1:13-cv-03079-DLI    Document 1-10    Filed 05/24/13    Page 6 of 133 PageID #: 173

reduce to money the property of the estate for which such trustee serves and to investigate the financial affairs of the debtor.  The duties can best be described as imposing the duties of a fiduciary upon the Trustee.  In this capacity, trustees have quasi-judicial or derived judicial immunity.  *Id.* at [*10] citing *In re Kashani,* 190 B.R.875 (9th Cir B.A.P. 1995).

### THE INSTANT CHAPTER 7 CASE

7.    Consistent with her fiduciary obligations and the Bankruptcy Code, the Trustee conducted a section 341(a) meeting of creditors at which the Debtor appeared and was examined.  During the course of her investigation in to the Debtor's financial affairs and assets, the Trustee was provided with documents which included: (i) a closing statement (the "Closing Statement") as to the sale of the real property commonly known as 8727 110th Street, Richmond Hill, New York (the "Property"); (ii) copies of the checks disbursed at the closing of the sale of the Property; and (iii) the Debtor's 2007 tax returns.

8.    In addition to the documents described above, the Trustee obtained a copy of the deed (the "Deed") dated April 5, 2007, by which the titled owners of the Property, namely, Shawsum N. Rimi, Tozammel H. Mahia (the "Defendant" in the Adversary Proceeding) and Shahara Khan (the "Debtor") transferred their interest in the Property to Jany Sikder.

9.    The copies of the disbursement checks received by the Trustee from Debtor's counsel provided clear documentary evidence that despite having an ownership interest in the Property, the Debtor failed to receive any disbursement of proceeds

4

at the closing.  Instead, the proceeds were all paid to Tozammel H. Mahia.  From the documentary evidence provided, the Trustee determined that the estate had a cause of action against Tozammel H. Mahia to recover the alleged fraudulent conveyance of the Debtor's interest in the proceeds of sale of the Property for the benefit of creditors; to wit:  the amount of the Debtor's distributive share of the proceeds realized upon the sale of the Property.  Accordingly, in the Trustee's routine practice, she retained counsel to commence and prosecute an action to recover the funds for the benefit of the creditors of the estate.

## THE ADVERSARY PROCEEDING

10.  The Trustee, through her counsel, commenced the Adversary Proceeding to recover an alleged fraudulent conveyance for the benefit of the creditors of the estate.   The Trustee relied upon her avoidance powers as set forth under section 544 of the Bankruptcy Code.  Substantively, she relied upon New York Debtor and Creditor Law and common law principles of fraud and unjust enrichment. The complaint was filed commencing the Adversary Proceeding, and the summons and complaint were properly served upon the Defendant.

11.  The Defendant failed to answer or otherwise respond to the complaint.  Instead, at the initial pre-trial conference, the Trustee appeared by one of her attorneys, and the Defendant appeared by Dahiya and the DLO.  Despite the fact that no answer was interposed, and despite the fact that by his own admission, Dahiya was first retained the morning of the hearing, he determined that it was appropriate to argue the merits of the case.  In fact, he insisted that the Trustee could not prevail under

5

the facts and circumstances asserted in the complaint.  He further argued that the

Trustee commenced an action against the Debtor's family member and that such

an action was not warranted.

12.    The Court inquired of Dahiya when he was retained in the matter and if he could

file an answer to the complaint.  The Court issued an Order setting a deadline for

the Defendant to answer the complaint.  No answer was timely filed pursuant to

that Order.  Instead, an Answer with Counter-claims was filed a week late.  The

document was dated a week prior to when it was filed.

The Answer and the Abuse of Process Claim

13.    The Answer was a general denial to all of the allegations contained therein.  The

Answer asserted fifteen (15) separate affirmative defenses.  The Answer interposed

two counterclaims.

14.    The first counterclaim, entitled "First Counter-Claim Against Trustee for Abuse of

Process" (the "Abuse of Process Claim") alleged that the Trustee brought the

"action without basis, in fact or law" and

> "has caused and continues to cause harm to defendant
> and the family including the mother, debtor herein.  It is
> clear that the Trustee has used the law, without going
> into the details and merits of the positions adopted by
> the debtor and defendant regarding their finances.
> Trustee was under an obligation to make inquiries into
> the finances of the debtor and find in details the realities
> of the transaction and family as a unit.  However she
> did not do that, rather she chose this path to intimidate

6

the family to extract a settlement from the helpless family.  Section 341 provided ample opportunity for the trustee to examine the debtor, or she could have used other process to examine the debtor, however she deliberately did not do that, for a due diligence would have revealed that the debtor did not have any claims against the defendant and she would not have had the opportunity to sue a family and put them in fear.  She wants money.  Trustees in this District have started playing havoc with families.  This law suit was not a recklessly file one, but a deliberate attempt to put a family in fear, so that they could be forced to have settlement.  Helpless debtor here is sick and has no money to engage lawyers and is entirely dependent on his son defendant for day to day living.  Since the debtors or defendants like here have no financial wherewithal to hire attorneys, they are forced to settle eroding all rights and defenses.  Trustee here, has abused her power and so did the counsel for the trustee - they have indulged in an act that is contemptible form all aspects".

*See* Answer, ¶ 23.

15.   The Answer also stated that "Debra Kramer Trustee, the plaintiff herein is further subject to the Court's inherent power to award costs and attorneys' fees as it sees fit and just".  *See* Answer, ¶ 24.   The Answer further stated that

"Given the egregious nature of Trustee's aforementioned conduct, the Court should do so in this

7

instance, and award Mahia his costs and attorneys' fees.
As a proximate result of Plaintiff's conduct, plaintiff
[sic] has sustained damages in an amount to be
determined at trial.  In doing so the acts herein alleged,
the plaintiff along with her counsel acted deliberately,
willfully, maliciously, oppressively and with callous
and intentional disregard of their duties under the
bankruptcy code and subjected defendant to unjust and
extreme hardship, knowing that her conduct was
substantially likely to vex, annoy, and injure defendant.
As a result of this conduct, defendant is entitled to
punitive damages".

*See* Answer, ¶¶ 25, 26 & 27.

16.    As a result of the seriousness of the allegations asserted in the Abuse of Process

Claim, the Trustee alerted both her malpractice carrier as well as her insurer as to

actions she took as a Trustee.  As a result of having alerted these insurance carriers

and the carriers providing counsel to defend, the Trustee will be forced to incur

costs which are the deductibles in the amount of $2,500.00 each provided for in the

two policies, and will incur risk inherent with obtaining continuing coverage.

Thus, at a minimum, the Trustee will incur the deductible of $2,500.00 for each

policy, or $5,000.00 in the aggregate.  It is anticipated that the Trustee's premiums

will increase dramatically as a result of this baseless suit.

17.    The allegations are all without merit and were not included in the answer for any

purpose other than to harass and intimidate the Trustee and her counsel; impose

undue hardship upon the Trustee; frustrate the legitimate purpose of the bankruptcy process; disparage the Trustee and her counsel; and generally avoid reaching the merits of the Adversary Proceeding.

The Answer and the Constitutional Tort Claim

18.     The Answer asserts a second counterclaim against the Trustee for an alleged "Constitutional Tort" (the "Constitutional Tort Claim").  Dahiya alleges that "the trustee deliberately hurts the family composition here, undertakes to sue the son defendant on behalf of mother debtor".  *See* Answer, ¶ 29.  He goes on to hint that the Trustee has interfered with the Defendant's religious convictions by asserting that the "defendant-son is under religious duty to support his mother".   *See* Answer, ¶ 29.  Despite the Trustee having performed her fiduciary duties mandated by the Bankruptcy Code, Dahiya further asserts that the Trustee has failed to do her "homework"[1] for if she had done her homework, she would have declined to prosecute this action.  *See* Answer, ¶ 29.  That of course allowed Dahiya to conclude that the Trustee "abused her powers".   *See* Answer, footnote 3.

19.     For this alleged Constitutional Tort, Dahiya sought an award of legal fees and undefined punitive damages to be determined by a jury.  This cause of action simply does not state any cognizable claim.  The debtor voluntarily filed bankruptcy and submitted herself and her property to the jurisdiction of this Court.

---

[1] This is a common theme often asserted by Dahiya in various pleadings before various Courts in which he has attacked trustees for performing their obligations.

9

Case 1:13-cv-03079-DLI   Document 1-10   Filed 05/24/13   Page 12 of 133 PageID #: 179

The Wherefore Clause

20.     Based upon the counterclaims, Dahiya sought a preliminary and permanent

        injunction enjoining the Trustee and her counsel from commencing any action

        against what he termed "similarly situated defendants", which he defined as family

        members of a debtor, in the Eastern District of New York, unless "the Trustee has

        filed an independent sheet along with the summons and complaint delineating the

        steps the trustee has undertaken to ascertain the facts alleged in the complaint and

        a minimum one page summary of arguments as to why there is a probable cause

        action for allegation in the complaint." *See* Answer, p. 6   He stated that there was

        a need to "check abuse".  He further sought an Order "directing the United States

        Trustee Office to conduct an enquiry [sic] into filings of such lawsuits by the panel

        trustees and initiating such action including removal from the panel if any law suit

        was found to have been abusive". *See* Answer, p. 7.  This rather bizarre request

        appears to ignore the fact that trustees are required under the Bankruptcy Code to

        recover preferences to insiders, specifically family members, and fraudulent

        conveyances to whomever they are made.

**DISCUSSIONS WITH DAHIYA REGARDING THE COUNTERCLAIMS**

21.     The Trustee notes that the Court at the most recent pre-trial conference in the

        Adversary Proceeding, inquired of Dahiya as to the facts that supported his

        counterclaims, and Dahiya was hard pressed to articulate any facts and stated that

        he was "rethinking" the counter-claims.  Dahiya did indicate that he intended to

        move to withdraw the reference in order to remove the pending Adversary

Proceeding from this Court's jurisdiction to the District Court.  He further

indicated that the Constitutional Tort was interposed because he believed that the

Defendant had the right to be left alone.

22.    Without discussing "settlement discussions", the Trustee and Dahiya engaged in

efforts that would have led to the dismissal, with prejudice of the counter-claims

asserted against the Trustee.  In fact, Dahiya represented in writing to the Trustee

that he agreed to withdraw the counterclaims.  To date, the counter-claims have not

been withdrawn.[2]  Accordingly, the asserted counter-claims continue to remain at

issue.  Dahiya was presented with an ultimatum to withdraw the counter-claims or

the Trustee would take action.  That demand was ignored.

### THE BASIS FOR THE INSTANT MOTION

23.    It is plain that Dahiya, rather than addressing the merits of actions commenced by

trustees to recover fraudulent and /or preferential actions, Dahiya sues trustees for

alleged abuse of process and other claims as a result of having commenced the

actions.   Dahiya has engaged in this practice in a number of cases.  For example,

Dahiya has raised similar counterclaims against Robert L. Pryor, a trustee serving

in the Central Islip Court, R. Kenneth Barnard, also a trustee in Central Islip, and

Robert L. Geltzer, a trustee serving in the Brooklyn Court.   In *In re Leonid

Chatkhan,* 10-46755-cec, and *Geltzer v. Dahia et al,* Adv. Pro. No. 11-1017-cec,

Dahiya employed the same abusive tactics, made very similar arguments and

---

[2]       The Trustee forwarded a proposed stipulation withdrawing the counterclaims to Dahiya.  To date, the stipulation has not been executed.

asserted very similar accusations against the trustee.  Geltzer has moved for sanctions.

24.    In *Chatkhan*, Geltzer stated in his pleadings before the Hon. Carla E. Craig, Chief United States Bankruptcy Judge, that, "in this case, the majority of these factors [cited factors for the imposition of sanctions] weighs in favor of imposing a meaningful sanction against Dahiya.  Dahiya's conduct has been willful in the relentless pursuit of the Trustee.  As noted, Dahiya's conduct is not an isolated event, but a pattern of activity on his part in this case, as well as in other cases. Clearly, Dahiya intends to injure the Trustee and the Debtors' estates through his needless litigation, mendacious statements and dilatory tactics".  *See* Exhibit "B" ¶ 41. Trustee Geltzer went on to say, "Dahiya's Dismissal Motion 2 has also greatly increased administrative expenses.  Dahiya claims to be an experienced bankruptcy lawyer and thus, should have known that the Amended Complaint was well-pleaded.  Only a significant monetary sanction will deter repetition of such conduct.  As of this date, the Law Offices of Robert L. Geltzer has expended $7,182.00 of legal fees and costs in defending Dahiya's various motions."  *See* Exhibit B, ¶¶ 42 & 43.  Moreover, the *Chatkhan* matter further demonstrates that Dahiya is aware of the *Barton* Doctrine and is aware that in order to maintain an action against the Trustee herein, he is required to obtain permission from this Court to do so.  None was ever sought.

25.    Dahiya engaged in similar tactics against Trustee Robert L. Pryor.  In *In re Jennifer Pupo Santangelo*, 10-78726-ast, Dahiya again waged a campaign against

Trustee Pryor, who commenced an adversary proceeding entitled *Robert L. Pryor, Chapter 7 Trustee of the Estate of Jennifer Pupo Santangelo v. Michael Santangelo,* Adv. Pro. No. 11-9096-ast, in which he sought to recover alleged pre-petition transfers pursuant to sections 542, 544, 548, 550 and 551 of the Bankruptcy Code, as well as pursuant to New York Debtor and Creditor Law.

26.    The adversary proceeding in the *Santangelo* matter was commenced by the filing of the summons and complaint on June 2, 2011 and was served upon the defendant on June 6, 2011.  The defendant failed to file a timely answer or otherwise respond to the complaint.  On July 23, 2011, after the time to answer had run, the defendant, by and through her counsel, Dahiya, filed an emergency motion to withdraw the reference and requesting a jury trial by an Article III court.  The trustee sought the entry of a default judgment which was to be presented to the Hon. Alan S. Trust, on September 6, 2011.  On September 5, 2011, the defendant filed an answer to the complaint and asserted a counterclaim against the trustee for abuse of process.  Dahiya alleged that the trustee "did not put forward any material fact which could have been a basis for or even alleging a fraudulent transfer."  The answer sought dismissal of the adversary proceeding. See Exhibit "A", Pg. 3

27.    On December 15, 2011, Trustee Pryor filed a motion to dismiss the counterclaim and an accompanying memorandum of law.  The trustee argued that the counterclaim failed to state a viable cause of action because the only process issued in the adversary proceeding was the summons and complaint, which were not capable of being abused.  The trustee further asserted that if Dahiya's

13

allegation was one of malicious prosecution, such allegation would have been untimely because a claim for malicious prosecution lies "only when the judicial proceeding begun in malice, without probable cause, . . . finally ends in failure.  It cannot be asserted as a counterclaim in the very action it challenges as malicious". quoting *Kalsco Systemet, Inc.,* 474 F. Supp. 666, 670 (S.D.N.Y. 1979). *Id.*

28.  Dahiya filed an affirmation in opposition to the trustee's motion to dismiss the counterclaim in which he asserted that he had established a claim for abuse of process because there was a regularly issued process served by the trustee with the intention of intimidating the defendant into settling, and with the collateral objective of causing defendant fear that he might lose his house if he did not settle.

29.  Judge Trust, in his Decision and Order dated February 10, 2012, dismissed Dahiya's counterclaim for abuse of process as being untimely because the "adversary proceeding has not been finally terminated in the Defendant's favor, and because Defendant has not alleged any special injury".  *See Kaslof v. Global Health Alternatives, Inc.,* 2000 U.S. Dist. LEXIS 21053, at *62-70 (E.D.N.Y. 2000).  *Id.*  at 5. He granted leave to Dahiya to bring on a claim for abuse of process "if and when Defendant prevails on the claims asserted by the Plaintiff in the adversary proceeding".  Dahiya has appealed that decision.

30.  Accordingly, as early as one month ago, Dahiya had the Decision and Order of Judge Trust instructing him that the cause of action for abuse of process which he seeks to assert in the case before the Court is not ripe for adjudication.  Despite having that knowledge, Dahiya refused to and continues to refuse to dismiss the

counterclaims before this Court.

31.     In a case currently pending before the Hon. Jerome Feller, *In re Louis Stogianos*,

        Case No. 11-40832-jf, a case in which Debra Kramer serves as the Trustee, Dahiya

        engaged in a pattern and practice of frustrating the Trustee's administration of the

        estate as well as the rights of the creditors.  In that case, on February 4, 2011,

        Dahiya filed a voluntary petition for the debtor pursuant to chapter 13 of the

        Bankruptcy Code. On February 28, 2011 Dahiya filed a notice of voluntary

        conversion of the case to chapter 7.  Upon the appointment of the Trustee, and her

        discovery of a valuable asset, Dahiya moved before Judge Feller to withdraw the

        debtor's voluntary conversion to chapter 7 in an effort to return to chapter 13.

        Judge Feller denied the motion.

32.     The Trustee commenced an adversary proceeding to recover an alleged fraudulent

        conveyance of a taxi Medallion from the debtor to an entity controlled exclusively

        by the debtor for no consideration.  Dahiya moved to withdraw the reference, and

        asserted counterclaims against the Trustee for abuse of process.  Just recently,

        Dahiya agreed to dismiss the counterclaims asserted in that case.

33.     R. Kenneth Barnard, a trustee serving in the Central Islip Court, was also sued by

        Dahiya on the same grounds in the case entitled *Barnard v. Mohamed Arif and*

        *Lailun N. Shaikh*, Case No. 09-08315-ast. Copies of the pleadings are annexed

        hereto as Exhibit "C".  That case was settled.  In each case, Dahiya attempts to use

        the withdrawal of the frivolous action as a bargaining chip to achieve other goals

        in the litigation.

**SANCTIONS ARE WARRANTED PURSUANT TO 28 U.S.C. §1927 AND 11 U.S.C. §105**

34.    Dahiya's actions are those types of actions for which sanctions under section 1927 are entirely appropriate.  These are precisely the sort of tactics this statute was enacted to deter.

35.    Section 1927 provides "any attorney or other person admitted to conduct cases in any court of the United States or any territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses and attorney's fees reasonably incurred because of such conduct".

36.    "A bankruptcy court may impose sanctions pursuant to section 1927 if it finds that 'an attorney's actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay'". *In re Cohoe Indus. Terminal, Inc.,* 931 F.2d at 230.  To establish that sanctions are warranted, the moving party must demonstrate that "an attorney has: (1) multiplied proceedings; (2) unreasonably and vexatiously; (3) thereby increasing the cost of the proceedings; (4) with bad faith or with intentional misconduct".  *Veneziano v. Long Island Fabrication & Supply Corp.,* 238 F. Supp. 2d 683, 693 (D.N.J. 2002).

37.    There is no doubt that Dahiya's actions herein satisfy each and every element to impose sanctions pursuant to section 1927.  Instead of determining an appropriate litigation strategy based in fact and law and rather than offering evidentiary support to the Trustee and/or her counsel, that would establish a defense to the

16

allegations raised in the adversary proceeding, Dahiya asserted baseless counterclaims designed to unreasonably and vexatiously multiply the proceedings and the costs associated therewith, as well as delay the administration of the case. He brings causes of action that he knows cannot be sustained as a matter of law. He violates the *Barton* Doctrine, and ignores the trustees' quasi-judicial immunity. He intentionally sues trustees, knowing that they will incur large legal bills and increased insurance premiums.  All of this is done to force settlements on valid actions commenced by trustees in their fiduciary capacities.  In this case, the asserted counterclaims even seek an injunction to prevent the Trustee from performing her statutorily mandated responsibilities.

38.    Here, as in the other cases, Dahiya knew that the Trustee had conducted a reasonable inquiry in connection with her investigation of the alleged transfer by the Debtor to the Defendant.  Nevertheless, as in the other cases, Dahiya filed his improper motions and counterclaims.  Consequently, the Trustee has been forced to defend herself against Dahiya's tactics and, in turn, move to sanction Dahiya for his actions.  "Section 1927 invites attention to a course of conduct, and imposes a continuing obligation on attorneys to avoid dilatory tactics."  *Ted Lapidus, S.A. v. Vann*, 122 F.3d 91, 92 (2d Cir. 1997).   The tactics here are the very kind that must not be allowed to continue.

39.    This Court also has inherent authority to sanction Dahiya and DLO pursuant to §105 of the Bankruptcy Code.  *See In re Grand Street Realty, LLC  v. McCord*, 2005 US Dist. LEXIS 45314 (E.D.N.Y. 2005). In that case, the District Court

affirmed a Bankruptcy Court decision sanctioning a creditor's law firm which impeded the administration of the assets of an estate.  The Court set forth a four part test That test was:  "(1) whether the Chapter 7 trustee acted in good faith to pursue his statutory duties; (2) whether the response by the objecting party was made in good faith; (3) whether that party had an opportunity to correct its course but failed to do so; and (4) whether the chapter 7 trustee or the bankruptcy estate was damaged by incurring unnecessary costs as a result of the objecting party's actions.

40.    In this case, all of the factors have been met.  As is set forth above, this case concerns an alleged fraudulent conveyance that the Trustee is required to pursue. It is clear that the counterclaims were filed in bad faith, as there is no basis for them under the law.  The Trustee has endeavored to have Dahiya withdraw these claims.  He said he would and then reneged, wanting to use them as leverage in this action.  The estate has been damaged.   The Trustee, if a motion to dismiss has to be made, will incur the payment of her deductibles in the aggregate amount of $5,000.00.  Her premium rates will likely increase. The estate has had to negotiate for weeks with Dahiya over these issues.  There are the costs of this motion.  There is the delay in the administration of this estate.

## CONCLUSION

43.    For all of the reasons stated herein, the Trustee respectfully requests that the Court grant the Trustee's application and enter an Order imposing sanctions as against Dahiya and DLO pursuant to section 1927 of title 28 of the United States Code and

18

Case 1:13-cv-03079-DLI   Document 1-10   Filed 05/24/13   Page 21 of 133 PageID #: 188

11 U.S.C. §105, together with such other and further relief that this Court deems

just and proper under the circumstances herein.

Dated: Huntington, New York
      March 24, 2012

                            The Law Offices of Avrum J. Rosen, PLLC
                            Attorneys for the Trustee

               BY:     <u>S/Avrum J. Rosen</u>
                            Avrum J. Rosen
                            38 New Street
                            Huntington, New York 11743
                            631 423 8527
                            ajrlaw@aol.com

19

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
In re:

Jennifer Pupo Santangelo,                                    Case No.: 10-78726-ast
                                                             Chapter 7

                                    Debtor.
-------------------------------------------------------X
Robert L. Pryor, Chapter 7 Trustee of the
Estate of Jennifer Pupo Santangelo,

                                    Plaintiff,

        - against -                                          Adv. Pro. No.: 11-9096-ast

Michael Santangelo,

                                    Defendant.
-------------------------------------------------------X

## DECISION AND ORDER DISMISSING DEFENDANT'S COUNTERCLAIM, AND DENYING PLAINTIFF'S MOTION TO STRIKE THE JURY DEMAND

Before the Court are two motions filed by Robert L. Pryor (the "Plaintiff"), Chapter 7 Trustee of the bankruptcy estate of Jennifer Pupo Santangelo, the above-captioned debtor (the "Debtor"). The first motion seeks to dismiss or withdraw with prejudice the counterclaim (the "Counterclaim") filed by the defendant, Michael Santangelo (the "Defendant"), and seeks attorney's fees and expenses incident thereto ("Motion to Dismiss Counterclaim"). [dkt item 20] Plaintiff's second motion seeks to strike Defendant's jury demand as untimely ("Motion to Strike Jury Demand"). [dkt item 28] Defendant opposes both Motions. [dkt items 24, 31] For the reasons set forth below, the Motion to Dismiss Counterclaim is granted without prejudice to Defendant refiling the Counterclaim if and when Defendant prevails on the claims asserted by Plaintiff in this adversary proceeding, and the Motion to Strike Jury Demand is denied.

Order - 1

### Background and Procedural History

This adversary proceeding was commenced on June 2, 2011. The Defendant is Debtor's estranged spouse. The complaint (the "Complaint") [dkt item 1] alleges that, by virtue of a prepetition transfer that occurred less than two (2) years prior to the petition date, Defendant received Debtor's interest in the couple's former marital residence in exchange for Defendant satisfying or assuming certain student loan obligations owed by Debtor. [dkt item 1, at ¶¶ 9-13] The Complaint seeks to avoid this prepetition transfer pursuant to §§ 542, 544, 547(b), 548(a), 550 and 551 of title 11 of the United States Code (the "Bankruptcy Code"), and New York State Debtor and Creditor Law.

The summons and Complaint were served upon Defendant on June 6, 2011. [dkt item 3]

On July 23, 2011, after the time to answer had run, and no answer or responsive pleading having been filed, Defendant filed an emergency motion with this Court seeking the withdrawal of the reference by the United States District Court for the Eastern District of New York (the "District Court") and requesting a "jury trial by an Article III court" (the "Motion to Withdraw Reference"). [dkt item 5, at ¶ 2]  The Motion to Withdraw Reference was transmitted to the District Court on July 26, 2011. [dkt item 6][1]

On July 28, 2011, Plaintiff filed a motion for default judgment, based on Defendant's failure to timely file a responsive pleading, which provided an objection deadline of August 31, 2011, and which was to be presented for signature on September 6, 2011 (the "Default Judgment Motion"). [dkt item 7]

On September 5, 2011, Defendant filed an answer to the Complaint (the "Answer"). [dkt item 9]  The Answer includes a demand for a jury trial, and asserts a Counterclaim against

---

[1] The District Court case is *Pryor v. Santangelo*, 11-mc-00561-JFB.

Plaintiff for abuse of process and seeks sanctions. [dkt item 9, at ¶¶ 17-19]  Defendant alleges that Plaintiff "did not put forward any material fact which could have been a basis for or even alleging a fraudulent transfer," and seeks dismissal of the adversary proceeding. [dkt item 9, at ¶ 18]  Defendant did not serve the Answer on Plaintiff.

Also on September 5, 2011, Defendant filed an affirmation in opposition to Plaintiff's Default Judgment Motion. [dkt item 10]

Because Defendant had filed the Answer, albeit untimely, this Court denied Plaintiff's Default Judgment Motion by Order dated September 23, 2011. [dkt item 12]

On October 12, 2011, Plaintiff filed a reply to the Counterclaim arguing that Defendant's Counterclaim fails to state a claim upon which relief can be granted and asserting that Defendant's request for a jury trial was untimely. [dkt item 13]

On October 13, 2011, the Court issued an Initial Adversary Scheduling Order setting discovery deadlines and scheduling a pretrial conference for December 20, 2011. [dkt item 14]

On December 15, 2011, Plaintiff filed the Motion to Dismiss Counterclaim by notice of presentment and an accompanying memorandum of law. [dkt items 20, 21]  Plaintiff argues that Defendant fails to state a cause of action under Rule 7012 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") because the only process issued in this adversary proceeding are the summons and Complaint, which are not capable of being abused.  Plaintiff also argues that to the extent Defendant's actual allegation is malicious prosecution, such an allegation is untimely because a claim for malicious prosecution lies "only when the judicial proceeding begun in malice, without probable cause, . . . finally ends in failure.  It cannot be asserted as a counterclaim in the very action it challenges as malicious." [dkt item 20, at ¶ 24 (quoting *Kalsco Systemet, Inc.*, 474 F. Supp. 666, 670 (S.D.N.Y. 1979)]

Order - 3

On December 16, 2011, Defendant filed a separate Demand for Jury Trial in an Article III Court, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure. [dkt item 23]

A pretrial scheduling conference was held on December 20, 2011.

On December 23, 2011, Defendant filed an affirmation in opposition to Plaintiff's Motion to Dismiss Counterclaim, asserting that he had established a claim for abuse of process because there was a regularly issued process served by Plaintiff with the intention of intimidating Defendant into settling, and with the collateral objective of causing Defendant fear that he might lose his house if he does not settle. [dkt item 24]

Defendant filed a reply brief regarding the Withdraw of Reference Motion on December 26, 2011. [dkt item 25]

Plaintiff filed a reply and amended reply in support of his Motion to Dismiss Counterclaim on January 5, 2012 and January 6, 2012, respectively. [dkt item 26, 27]

On January 10, 2012, Plaintiff filed the Motion to Strike Jury Demand by notice of presentment. [dkt item 28]  Plaintiff argues that: (1) Defendant's jury demand was untimely pursuant to Federal Rule of Civil Procedure 38(b) and Bankruptcy Rule 9015; (2) Defendant waived his right to a jury trial through voluntary submission to the Court's jurisdiction by filing the Counterclaim; and (3) Plaintiff's causes of action are equitable in nature and there is no right to a jury trial on equitable actions.  Plaintiff also seeks to distinguish the United States Supreme Court's holding in *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989).

On January 17, 2012, this Court issued a Pretrial Scheduling Order, scheduling a final pretrial conference for August 14, 2012, at 2:00 p.m., and setting August 22, 2012 as the date for trial of this adversary proceeding. [dkt item 29]

Defendant filed an affirmation in opposition to the Motion to Strike Jury Demand on January 18, 2012. [dkt item 31]   Initially, Defendant argues that this Court does not have jurisdiction to decide this motion.  Defendant also argues that: (1) he has not submitted to the bankruptcy court's jurisdiction; (2) he invoked his right to be heard by an Article III court; (3) he demanded a jury trial; and (4) the right to a jury trial is coextensive to Article III adjudication.

Finally, the Court notes that Defendant has not filed a proof of claim in Debtor's main bankruptcy case, 10-78726-ast.

## Jurisdiction

This Court has jurisdiction over this core proceeding pursuant to 28 U.S.C. §§ 1334(b) and 157(b)(2)(A), (E), (F), (H), and (O), and the Standing Order of Reference in effect in the Eastern District of New York dated August 28, 1986.  Although Defendant has filed a Motion to Withdraw Reference, the District Court has not yet ruled on that Motion. Pursuant to Bankruptcy Rule 5011(c), "the filing of the motion for withdrawal . . . shall not stay the administration of the case or any proceeding therein before the bankruptcy judge . . . ." FED. R. BANKR. P. 5011(c).

The following constitutes this Court's findings of facts and conclusions of law to the extent Bankruptcy Rule 7052 so requires. FED. R. BANKR. P. 7052.

## Motion to Dismiss Counterclaim

Defendant's Counterclaim for abuse of process is untimely at this stage in the litigation because this adversary proceeding has not been finally terminated in Defendant's favor, and because Defendant has not alleged any special injury. *See Kaslof v. Global Health Alternatives, Inc.*, 2000 U.S. Dist. LEXIS 21053, at *62-70 (E.D.N.Y. June 29, 2000); *Bank of Boston Int'l v. Arguello Tefel*, 644 F. Supp. 1423, 1430 (E.D.N.Y. 1986); *Kalsco Systemet, Inc. v. Jacobs*, 474 F. Supp. 666, 670 (S.D.N.Y. 1979).   Therefore, Defendant's Counterclaim will be dismissed

without prejudice to Defendant refiling a claim for abuse of process or malicious prosecution against Plaintiff if and when Defendant prevails on the claims asserted by the Plaintiff in this adversary proceeding.

Based on the forgoing, it is hereby

**ORDERED**, that Defendant's Counterclaim is hereby DISMISSED without prejudice to Defendant refiling a claim for abuse of process or malicious prosecution against Plaintiff if and when Defendant prevails on the claims asserted by the Plaintiff in this adversary proceeding; and it is further

**ORDERED**, that the balance of Plaintiff's Motion to Dismiss Counterclaim seeking attorney's fees and costs is hereby DENIED without prejudice, should Defendant refile such a Counterclaim.

<u>**Motion to Strike Jury Demand**</u>

This Court has jurisdiction to decide the Motion to Strike Jury Demand pursuant to 28 U.S.C. §§ 1334(b) and 157(b), and Bankruptcy Rule 5011(c). FED. R. BANKR. PRO. 5011(c); see *Finger v. County of Sullivan Indus. Dev. Agency (In re Paramount Hotel Corp.,)*, 319 B.R. 350, 357 (Bankr. S.D.N.Y. 2005).

This Court has determined that Defendant Michael Santangelo has properly invoked his right to a jury trial pursuant to the Seventh Amendment of the United States Constitution because Defendant asserted a demand for jury trial in the first pleading he filed with the Court, which clearly demanded a jury trial. While Plaintiff argues that Defendant failed to timely demand a jury trial pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, courts in this circuit have permitted untimely jury demands when the opposing party had actual notice and suffered no prejudice as a result of an untimely jury demand. *Palmer v. Angelica Healthcare Servs.*

*Group,* 170 F.R.D. 88, 89-90 (N.D.N.Y 1997); *see Raymond v. IBM,* 148 F.3d 63 (2d Cir. 1998). Defendant is entitled to a jury trial, at a minimum, on the preference and fraudulent transfer claims asserted by Plaintiff under §§ 547 and 548 of the Bankruptcy Code. *Langenkamp v. Culp,* 498 U.S. 42, 45 (1990) ("a creditor's right to a jury trial on a bankruptcy trustee's preference claim depends upon whether the creditor has submitted a claim against the estate"); *Granfinanciera, S.A. v. Nordberg,* 492 U.S. 33, 36 (1989) ("the Seventh Amendment entitles such a person to a trial by jury, notwithstanding Congress' designation of fraudulent conveyance actions as 'core proceedings'").[2]  Absent consent of both parties and designation by the District Court, this Court cannot conduct a jury trial in this adversary proceeding.  28 U.S.C. § 157(e); FED. R. BANKR. PRO. 9015.

Based on the forgoing, it is hereby

**ORDERED,** that Plaintiff's Motion to Strike Jury Demand is hereby DENIED; and it is further

**ORDERED,** that the portions of this Court's Pretrial Scheduling Order dated January 17, 2012 [dkt item 29], which set August 7, 2012 as the deadline to file a joint pretrial memorandum, which scheduled a final pretrial conference for August 14, 2012, and which set August 22, 2012 as the date for trial of this adversary proceeding, are hereby VACATED; the remainder of the Pretrial Scheduling Order remains in effect; and it is further

---

[2]  Because Defendant did not file a proof of claim in Debtor's main bankruptcy case, the Court does not need to reach, and does not reach, the issue of whether Defendant waived his right to jury trial by filing a proof of claim. *Langenkamp* 498 U.S. at 45; *In re CBI Holding Co.,* 529 F.3d 432, 465-68 (2d Cir. 2008).

Order - 7

**ORDERED**, that the Court hereby sets <u>July 31, 2012</u>, as the deadline for the parties to file motions for summary judgment; any response to a motion for summary judgment shall be filed by <u>August 31, 2012</u>; and a reply may be filed by <u>September 14, 2012</u>.



Dated: **February 10, 2012**
      **Central Islip, New York**

_____
         **Alan S. Trust**
    **United States Bankruptcy Judge**

Order - 8

UNITED STATES BANKRUPTCY COURT     **Return Date: 7/14/11**     13-3589448
EASTERN DISTRICT OF NEW YORK     **Return Time: 2:00 p.m.**

------------------------------------------------------------

In Re:                                  **Chapter 7**

                                       **Case Nos. 10-46775 (CEC);**
**LEONID CHATKHAN et al.,**             **11-41799; 11-41803; 11-41804;**
                                       **11-41805; 11-41807.**
            Debtors.

                                       **Jointly Administered**

------------------------------------------------------------

**ROBERT L. GELTZER**, as Trustee of the
Estate of **LEONID CHATKHAN et al.,**

                Plaintiff,                 **Adv. Pro. No. 11-1017 (CEC)**

       -against-

**KARAMVIR DAHIYA and
DAHIYA LAW GROUP LLC,**

              Defendants.

-------------------------------------------------------x

**MOTION FOR AN ORDER IMPOSING SANCTIONS AGAINST
KARAMVIR DAHIYA, ESQ. PURSUANT TO BANKRUPTCY RULE 9011
AND 28 U.S.C. §1927 IN CONNECTION WITH DEFENDANTS'
MOTION TO DISMISS AMENDED COMPLAINT**

TO:     THE HONORABLE CARLA E. CRAIG,
        CHIEF UNITED STATES BANKRUPTCY JUDGE:

**PRELIMINARY STATEMENT**

       Robert L. Geltzer, chapter 7 trustee (the "Trustee") for Leonid Chatkhan, et al.

(the "Debtors"), by and through his undersigned counsel hereby moves for an order to assess

sanctions upon Karamvir Dahiya, Esq ("Dahiya") under Rule 9011 of the Federal Rules of

Bankruptcy Procedure (the "Rules") and 28 U.S.C. §1927 of the United States Code (the

"Bankruptcy Code").  The Trustee asserts that: (i) Dahiya filed multiple motions for an improper

purpose; (ii) Dahiya delayed the Trustee's administration of the Debtors' estates; (iii) Dahiya

needlessly increased the costs of litigation; (iv) Dahiya unreasonably and vexatiously multiplied

proceedings in this case; (v) Dahiya's factual contentions lack evidentiary support; and

(vi) Dahiya's denials of factual contentions are not warranted on the evidence.  Such actions

undertaken by Dahiya expose him to sanctions under the Bankruptcy Code and the Rules for the

expenses incurred by the Debtors' estates in having to oppose his frivolous motion.

## BACKGROUND

1.    On or about July 19, 2010, Leonid Chatkhan ("Chatkhan") filed a

voluntary petition under Chapter 11 of Title 11 of the Bankruptcy Code with this Court.

2.    On or about October 20, 2010, this case was converted to one under

Chapter 7 of the Bankruptcy Code.

3.    On or about October 20, 2010, Robert L. Geltzer, Esq. was appointed by

the Office of the United States Trustee as interim trustee of Chatkhan's estate pursuant to § 701,

and pursuant to § 702(d) of the United States Bankruptcy Code thereafter became permanent

Trustee by operation of law, and is serving as such.

4.    On or about April 1, 2011, this Court entered an order directing the

substantive consolidation and joint administration of the chapter 7 cases of Chatkhan and certain

related entities.  Subsequently, the Trustee was appointed Trustee for the consolidated Debtors'

estates.

5.    Based upon the Schedules attached to Chatkhan's petition, and/or

Chatkhan's testimony at the § 341 meeting, and/or the Chatkhan's affidavit of October 15, 2010,

and/or Dahiya's May 3, 2010 Declaration in Support of Chatkhan's (i.e., Irina Chatkhan

("Irina"), Chatkhan's wife, and the debtor in case #09-51286-CEC reposing in this Court)

paragraph 10 Motion to Retain Dahiya Law Group LLC as counsel to the debtor (i.e., Irina

Chatkhan), and/or her May 3, 2010 application, paragraph 14.e. thereof, the Debtors[1] transferred $15,000.00 (the "Funds") to Dahiya to pay for legal services that he was to render to the Irina in her bankruptcy case (the "Transfer"). The Transfer was without any consideration to the Debtors and, furthermore, the Debtors were insolvent at the time of the Transfer.

      6.    Based on the foregoing, the Trustee determined that Dahiya received a fraudulent transfer of $15,000.00. Accordingly, Trustee's counsel telephoned Dahiya and requested that he return the Funds; Dahiya did not return the Funds.

      7.    Subsequently, on or about November 16, 2010, the Trustee sent a letter to Dahiya in which the Trustee requested that Dayiha return the Funds; Dahiya neither responded to the letter nor returned the Funds.

      8.    Consequently, on or about January 21, 2011, the Trustee commenced the instant adversary proceeding against Dahiya pursuant to Sections 101, 105(a), 541, 542, 548, 550 and 551 of the Bankruptcy Code; the general equity powers of the Bankruptcy Court; the general common law; and Rules 6009, 7001, 7008, <u>et seq.</u> to avoid and recover the Funds as a fraudulent conveyance of money or property of the estate (the "Complaint").

      9.    Prior to the answer due date of February 24, 2011, Dahiya telephoned the Trustee's counsel and requested an extension of time to answer the Complaint. Consistent with Your Honor's October 28, 2010 Administrative Order No. 568, which states, among other things, that: "Upon request coupled with the simple representation by counsel that more time is required, the first request for an extension to respond to pleadings ordinarily should be granted

---

[1] The Transfer was made by check #1498, dated January 10, 2010, to Karam Vir Dahiya in the amount of $15,000.00 by Hill 135, Inc. (the "Check"), a corporation wholly owned and operated by Chatkhan, and which has been substantively consolidated with the Debtors' cases by order of this Court, dated April 1, 2011, and for all of which cases the Trustee serves as trustee.

as a matter of courtesy," the Trustee extended Dahiya's time to answer the Complaint to March 8, 2011.

10.    On March 9, 2011, the Trustee amended the Complaint (the "Amended Complaint") to add, among other things, Dahiya Law Group LLC ("DLG") as a defendant (Dahiya and DLG are cumulatively referred to as the "Defendants").

11.    Upon information and belief, Dahiya is an individual practicing law as DLG at 350 Broadway, Suite 412, New York, New York 10013. Upon information and belief, Dahiya is a (if not the only) member of DLG.

12.    On March 10, 2011, the Trustee was served with Dahiya's motion to dismiss Complaint (the "Dismissal Motion 1"). Dahiya scheduled Dismissal Motion 1 for May 10, 2011 at 2:00 p.m.

13.    On or about April 8, 2011, Dahiya's office telephoned the Trustee's counsel regarding an extension of time to answer the Amended Complaint. The Trustee's counsel, Mark E. Bruh, Esq. ("Bruh") advised Dahiya's office that Bruh wanted to speak to Dahiya regarding the extension, as well as the mendacious statements in Dismissal Motion 1. Dayiha never returned the telephone call, in violation of Your Honor's October 28, 2010 Administrative Order No. 568 which states that: "A lawyer should promptly return telephone calls and answer correspondence reasonably requiring a response."

14.    On or about April 10, 2011, the Trustee was served with the Defendants' motion to dismiss Amended Complaint ("Dismissal Motion 2"), which motion is substantially the same as Dismissal Motion 1 and, moreover, contains the same mendacious statements.

15.    On or about April 22, 2011, the Trustee filed his response to Dahiya's

Dismissal Motion 1 and Dismissal Motion 2.[2]

16.    In connection with the Amended Complaint, the Court set May 10, 2011 at 11:00 a.m. as the date and time for the initial pre-trial conference. Bruh appeared at said hearing; however, Dahiya failed to appear. The Court noted Dahiya's failure to appear at the initial pre-trial conference - - while Bruh had to wait for the 2:00 p.m. hearing in connection with the Dismissal Motion 1. Albeit the Trustee filed and served an Amended Complaint, Dahiya did not withdraw Dismissal Motion 1.

17.    At the 2:00 p.m. hearing in connection with Dismissal Motion 1, Bruh and Dahiya appeared and were heard. Bruh argued, among other things, that the Complaint and Amended Complaint set forth sufficient factual detail with particularity to support a claim against the Defendants, and cited relevant case law in connection therewith. Dahiya argued, among other things, that he: (a) did not understand how the Trustee could commence a fraudulent transfer action against him while the Trustee is administering the Debtors' estates, (b) needed to preserve his Article III rights, (c) wanted a jury trial, and (d) would file a motion to withdraw the reference. Ultimately, Dahiya withdrew Dismissal Motion 1; however, he refused to withdraw Dismissal Motion 2, apparently, preferring to embark on a crusade against the Trustee, but only armed with his improper motion that is needlessly inflating the costs of litigation, rather than properly and promptly agreeing to withdraw Dismissal Motion 2. Accordingly, the Court intimated that it might entertain the Trustee's motion for sanctions under Rule 11 against Dahiya.

---

[2]In the interest of judicial economy, as well as the fact that Dismissal Motion 1 and Dismissal Motion 2 are substantially the same motion, the Trustee responded to both motions in his response filed with the Court (see Dkt. No. 13).

**LEGAL ARGUMENT**

**I.    THE IMPOSITION OF SANCTIONS AGAINST
    DAHIYA IS WARRANTED PURSUANT TO RULE 9011**

    **A.    Dahiya has Violated Rule 9011(b)**

18.    Rule 9011 parallels Rule 11 of the Federal Rules of Civil Procedure.  Rule 11 "establishes an objective standard, intended to eliminate any 'empty-head pure-heart justification for patently frivolous arguments." FED.R.CIV.P.11 advisory committee note (1993). A pleading, motion or other paper violates Rule 11 when it "has been interposed for an improper purpose or where, after reasonable inquiry, a competent attorney could not form a reasonable belief that the pleading is well-grounded in fact and warranted by existing law...." The Cartlon Group, Ltd. v. Tobin, 2003 WL 21782650 *2 (S.D.N.Y) (citing W.K. Webster & Co. v. American President Lines, Ltd., 32 F. 3d 66, 670 (2d Cir. 1994) (quoting Eastern Contr. Corp. v. City of New York, 762 F. 2d 243 (2d Cir. 1985)).

19.    Rule 9011 provides:

> (b) *Representations to the Court*.  By presenting to
> the court (whether by signing, filing, submitting, or
> later advocating) a petition, pleading, written motion,
> or other paper, an attorney  or unrepresented party is
> certifying that to the best of the person's knowledge,
> information, and belief, formed after an inquiry reasonable
> under the circumstances,--
>
> > (1) it is not being presented for any
> > improper purpose, such as to harass or
> > to cause unnecessary delay or needless
> > increase in the cost of litigation;
> >
> > (2) the claims, defenses, and other legal contentions
> > therein are warranted by existing law or by a
> > nonfrivolous argument for the extension, modification,
> > or reversal of existing law or the establishment of
> > new law;

(3) the allegations and other factual contentions have
evidentiary support or, if specifically so identified,
are likely to have evidentiary support after a reasonable
opportunity for further investigation or discovery; and

(4) the denials of factual contentions are warranted
on the evidence or, if specifically so identified, are
reasonably based on lack of information or belief.

20.     The Trustee seeks sanctions under subsections (b)(1), (2), (3) and/or (4) of
Rule 9011 because there is ample basis to conclude that Dahiya's motion tactics: (1) were
presented for an improper purpose, (2) are not warranted by existing law, (3) lack evidentiary
support, and (4) the denials of factual contentions are not warranted on the evidence.

21.     In determining whether Rule 9011 has been violated, the court must apply
the "reasonableness under the circumstances" standard.  See Business Guides, Inc. v. Chromatic
Communications Enterprises, Inc., 498 U.S. 533, 534 (1991).  The analysis focuses on whether a
reasonable attorney in like circumstances would believe his actions to be factually and legally
justified. See In re Ford T. Johnson v. W. Clarkson McDow, Jr., 236 B.R. 510 (D.D.C. 1999)
(Citing Artco Corp. v. Lynnhaven Dry Storage Marina, Inc., 898 F.2d 953, 956 (4th Cir. 1990)
(citations omitted)).

**B.     Dahiya Filed Dismissal Motion 2 for an Improper Purpose**

22.     In the instant case, sanctions are mandated inasmuch as Dahiya filed
Dismissal Motion 2 for an improper purpose.  It has been held that "[t]he purpose of Rule 11 is to
deter abusive or frivolous litigation." Granville Gold Trust-Switzerland v. Commissione Del
Fullimento/Inter Change Bank, 924 F. Supp. 397, aff'd, 111 F.3d 123 (2nd Cir. 1997)(citing to
Murphy v. Cuomo, 913 F. Supp. 671, 682 (N.D.N.Y. 1996)).  "The real purpose of Rule 11 is to
deter 'abusive pleading and motion tactics'", Baranski v. Serhant, 106 F.R.D. 247 (N.D. Ill. 1985).

23.    <u>First</u>, Dahiya's Dismissal Motion 2 is in violation of Paragraph IA of Your

Honor's October 28, 2010 Administrative Order No. 568 states that: "Whether orally or in writing,

lawyers should avoid vulgar language, disparaging personal remarks or acrimony toward other

counsel . . . ."

In paragraph 1a. of Dismissal Motion 2, Dahiya states that:

> The reason for this proceeding is <u>vindictiveness</u> of the Trustee,
> which is extremely disconcerting and vexatious to respond.
> The germane source of this complaint is case number 10-
> 01145. . .
> [emphasis added].

In paragraph 1b. of Dismissal Motion 2, Dahiya states that:

> Hector Roman, Esq. retained my services to check this
> <u>Trustee's abuse of power</u> [emphasis added].

In paragraph 1c. of Dismissal Motion 2, Dahiya states that:

> Before the adversary proceeding could be heard, the
> Geltzer withdrew his complaint.  <u>Trustee was not happy</u>
> [emphasis added].

24.    <u>Second</u>, even if Dahiya's mendacious and bizarre claims are true[3], whatever

happened in another wholly unrelated case has no bearing in the case at bar.  Moreover, here, in light

of the fact that Dahiya refused to discuss Dismissal Motion 1 with Bruh (<u>see</u> paragraph 13 above)

regarding the above mendacious and ad hominem remarks and, moreover, repeated those same

remarks in Dismissal Motion 2, the only reasonable conclusion that can be drawn is that Dahiya's

abusive pleadings and motion tactics, and the false and spiteful statements contained therein, were

intentionally designed to mislead this Court and/or bully the Trustee to discontinue the instant

adversary proceeding.  Clearly, this conduct is sanctionable under Rule 9011(b)(1) inasmuch as his

---

[3] Annexed hereto as Exhibit "A" is an affirmation from Bruh who worked on Case No. 10-01145 prior to, and during, Dahiya's involvement in that case.  As affirmed in Exhibit A, the remarks made by Dahiya are not true.

motions were filed with the improper purpose to harass the Trustee.

25.    <u>Third</u>, Dahiya engaged in tactics clearly designed to thwart the Trustee's administration of the Debtors' estates and, thereby, to attempt to pervert the bankruptcy system. Dahiya's deliberate strategy to delay and to derail the Trustee's administration of the estate began when he failed to return the Trustee's telephone calls and respond to the Trustee's letter regarding the Transfer, all of which are in violation of Your Honor's October 28, 2010 Administrative Order No. 568 which states that: "A lawyer should promptly return telephone calls and answer correspondence reasonably requiring a response." Beyond his failure to comply with Your Honor's October 28, 2010 Administrative Order No. 568, Dahiya failed to even appear at the initial pre-trial conference in connection with the Amended Complaint and, moreover, failed to withdraw Dismissal Motion 1, which motion was mooted by the filing of the Amended Complaint and Dismissal Motion 2.

26.    These intentional dilatory tactics by Dahiya have been clearly detrimental to the interest of the Debtors' estates and its creditors. Based on the foregoing, Dahiya's conduct is sanctionable under Rule 9011(b)(1).

27.    <u>Fourth</u>, Dahiya's motion tactics have needlessly increased, and continue to increase, the costs of litigation. The Court must determine in considering whether to impose Rule 9011 sanctions, whether, after reasonable inquiry, a competent attorney could form a reasonable belief that the pleading (i.e., Dahiya's Dismissal Motion 2) is well grounded in fact and warranted by existing law or contains a good faith argument for the extension, modification or reversal or existing law.[4] <u>Desert Palace, Inc., d/b/a Caesars Palace v. Vladimir Baumblit</u> (<u>In re Vladimir Baumblit</u>) 229 B.R. 50 (Bankr. E.D.N.Y. 1999), citing, <u>In re 680 Fifth Avenue Assoc.</u>, 218 B.R. 305 (Bankr.

---

[4]Clearly, the Trustee's Amended Complaint presents a perfectly plausible prima facie case; indeed, so plausible that it is ripe for summary judgment.

9

S.D.N.Y. 1998).

28.      Dahiya's Dismissal Motion 1 was not grounded in fact and was filed for

an improper purpose, which motion he then filed in substantially the same form.  In addition, because

he refused to return telephone calls from the Trustee's office, Dahiya made the prospect of discussing

the Transfer an impossibility.  Indeed, it appears that his only motive is to inflate needlessly litigation

costs in order to force a dismissal of the adversary proceeding.

29.      Finally, the fact that an overly zealous - - wholly invalid - - and unpredictable

defense may cause the expenditures of a great deal of time to address that defense, should not bar a

trustee from initiating and pursuing a claim on behalf of an estate, and, certainly, not at the outset

when the Trustee cannot know he will be barraged by invalid motions, falsehoods, contradictions,

and spiteful statements. Thus, the Trustee was compelled to apprise the Court of Dahiya's

sanctionable conduct.  Accordingly, Dahiya's needless litigation is sanctionable under Rule

9011(b)(1).

### C.      Dahiya's Dismissal Motion 2 is not Warranted by Existing Law and His Denials of Factual Contentions are not Warranted on the Evidence

30.      As set out in the Trustee's response to Dahiya's Dismissal Motion 2, the

Complaint and the Amended Complaint against Dahiya and DLG are supported by sufficient factual

detail in the form of references to the Chatkhan's Petition and Schedules, Chatkhan's affidavit of

October 15, 2010, Dahiya's declaration in Irina's bankruptcy case, the motion of DLG in Irina's

bankruptcy case for it to be retained as counsel to Irina, the May 3, 2010 application thereof, and the

Check, more than adequately set forth viable prima facie claims for the avoidance of the fraudulent

transfer by the Debtors to the Defendants.  They set forth "enough facts to state a claim for relief that

is plausible on its face." Patane v. Clark, 508 F.3d 106, 111-112 (2d Cir. 2007) (quoting Bell

Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1974 (2007)). For example:

- The Defendants do not deny that they received the $15,000.00 (see ¶9 Dismissal Motion 2: "It was Dahiya Law Group, LLC that received the fund[s] . . . "). However, the Check is made payable to Karam Vir Dahiya;

- Despite Dahiya's representations in Dismissal Motion 2 that: "the monies came from business [sic] of both Mr. And Mrs. Chatkhan" (see ¶5 Dismissal Motion 2), Dahiya's declaration under penalties of perjury pursuant to 28 U.S.C. § 1746, in support of the retention of DLG in Irina's bankruptcy, states that: "Leo Chatkhan is paying the retainer, instead of the Debtor [Irina], because the Debtor [Irina] did not have the funds available to pay the retainer. The Check admits and confirms that the Transfer was from the Chatkhan's wholly owned company, and not from "both Mr. And Mrs. Chatkhan." Clearly, Dahiya is attempting to mislead the Court; and

- Under a balance sheet test, the Debtors were insolvent because their liabilities exceeded their assets. Dahiya alleges that the "Trustee has not done his homework for asserting such speculative statements" that the Debtors were insolvent at the time of the Transfer or rendered insolvent as result of such Transfer. According to the Check, the Transfer was in February 2010[5]; on July 19, 2010, approximately 4 months thereafter, Chatkhan filed for bankruptcy. According to the Chatkhan's Petition and Schedules, his assets total $4,249,500.00, and his liabilities total $7,945,000.00; however, according to the Court's claim register, there are filed claims against the Debtors' estates in excess of $15,800,000.00.

31.     Moreover, as Judge Lifland observed in Picard v. Chais (In re Bernard L.

Madoff Inc. Secs. LLC), 2011 Bankr. LEXIS 606, *14, *15 (S.D.N.Y. Feb. 24, 2011), courts have

found that "[g]reater liberality in the pleading of fraud is particularly appropriate in bankruptcy cases

. . . it is often the trustee, a third party outsider to the fraudulent transaction, that must plead the fraud

on secondhand knowledge for the benefit of the estate and all of its creditors." Sec. Investor Prot.

---

[5]According to Irina's Statement of Financial Affairs, the Transfer was in December 2010; according to the declaration of Leo Chatkhan in connection with the retention of DLG in Irina's bankruptcy, the Transfer was in May 2010, but the Check is marked paid in February 2010.

Corp. v. Stratton Oakmont, Inc., 234 B.R. 293, 310 (Bankr. S.D.N.Y. 1999) (citing Atlanta Shipping

Corp. Inc. v. Chem Bank, 631 F. Supp. 335, 348 (S.D.N.Y. 1986), aff'd 818 F.2s 240 (2d Cir. 1987)).

32.     Furthermore, where, as in this case, the Trustee has been appointed subsequent

to the occurrence of transactions identified in his Amended Complaint, and accordingly, does not

have firsthand knowledge of those events and has not yet had the opportunity to take discovery, the

Trustee should be afforded even more leeway in his pleadings, cf., In re Everfresh Beverages, Inc.,

238 B.R. 558 (Bankr. S.D.N.Y. 1999).

33.     Here, the pleadings filed in this Debtors' cases, as well as those filed in Irina's

case clearly show that Dahiya and/or DLG received a fraudulent transfer. The Trustee conducted a

reasonable inquiry concerning the Transfer to Dahiya and/or DLG and the Trustee made known his

intent to Dahiya. Bruh afforded Dahiya the opportunity to withdraw Dismissal Motion 2 at the May

10, 2011 hearing; however, Dahiya, refused to do so.[6] Accordingly, the Court suggested that the

Trustee may seek sanctions under Rule 9011.

34.     Based on the foregoing, Dahiya exposed himself to sanctions under Rule

9011(b)(2) and (4), inasmuch as he should have withdrawn Dismissal Motion 2. Trustee has set forth

sufficient factual detail with particularity to support a claim against Dahiya and/or DLG; Dahiya's

legal contentions are not warranted by existing law, and the denials of factual contentions are not

warranted on the evidence.

### D.  Dahiya's Factual Contentions Lacked Evidentiary Support

---

[6]Additionally, the notice in connection with Dahiya's Dismissal Motion 2 cites Rules 12 (b)(1) and (7) as the bases to dismiss the Amended Complaint. However, after sorting through various paragraphs in which Dahiya uses Dismissal Motion 2 to hurl ad hominem remarks at the Trustee in this case and an unrelated case, as well as those paragraphs which contain mendacious statements, Dahiya has failed to articulate why: (a) the Bankruptcy Court lacks subject-matter jurisdiction to hear this matter, and (b) Rule 19 joinder is applicable to the instant case.

35.    Dahiya's Dismissal Motion 2 contains the following false statements:

•    The Defendants further allege that a "substantial sum of monies [sic] is owed [sic] to Ms. Irina Chatkhan by Leonard Chatkhan. There cannot be a fraudulent transfer, if Leonard Chatkhan makes a partial payments [sic] towards that [sic]" (see ¶4 Dismissal Motion 2). However, according to Chatkhan's schedules, Irina is not a claimant against the Debtors' estates and, moreover, has not filed a claim against the Debtors' estates.  Additionally, Dahiya is not owed any money from the Debtors' estates and, moreover, Dahiya made it very clear in the DLG retention application in Irina's bankruptcy that: "DLG has explained to Ms. Irina Chatkhan [sic] husband Leo Chatkhan . . . DLG's allegiance and duty is to the Debtor [Irina] first and foremost." Dahiya is not, in any capacity, a representative of the Debtors - - and has not provided any benefit to the Debtors; on the contrary, Dahiya has caused unnecessary expenses to accrue against the Debtors' estates; and

•    "This court approved retention of Dahiya Law Offices based on full disclosure in the case of Ms. Irina Chatkhan, hence Mr. Geltzer is precluded from questioning the same.  Geltzer attacks that now, without challenging the appointment of undersigned as an attorney for Ms. Chatkhan." This is the ultimate red herring inasmuch as Mr. Geltzer was appointed Trustee in the Chatkhan's case on October 20, 2010; Dahiya filed the DLG retention application in Irina's bankruptcy on June 15, 2010 - - 4 months prior to Mr. Geltzer's appointment as Trustee.

36.    As stated above, Dahiya's statements are blatant lies. Dahiya's mendacious allegations are sanctionable under Rule 9011(b)(3) inasmuch as no reasonable attorney would have leveled these allegations against the Trustee without first reviewing his own pleadings, as well as those filed in the Debtors' cases.

## II.    THE TRUSTEE HAS COMPLIED WITH THE PROCEDURAL REQUIREMENTS SET FORTH IN BANKRUPTCY RULE 9011(C)(1)(A)

37.    Rule 9011(c)(1)(A) sets forth the manner in which a party may seek sanctions for violations of the rule.  That subsection provides, *inter alia*, that, "[a] motion for sanction may not be filed with or presented to the court unless, within 21 days after service of the motion...., the challenged paper, claim defense, contention, allegation, or denial is not withdrawn or appropriately corrected[.]" Rule 9011(c)(1)(A).  The purpose of this requirement is to afford counsel a "safe

harbor" to withdraw the papers complained of and to avoid sanctions.  (See 10 Collier on Bankruptcy ¶9011.06[1][b] (15th ed. 2003)).

38.    In the instant case, the Trustee, on May 31, 2011, served the extant theretofore unfiled Rule 9011 sanctions motion (the "Trustee's Sanctions Motion"), which clearly sets forth the bases for the imposition of sanctions under Rule 9011.  The Trustee's Sanctions Motion put Dahiya on notice of the consequences if he did not withdraw his Dismissal Motion 2; and Dahiya chose not to.  Because the Trustee's Sanctions Motion (i) amply notified Dahiya that his continued prosecution of Dismissal Motion 2 violated Rule 9011, and (ii) afforded Dahiya the 21-day "safe harbor" to withdraw his motion to avoid sanctions, the Trustee's Sanctions Motion satisfies the requirements of Rule 9011(c)(1)(A) and the Court, therefore, should hear the Trustee's Sanctions Motion.

### III.    PURSUANT TO BANKRUPTCY RULE 9011(C)(2), ONLY A MEANINGFUL  MONETARY SANCTION WILL DETER SIMILAR MISCONDUCT BY DAHIYA

39.    Pursuant to Rule 9011(c)(2), the Court's determination of the type of sanctions to be imposed is discretionary.  Rule 9011(c)(2) states that sanctions "shall be limited to what is sufficient to deter repetition of such conduct or comparable conduct by others similarly situated".  The sanctions may include an Order directing payment to the movant of some or all of the reasonable attorney's fees and other expenses incurred as a direct result of the violation.

40.    The advisory committee Note to Rule 9011 suggests various factors for consideration by the Court:

- whether the improper conduct was willful or negligent;
- whether it was part of a pattern of activity or an isolated event;
- whether it infected the entire pleading or only on particular count or defense;
- whether the person has engaged in similar conduct in other litigation;
- whether it was intended to injure;
- what effect it had on the litigation process in time or expense;
- what amount, given the financial resources of the responsible person, is needed to

deter that person from repetition in the same case;
- what amount is needed to deter similar activity by other litigants.

Collier on Bankruptcy, ¶9011.07[1] (15th ed. 2003).

41.    In this case, the majority of these factors weighs in favor of imposing a meaningful sanction against Dahiya.  Dahiya's conduct has been willful in the relentless pursuit of the Trustee.  As noted, Dahiya's conduct is not an isolated event, but a pattern of activity on his part in this case, as well as in other cases.  Clearly, Dahiya intends to injure the Trustee and the Debtors' estates through his needless litigation, mendacious statements and dilatory tactics.

42.    Dahiya's Dismissal Motion 2 has also greatly increased administrative expenses.  Dahiya claims to be an experienced bankruptcy lawyer and, thus, should have known that the Amended Complaint was well-pleaded.  Only a significant monetary sanction will deter repetition of such conduct.

43.    As of this date, the Law Offices of Robert L. Geltzer has expended $7,182.00 of legal fees and costs in defending against Dahiya's various motions.  The Trustee respectfully requests that Dahiya reimburse the Law Offices of Robert L. Geltzer in the total amount of $7,182.00.

## IV.    DAHIYA'S TACTICS ARE SANCTIONABLE UNDER 28 U.S.C. §1927

44.    28 U.S.C.§1927 provides:

> Any attorney or other person admitted to conduct cases in any court of the United States or any territory thereof who so multiples the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorney's fees reasonably incurred because of such conduct.

45.    "A bankruptcy court may impose sanctions pursuant to 28 U.S.C. §1927 if it finds that '[a]n attorney's actions are so completely without merit as to require the conclusion that

15

they must have been undertaken for some improper purpose such as delay.'" In re Cohoe Indus. Terminal, Inc., 931 F.2d at 230 (quoting Oliveri v. Thompson 803 F.2d at 1273). To establish the right to obtain sanctions pursuant to 28 U.S.C. §1927, a party must demonstrate that "an attorney has: (1) multiplied proceedings; (2) unreasonably and vexatiously; (3) thereby increasing the cost of the proceedings; (4) with bad faith or with intentional misconduct." Veneziano v. Long Island Fabrication & Supply Corp., 238 F. Supp. 2d 683, 693 (D.N.J. 2002).

46.    In the instant case, Dahiya knew that the Trustee had conducted a reasonable inquiry in connection with his investigation of the Transfer by the Debtors to Dahiya and/or DLG. Nevertheless, Dahiya filed his improper motions. Consequently, the Trustee had to defend himself against Dahiya's tactics and, in turn, move to sanction Dahiya for those same tactics. "[Section]1927 invites attention to a course of conduct, and imposes a continuing obligation on attorneys to avoid dilatory tactics." Ted Lapidus, S.A. v. Vann, 112 F. 3d 91, 96 (2nd Cir. 1997). As stated above, the tactics used by Dahiya were in bad faith and for the purpose of multiplying proceedings in this case with the result of delaying the Trustee's administration of the Debtors' estates.

47.    For all of the reasons set forth above, not only has Dahiya exposed himself to sanctions under Rule 9011, but also to sanctions under 28 U.S.C. §1927 for his violation thereof.

**CONCLUSION**

48.    Accordingly, the Trustee respectfully requests that the within motion for sanctions be granted and that the Court afford such other relief as it deems just and equitable.

Dated: New York, New York          Respectfully Submitted,
     May 31, 2011

                                        THE LAW OFFICES OF
                                        ROBERT L. GELTZER,
                                        Counsel to the Chapter 7 Trustee

                                        By: /s/ Robert L. Geltzer
                                            Robert L. Geltzer  (RG 4656)

17

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

---------------------------------------------------X Case:  10-46775 (CEC)

IN RE:

      LEONID CHATKHAN          Chapter 7


        Debtor.

---------------------------------------------------X  Adversary no. 11-1017

ROBERT GELTZER

      Plaintiff,

v.

KARAMVIR S. DAHIYA,

DAHIYA LAW OFFICES, LLC,

      Defendants.

---------------------------------------------------X

Karamvir S. Dahiya of Dahiya Law Offices, LLC respectfully submit the following against Rule 11 Motion filed by Robert Geltzer.


      My objections are mainly threefold, Robert Geltzer did not comply with the procedural requirements of Rule 11, its devoid of merit and that this Court has no jurisdiction to entertain motion under 28 USC 1927, as this is not a "Court of the United States."


      The motion for sanctions is untenable, unwarranted, vexatious and is threat to stymie speech and is a tortious interference in a client and attorney relationship, access to courts,  and raises serious constitutional issues regarding the religious

1

practice of the Debtor to take care of his family and right of his wife to be supported. The trustee should have not instituted the adversary proceedings and must not have filed the instant motion. It makes mockery of law. Robert Geltzer, the Trustee should have undertaken to do some homework before asserting baseless fraudulent transfer causes of action. He knows that Leonid Chatkhan the debtor herein is the husband of my client Ms. Irina Chatkhan.

## ROBERT GELTZER DID NOT GIVE 21 DAYS NOTICE

1.    To begin with the Rule 11 Notice of Safe Harbor was a nullity. The movant must provide a 21 days notice. Robert Geltzer provides the following notice.

*Be advised that pursuant to Bankruptcy Rule 9011(c)(1)(A), you have 21 days from this date to withdraw Defendants' Motion to Dismiss Amended Complaint, or I shall file this motion and thereafter advise you of its return date.* Ex. A.

2.    The author of letter stated that the impugned pleadings be withdrawn within 21 days from this date. 21 days from this date—date of this letter or date of mailing of this letter or date of receipt of this letter—it is highly misleading, thus fatal for not complying the mandatory and stringent requirement of Rule 11 statute. Strict requirement of proper notice was not observed. Law states that it should be 21 days from the time of receipt, however the movant by providing misleading time frame (or not providing the proper time frame) does not comply with Notice requirement.

## ROBERT GELTZER DID NOT MAINTAIN SINGULARITY OF MOTION AND SINGULARITY OF RELIEF.

2

3.      The current Rule requires that every Rule 11 motion "be made separately from any other motion and must describe the specific conduct that allegedly violates Rule 11(b). Under the safe harbor, if an offending paper is withdrawn in response to a Rule 11 motion, no Rule 11 motion can properly be made targeting that filing. *Photocircuits Corp. v. Marathon Agents, Inc.*, 162 F.R.D. 449, 452 (E.D.N.Y. 1995).

4.      Robert Geltzer, did not serve Rule 11 Motion separately and improperly asked for an hybrid relief i.e. under Rule 11 and 28 USC 1927. Robert Geltzer did not comply with the strict requirement of singular motion with a singular relief i.e. Rule 11.

5.      Failure to comply with the separate-motion requirement bars consideration of the motion. *Travelers Ins. Co. v. St. Jude Medical Office Bldg., L.P.*, 154 F.R.D. 143, 144 n.4 (E.D. La. 1994) ; *Dunn v. Pepsi-Cola Metro. Bottling Co.*, 850 F. Supp. 853, 856 n. 4 (N.D. Cal. 1994) . See also *Hadges v. Yonkers Racing Corp.*, 48 F.3d 1320, 1328 (2d Cir. 1995) (separate motion requirement ignored; sanctions reversed "under all the circumstances, particularly the failure to afford Hadges the 21-day safe-harbor period"). *Martens v. Thomann*, 273 F.3d 159, 178 (2d Cir. 2001) (reversing sanctions award where neither separate motion filed nor 21-day safe harbor afforded sanctioned party).

6.      The separate motion requirement is strictly construed. The Second Circuit declined to consider a party's affidavit of services and reply affidavit--filed following issuance of a sua sponte order to show cause--as a "motion" in *Nuwesra v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 174 F.3d 87, 94 (2d Cir. 1999) (thereby precluding the imposition of an award of attorneys' fees--see § 16(B)(2)

7.    The separate motion requirement is largely dictated by the safe harbor of subdivision (c)(2) According to the 1993 Advisory Committee Note, the purpose of the separate motion requirement, in tandem with the safe harbor provision, is to reduce the volume of Rule 11 motion practice. The specificity requirement is similarly required by the safe harbor provision so as to permit the recipient of the motion to exercise its option to correct or withdraw the offending paper, and thereby obviate presentation of the motion to the judge.

8.    The Second Circuit, while vacating a Rule 11 award for failure to adhere to the separate-motion and safe-harbor requirements, "remand[ed] the case for reconsideration of the sanctions issue," in *Perpetual Secs., Inc. v. Tang*, 290 F.3d 132 (2d Cir. 2002) .

## ROBERT GELTZER DID  NOT RESPECT SAFE HARBOR

**9.**    The Rule provides that the separate motion described above is to be served in ordinary course but <u>is not to be presented to the court if the opposing party withdraws or corrects the challenged paper or contention within **21 days of receipt of the Rule 11 motion**</u>. See Rule 11(c)(2). Failure to follow this procedure requires denial of the motion. *Elliott v. Tilton*, 64 F.3d 213, 216 (5th Cir. 1995) ; *First Bank of Marietta v. Hartford Underwriters Ins. Co.*, 307 F.3d 501, 510-511, 527-528 (6th Cir. 2002) ; *Weinreich v. Sandhaus*, 156 F.R.D. 60, 63 (S.D.N.Y. 1994) , *aff'd without opinion*, 60 F.3d 810 (2d Cir. 1995) ; *Mareno v. Jet Aviation of Am., Inc.*, 155 F.R.D. 74, 77 (S.D.N.Y. 1994) ; *United Food & Commercial Workers Union v. Four B Corp.*, 893 F. Supp. 980, 987 (D. Kan. 1995) . See also *Hadges v. Yonkers Racing Corp.*, 48 F.3d 1320, 1328 (2d Cir. 1995) (reversing sanctions "under all the circumstances, particularly the failure to afford Hadges the

21-day safe-harbor period"); *Radcliffe v. Rainbow Constr.* Co., 254 F.3d 772, 789 (9th Cir. 2001) ("Rainbow did not serve the plaintiffs with the motion in advance of filing and thus did not comply with the 21-day advance service provision. Having not followed this procedure, Rainbow was not entitled to obtain an award from the plaintiffs"); *Martens v. Thomann,* 273 F.3d 159, 178 (2d Cir. 2001) (**reversing sanctions award where neither separate motion filed nor 21-day safe harbor period honored**). This subdivision (c)(2) safe harbor appears to have the effect of reducing Rule 11 volume while accomplishing the goal of the rule--streamlining litigation by eliminating papers and contentions proscribed by the rule--without burdening the Court.

10.    Robert Geltzer had 21 days Safe Harbor Notice dropped by Federal Express overnight service at my office door. Date of preparation of folder states May 31st, 2011. My office received it on 1st June, 2011. If the service is considered proper, which it is not, then the 21 days are over on 22nd June, 2011 at 11:59 PM. Law says 21 days of the receipt of the motion and not 21 days of mailing of Notice. In other words it is the date of receipt which constitute date of service.

11.    Rule 11 is unavailable where the moving party fails to serve a timely "safe harbor" letter. *Ridder v. City of Springfield,* 109 F.3d 288, 297 (6th Cir.1997) (holding that "sanctions under Rule 11 are unavailable, unless the motion for sanctions is served on the opposing party for the full twenty-one day `safe harbor' period before it is filed with or presented to the court").

12.    "[T]he law is clear and consistent and this court's research has uncovered no case in which any court has excused a party from complying with the "safe harbor" provisions of Rule 9011 or Rule 11. *See Hadges v. Yonkers Racing Corp.,* 48 F.3d 1320 (2nd Cir. 1995)(Failure to provide safe harbor period as required by Rule 11 requires reversal of sanctions imposed); *Tornheim v. Federal Home Mort.*

*Corp.*, 988 F.Supp. 279 (S.D.N.Y. 1997)(Request for Rule 11 sanctions denied without respect to merits when request included in summary judgment motion papers, rather than as a separate motion); *Photocircuits Corp. v. Marathon Agents, Inc.*, 162 F.R.D. 449 (E.D.N.Y. 1995) (Failure to comply with safe harbor provision requires denial of motion); *In re Russ* 218 B.R. 461 (Bankr. D. Minn. 1998) *aff'g in part rev'd in part on diff. grnds* 1999 WL 608629 (8th Cir. 1999)(Failure to comply with safe harbor provision of Rule 9011 and filing motion with the court prior to expiration of 21 days was itself sufficient to deny motion); *In re Talon Holdings, Inc.*, 1999 WL 150337 (Bankr.N.D. Ill. 1999)(Failure to comply with safe harbor provision requires denial of motion);*DeShiro v. Branch*, 183 F.R.D. 281 (M.D. Fla. 1998)(Motion that did not comply with safe harbor provision is denied); *United States v. BCCI Holdings (Luxembourg), S.A.*, 176 F.R.D.1 (D.C. 1997)(Rule 11 sanctions will not be imposed when procedure is not complied with); *Progress Fed. Sav. Bank v. Lenders Assoc. Inc.*, 1996 W.L. 57942 (E.D. Pa. 1996)(Rule 11 motion denied on procedural grounds)." Hon. Robert E. Littlefield, Jr., United States Bankruptcy Judge in the Matter of Alfred E. Diamante, Adversary No. 99-91137  USBC, NDNY.

13.    Robert Geltzer, ignore statutory caution.

The advisory committee notes that accompany the 1993 amendment to Rule 11 crystallizes the paramount importance that was placed upon the "safe harbor" provision. The notes aver:

The rule provides that requests for sanctions must be made as a separate motion, *i.e.*, not simply included as an additional prayer for relief contained in another motion. The motion for sanctions is not, however, to be filed until at least 21 days ...after being served. If, during this period, the alleged violation is corrected, as by withdrawing (whether formally or informally) some allegation or contention, the motion should not be filed with

6

the court.

14.    Robert Geltzer fails on all possible construction of service employed here for the service of 21 days Safe Harbor Notice.

a.    Service of Motions and other misceallanous proceedings is governed by FRBP 7005.  Service of Rule 11 Motion is clearly controlled by Rule 7005.

Rule 5 of FRCP states:

b.    *A paper is served under this rule by: (A) handing it to the person;*

### I was not handed any papers.

*(B) leaving it:*
*(i) at the person's office with a clerk or other person in charge or, if no one is in charge, in a conspicuous place in the office; or*
*(ii) if the person has no office or the office is closed, at the person's dwelling or usual place of abode with someone of suitable age and discretion who resides there;*

### Fedex is not an agent of Robert Geltzer as per the Fedex Service Terms.  Service is not personally affected  than it has to be by the agent under this section.

*(C) mailing it to the person's last known address — in which event service is complete upon mailing;*

### Robert Geltzer did not mail it, as Fedex is not considered mail.

*(D) leaving it with the court clerk if the person has no known address;*
*(E) sending it by electronic means if the person consented in writing — in which event service is complete upon transmission, but is not effective if the serving party learns that it did not reach the person to be served; or*

### I did not receive the Notice and Motion via an electronic means.

*(F) delivering it by any other means that the person consented to in writing — in which event service is complete when the person making service delivers it to the agency designated to make delivery.*

### I had not consented to fedex delivery in writing

7

15.    Service of papers by delivery to fedex does not constitute service by mail within the meaning of Rule 5. See Magnuson v. Video Yesteryear, 85 F.3d 1424, 1430-1431 (9th Cir. 1996) (Federal Express is not "mail" for the purposes of Rule 4. *Audio Enterprises, Inc. v. B & W Loudspeakers,* 957 F.2d 406, 409 (7th Cir.1992). In *Audio Enterprises,* the court reasoned that "Rule 4(c)(2)(C)(ii) specifies first class mail, postage prepaid. Federal Express is not first class mail." *Id.* Similarly, the Fifth Circuit has held that Federal Express is not mail for purposes of Fed.R.App.P. 25(a). *Prince v. Poulos,* 876 F.2d 30, 32 n. 1 (5th Cir.1989).

16.    Mark Brouh, attorney for Robert Geltzer states in his Notice Letter that is an overnight mail.   Should we construe overnight Courier service a mailing, then the "mail box rule" provides that service is complete upon mailing. F.R.Civ.P. 5(b)(2)(C). The mail box rule applies in cases under the Code (Rule 9006(e)) and in adversary proceedings (Rule 7005 applying Civil Rule 5(b)). However under this scene, the party who is served by mail is allowed the addition of three days to any prescribed time period that begins to run upon service. Rule 9006(f).  Then 25 June shall be the deadline to withdraw impugned pleadings.

17.    Under all situations, the complained of motion was withdrawn within the safe harbor timing, thus, this court has no jurisdiction on Rule 11 Motion as there is no case or controversy regarding it.

18.    As far as the merits of my motions (which was withdrawn) are concerned, I will address them in the following paragraphs addressing Rule 1927 issues, for they were are delineated clearly in the motion.

## ON MERITS & 28 U.S.C. 1927

19.    Robert Geltzer has not made any request under this Rule as such, he seeks relief only under Rule 11, though he asserts Rule 1927. ( See Letter Notice and Motion Relief)

20.    Robert Geltzer add adhominems to his motion, for clearly the Motion as filed does not rise to the level of conduct what Rule 11 or Rule 1927 is supposed to address.  I will address each accusation of the Trustee.

*18. Rule 9011 parallels Rule 11 of the Federal Rules of Civil Procedure. Rule "establishes an objective standard, intended to eliminate any 'empty-head pure-heart justification for patently frivolous arguments." FED.R.CIV.P.11 advisory committee note (1993). A pleading, motion or other paper violates Rule 11 when it "has been interposed for an improper purpose or where, after    reasonable inquiry, a competent attorney    could not form a reasonable belief that the pleading is well-grounded in fact and warranted by existing law...." The    Carllon Group, Ltd. v. Tobin, 2003    WL 21782650 \*2 (S.D.N.Y.) (citing W.K. Webster & Co. v. American    President Lines, Ltd., 32 F. 3d 66, 670 (2d Cir. 1994) (quoting Eastern    Contr. Corp. v. City of New York, 762 F. 2d 243 (2d Cir. 1985)).*

*19. Rule 9011 provides:*
*(b) Representations to the Court. By presenting to the court (whether by signing, filing, submitting, or later advocating) a petition, pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonableunder the circumstances,-- (1) it is not being presented for any improper  purpose, such as to harass or to cause unnecessary delay or needless increase     in the cost of litigation; (2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification,or reversal of existing law or the establishment of new law;  3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery;*

9

*and (4) the denials of factual contentions are warranted
on the evidence or, if specifically so identified, are reasonably based on lack of
information or belief.*

*20. The Trustee seeks sanctions under subsections (b)(1), (2), (3) and/or (4) of
Rule 9011 because there is ample basis to conclude that Dahiya's motion tactics:
(1) were presented for an improper purpose, (2) are not warranted by
existing law, (3) lack evidentiary support, and (4) the denials of factual
contentions are not warranted on the evidence.*

*21. In determining whether Rule 9011 has been violated, the court must apply
the "reasonableness under the circumstances" standard. See Business Guides,
Inc. v. Chromatic Communications Enterprises, Inc., 498 U.S. 533, 534 (1991).
The analysis focuses on whether a reasonable attorney in like circumstances
would believe his actions to be factually and legally justified. See In re Ford T.
Johnson v. W. Clarkson McDow, Jr., 236 B.R. 510 (D.D.C. 1999) (Citing Artco
Corp. v. Lynnhaven Dry Storage Marina, Inc., 898 F.2d 953, 956 (4th Cir. 1990)
(citations omitted)).*

21.    Paragraphs numbered "18", "19", "20", and 21 are reproduction of statute, case
law and conclusionary allegations and hence need no response.

*B. Dahiya Filed Dismissal Motion 2 for an Improper Purpose*
*22. In the instant case, sanctions are mandated inasmuch as Dahiya filed
Dismissal Motion 2 for an improper purpose. It has been held that "[t]he
purpose of Rule 11 is to deter abusive or frivolous litigation." Granville Gold
Trust-Switzerland v. Commissione Del Fullimento/Inter Change Bank, 924
F. Supp. 397, aff'd, 111 F.3d 123 (2nd Cir. 1997)(citing to Murphy v. Cuomo,
913 F. Supp. 671, 682 (N.D.N.Y. 1996)). "The real purpose of Rule 11 is to
deter 'abusive pleading and motion tactics'", Baranski v. Serhant, 106 F.R.D.
247 (N.D. Ill. 1985).*

22.    Robert Geltzer here makes a conclusionary statement.

*23. First, Dahiya's Dismissal Motion 2 is in violation of Paragraph IA of Your
Honor's October 28, 2010 Administrative Order No. 568 states that: "Whether orally or
in writing, lawyers should avoid vulgar language, disparaging personal remarks or
acrimony toward other counsel . . . ." In paragraph 1a. of Dismissal Motion 2, Dahiya
states that: The reason for this proceeding is vindictiveness of the Trustee, which is
extremely disconcerting and vexatious to respond. The germane source of this complaint
is case number 10- 01145. . . [emphasis added]. In paragraph 1b. of Dismissal Motion 2,
Dahiya states that: Hector Roman, Esq. retained my services to check this
Trustee's abuse of power [emphasis added]. In paragraph 1c. of Dismissal Motion 2,*

*Dahiya states that: Before the adversary proceeding could be heard, the Geltzer withdrew his complaint. Trustee was not happy [emphasis added].*

23.     With tremendous deference to this Administrative Order No. 568, I must respectfully state that the language cited above is not vulgar or disparaging personal remarks or acrimonious. Robert Geltzer does not state and clarify as to what part is vulgar, disparaging or acrimonius and the basis for his impression. Court can access and see for itself the contents of the complaints as which was filed by Robert Geltzer regarding Hector Roman Case and decide for itself.

*24. Second, even if Dahiya's mendacious and bizarre claims are true, whatever happened in another wholly unrelated case has no bearing in the case at bar. Moreover, here, in light of the fact that Dahiya refused to discuss Dismissal Motion 1 with Bruh (see paragraph 13 above) regarding the above mendacious and ad hominem remarks and, moreover, repeated those same remarks in Dismissal Motion 2, the only reasonable conclusion that can be drawn is that Dahiya's abusive pleadings and motion tactics, and the false and spiteful statements contained therein, were intentionally designed to mislead this Court and/or bully the Trustee to discontinue the instant adversary proceeding. Clearly, this conduct is sanctionable under Rule 9011(b)(1) inasmuch as his motions were filed with the improper purpose to harass the Trustee.*

24.     To the best of my recollection, I spoke to Mr. Bruah, however it was only about extension of time to file responsive pleadings and there was no talk about the alleged "mendacious" and "ad hominem remarks."

25.     Facts to the best of knowledge, have to be brought to this court and if I have felt to the best of my knowledge and judgment, then I must report it to this court. Here there is nothing to mislead this court or Robert Geltzer. Adversary Proceeding was not and is not clearly maintainable, as in New York State, it is spousal obligation to take care of each other. Husband has a duty to take care of his wife and children and there is no law that prohibits that. There are hundreds of case law and basic common law jurisprudence upholding the right of the

spouse to be supported by her husband. New York Domestic Relations Law and Family Law clearly puts parties under a duty to provide. However Mr. Geltzer feels otherwise.

26.    If one looks at the content of the impugned motion (withdrawn now), it would show that I did not seek dismissal of the underlying case based on my impression of Mr. Geltzer conduct, it was based on my impression of law and that motion has those legal assertions.

**27.**    Whether a presenter acts with an improper purpose is judged under an objective standard. ABA Standard (H)(2) *Flip Side Productions, Inc. v. JAM Productions, Ltd.*, 843 F.2d 1024, 1036 (7th Cir. 1988) ; *Burkhart v. Kinsley Bank*, 804 F.2d 588, 589 (10th Cir. 1986) ; *Stevens v. Lawyers Mut. Liab. Ins. Co.*, 789 F.2d 1056, 1060 (4th Cir. 1986) ; *Lieb v. Topstone Indus.*, 788 F.2d 151, 157 (3d Cir. 1986) ; *Zaldivar v. City of Los Angeles*, 780 F.2d 823, 831 (9th Cir. 1986) ; *Oliveri v. Thompson*, 803 F.2d 1265, 1275 (2d Cir. 1986).

28.    Robert Geltzer says that I made statement about a past matter in this case, however that was not the ground for seeking dismissal of Complaint relief. See *Oliveri v. Thompson*, 803 F.2d 1265, 1275 (2d Cir. 1986) ("Although [an earlier Second Circuit decision] might be read as leaving open the possibility of imposing Rule 11 sanctions where the attorney [or pro se litigant] is guilty of a subjective violation of the rule, we hold today **that there is no necessary subjective component to a proper Rule 11 analysis.** Removing any subjective good faith component from Rule 11 analysis should reduce the need for satellite litigation when a district court is called upon to impose a Rule 11 sanction").

29.    I am not sure as to why the Trustee feels bullied ("bully the Trustee"). **Harass[ment]," within Rule 11, is not gauged by the effect of the challenged conduct on the opposing party--whether, e.g., the conduct did in fact bother,**

annoy or vex. ABA Standard (H)(2)(b) *Zaldivar v. City of Los Angeles*, 780 F.2d 823, 831-832 (9th Cir. 1986) . *Newton v. Thomason*, 22 F.3d 1455, 1464 (9th Cir. 1994).

30.    Here, increase in litigation, by result of a second motion (made necessary by virtue of amendment complaint) by the trustee alone cannot be an improper purpose. *Storey v. Cello Holdings, L.L.C.*, 347 F.3d 370, 393 (2d Cir. 2003) (reversing improper-purpose sanction after finding factual and legal contentions to be non-frivolous: "Without objectively unreasonable statements, economic disparity and a greater litigiousness do not alone amount to improper purpose").

> *25. Third, Dahiya engaged in tactics clearly designed to thwart the Trustee's administration of the Debtors' estates and, thereby, to attempt to pervert the bankruptcy system. Dahiya's deliberate strategy to delay and to derail the Trustee's administration of the estate began when he failed to return the Trustee's telephone calls and respond to the Trustee's letter regarding the Transfer, all of which are in violation of Your Honor's October 28, 2010 Administrative Order No. 568 which states that: "A lawyer should promptly return telephone calls and answer correspondence reasonably requiring a response." Beyond his failure to comply with Your Honor's October 28, 2010 Administrative Order No. 568, Dahiya failed to even appear at the initial pre-trial conference in connection with the Amended Complaint and, moreover, failed to withdraw Dismissal Motion 1, which motion was mooted by the filing of the Amended Complaint and Dismissal Motion 2.*
>
> *26. These intentional dilatory tactics by Dahiya have been clearly detrimental to the interest of the Debtors' estates and its creditors. Based on the foregoing, Dahiya's conduct is sanctionable under Rule 9011(b)(1).*

31.    I am not sure what telephone call Mr. Geltzer is referencing?  I have never received any call regarding this case from Mr. Geltzer office other than a letter from Mr. Getlzer wherein he demanded return of the retainer paid by  debtor Irina Chatkhan's husband, Leonid Chathan.   As far as the appearance for pretrial conference was concerned. I did appear on that date regarding these matters. I still

don't understand as to what intentional dilatory tactics were adopted by the undersigned which were detrimental to the estate or creditors. Not returning his phone call, when I state that there was none regarding this matter, other than extension issue. If Robert Geltzer really wanted to talk, he could have emailed or faxed, but there was none, other then a demand for return of monies. Mark Bruh had sent my office fax regarding extension, he could have drawn my attention to other settlement issues. They never sought any clarification from my office other than a demand for return of money.

> 27. Fourth, Dahiya's motion tactics have needlessly increased, and continue to increase, the costs of litigation. The Court must determine in considering whether to impose Rule 9011 sanctions, whether, after reasonable inquiry, a competent attorney could form a reasonable belief that the pleading (i.e., Dahiya's Dismissal Motion 2) is well grounded in fact and warranted by existing law or contains a good faith argument for the extension, modification or reversal or existing aw. Desert Palace, Inc., d/b/a Caesars Palace v. Vladimir Baumblit (In re Vladimir Baumblit) 229 B.R. 50 (Bankr. E.D.N.Y. 1999), citing, In re 680 Fifth Avenue Assoc., 218 B.R. 305 (Bankr. S.D.N.Y. 1998).

> 28. Dahiya's Dismissal Motion 1 was not grounded in fact and was filed for an improper purpose, which motion he then filed in substantially the same form. In addition, because he refused to return telephone calls from the Trustee's office, Dahiya made the prospect of discussing the Transfer an impossibility. Indeed, it appears that his only motive is to inflate needlessly litigation costs in order to force a dismissal of the adversary proceeding.

> 29. Finally, the fact that an overly zealous - - wholly invalid - - and unpredictable defense may cause the expenditures of a great deal of time to address that defense, should not bar a trustee from initiating and pursuing a claim on behalf of an estate, and, certainly, not at the outset when the Trustee cannot know he will be barraged by invalid motions, falsehoods, contradictions, and spiteful statements. Thus, the Trustee was compelled to apprise the Court of Dahiya's sanctionable conduct. Accordingly, Dahiya's needless litigation is sanctionable under Rule 9011(b)(1).

32.    Here Robert Geltzer is making an accusation that the impugned motion was not grounded in fact and was for improper purpose, without telling us as to what

was really not grounded in fact and how and what improper purpose was being achieved. The motion was proper and raised proper points of law and reasonable inferences based on Debtor Leo Chatkhan and Ms. Irina Chatkhan interspousal obligation, refinancing of properties to give money to the business owned by debtor, approval of retention by this court. Rule 11 sanctions may not be imposed where an attorney has an objectively reasonable basis to pursue a factual claim. *Oliveri v. Thompson*, 803 F.2d 1265 (2d Cir. 1986), *cert. denied*, 480 U.S. 918, 107 S. Ct. 1373, 94 L. Ed. 2d 689 (1987),

33.    Mr. Geltzer should not have been surprised by all this, he has all the business records of the debtor, its clear that from the account owned by Ms. Irina Chatkhan more than $200,000 had gone to the business of Leo Chatkhan. There were other checks from company PMLD to Leonid Chatkhan the debtor herein. Robert Geltzer has all these accounts. What surprises me is that despite such knowledge, he undertakes to sue my office and me personally.

> 30. As set out in the Trustee's response to Dahiya's Dismissal Motion 2, the Complaint and the Amended Complaint against Dahiya and DLG are supported by sufficient factual detail in the form of references to the Chatkhan's Petition and Schedules, Chatkhan's affidavit of October 15, 2010, Dahiya's declaration in Irina's bankruptcy case, the motion of DLG in Irina's bankruptcy case for it to be retained as counsel to Irina, the May 3, 2010 application thereof, and the Check, more than adequately set forth viable prima facie claims for the avoidance of the fraudulent transfer by the Debtors to the Defendants. They set forth "enough facts to state a claim for relief that is plausible on its face." Patane v. Clark, 508 F.3d 106, 111-112 (2d Cir. 2007) (quoting Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1974 (2007)). For example:
>
> • The Defendants do not deny that they received the $15,000.00 (see ¶9 Dismissal Motion 2: "It was Dahiya Law Group, LLC that received the fund[s] . . . "). However, the Check is made payable to Karam Vir.

34.    Robert Geltzer misunderstand and misquotes law here.  No fraudulent transfer is possible when one spouse has a duty to take care of the other spouse.

Further, the debtor, Leonid Chatkhan was saving his marital assets by retaining the undersigned services for the purposes of prosecuting a chapter 11 case of his wife. Debtor Leo Chatkhan has a duty to support his wife and children, by law and common law duties. Further, as is seen by his affidavit that it is his religious duty to take care of his children and wife.

35.    Check might have been made to Karam Vir, however it is Dahiya Law Offices, LLC that ultimately received the payment and was so declared in the affirmation for retention application which was filed with the court.

> *Despite Dahiya's representations in Dismissal Motion 2 that: "the monies came from business [sic] of both Mr. And Mrs. Chatkhan" (see ¶5 Dismissal Motion 2), Dahiya's declaration under penalties of perjury pursuant to 28 U.S.C. § 1746, in support of the retention of DLG in Irina's bankruptcy, states that: "Leo Chatkhan is paying the retainer, instead of the Debtor [Irina], because the Debtor [Irina] did not have the funds available to pay the retainer. The Check admits and confirms that the Transfer was from the Chatkhan's wholly owned company, and not from "both Mr. And Mrs. Chatkhan." Clearly, Dahiya is attempting to mislead the Court; and*

36.    A look at Proofs of Claim filed in Irina Chatkhan case will show the business liabilities of the Ms. Chatkhan.  She was guarantor on many of contracts and leases.  she provided more than $300,000 to the business of Leonid Chatkhan by refinancing her properties. See (Exhibits checks) She borrowed $200,000 for Marat Rosiki and gave it to the debtor for business.  If the debtor gave 15,000 dollars out that these sums for legal services, where is the fraudulent transfer?

> *Under a balance sheet test, the Debtors were insolvent because their liabilities exceeded their assets. Dahiya alleges that the "Trustee has not done his homework for asserting such speculative statements" that the Debtors were insolvent at the time of the Transfer or rendered insolvent as result of such Transfer. According to the Check, the Transfer was in February 2010[5]; on July 19, 2010, approximately 4 months thereafter, Chatkhan filed for bankruptcy. According to the Chatkhan's Petition and Schedules, his assets total $4,249,500.00, and his liabilities total $7,945,000.00; however, according to the Court's claim register, there are filed claims against the Debtors' estates in excess of $15,800,000.00.*

16

> *33.    Here, the pleadings filed in this Debtors' cases, as well as those filed in Irina's case clearly show that Dahiya and/or DLG received a fraudulent transfer. The Trustee conducted a reasonable inquiry concerning the Transfer to Dahiya and/or DLG and the Trustee made known his intent to Dahiya. Bruh afforded Dahiya the opportunity to withdraw Dismissal Motion 2 at the May 10, 2011 hearing; however, Dahiya, refused to do so. Accordingly, the Court suggested that theTrustee may seek sanctions under Rule 9011.34. Based on the foregoing, Dahiya exposed himself to sanctions under Rule9011(b)(2) and (4), inasmuch as he should have withdrawn Dismissal Motion 2. Trustee has set forth sufficient factual detail with particularity to support a claim against Dahiya and/or DLG; Dahiya's legal contentions are not warranted by existing law, and the denials of factual contentions are notwarranted on the evidence.*

37.    Trustee is wrong in his legal conclusions. What reasonable enquiry did he conduct? He could have asked me if the debtor was the husband of my client Ms. Irina Chatkhan. That fact alone would have sufficient to justify such payment. Further, the motion to dismiss was withdrawn.

> *35. Dahiya's Dismissal Motion 2 contains the following false statements:*
> *• The Defendants further allege that a "substantial sum of monies [sic] is owed [sic] to Ms. Irina Chatkhan by Leonard Chatkhan. There cannot be a fraudulent transfer, if Leonard Chatkhan makes a partial payments [sic] towards that [sic]" (see ¶4 Dismissal Motion 2). However, according to Chatkhan's schedules, Irina is not a claimant against the Debtors' estates and, moreover, has not filed a claim against the Debtors' estates. Additionally, Dahiya is not owed any money from the Debtors' estates and, moreover, Dahiya made it very clear in the DLG retention application in Irina's bankruptcy that: "DLG has explained to Ms. Irina Chatkhan [sic] husband Leo Chatkhan . . . DLG's allegiance and duty is to the Debtor [Irina] first and foremost." Dahiya is not, in any capacity, a representative of the Debtors - - and has not provided any benefit to the Debtors; on the contrary, Dahiya has caused unnecessary expenses to accrue against the Debtors' estates; and*

38.    Trustee once again misunderstand. It is true that I do not have any direct privity to the debtor's estate, however Ms. Chatkhan does.  Yes, substantial monies is owed by Leonard Chatkhan to Irina Chatkhan, however they were not listed, because there is no creditor debtor relationship between husband and wife. Spouses are creditors and debtor only upon commencement of legal proceedings.  The duty to conduct a reasonable inquiry into the law does not require that the presenter ultimately be proved correct in his or her view of the law. A reasonable inquiry requires only that amount of legal

research that is reasonable under the circumstances of the case. *Zaldivar v. City of Los Angeles*, 780 F.2d 823, 830 (9th Cir. 1986) ; *Robinson v. National Cash Register Co.*, 808 F.2d 1119, 1127 (5th Cir. 1987) ; *Brunt v. SEIU*, 284 F.3d 715, 721 (7th Cir. 2002) ("Even 'objectively frivolous filings support but do not compel an inference of unreasonable investigation'").

> • *"This court approved retention of Dahiya Law Offices based on full disclosure in the case of Ms. Irina Chatkhan, hence Mr. Geltzer is precluded from questioning the same. Geltzer attacks that now, without challenging the appointment of undersigned as an attorney for Ms. Chatkhan."* This is the ultimate red herring inasmuch as Mr. Geltzer was appointed Trustee in the Chatkhan's case on October 20, 2010; Dahiya filed the DLG retention application in Irina's bankruptcy on June 15, 2010 - - 4 months prior to Mr. Geltzer's appointment as Trustee.

39.   It is a not a red herring issue, it is a simple legal collateral estoppel issue. However, if the trustee feels that since it is fraudulent transfer, the proper thing to do is to request the court to unwind this retention, seek relief FRBP 9024.   That is my legal thinking on this issue. Its an appointment by court. This appointment would be rendered useless if the parties can attack it afterward under theories of fraudulent transfer etc.  If there is a grievance that comes to light after, they must ask the court to revisit.   However erroneous might the court order, it must be respected as long as it is not being attacked.

> *36. As stated above, Dahiya's statements are blatant lies. Dahiya's mendacious allegations are sanctionable under Rule 9011(b)(3) inasmuch as no reasonable attorney would have leveled these allegations against the Trustee without first reviewing his own pleadings, as well as those filed in the Debtors' cases.*

40.   These are not allegations against the Trustee, the are basic legal principles that we think are proper for our defense and for this case. Rule 11 is not designed "to chill an attorney's enthusiasm or creativity in pursuing ... legal theories." Adv. Com. Note (1983) to Fed. R. Civ. P. 11. It is intended only to chill abuse. Sanctions are therefore inappropriate where there is no clear, binding precedent on the issue and the position asserted is "fairly debatable," *Laborers Local No. 938 v. B.R. Starnes Co.*, 827

F.2d 1454, 1458 (11th Cir. 1987) ; where the issues involved are "close," *Morristown Daily Record, Inc. v. Graphic Communications Union Local No. 8N*, 832 F.2d 31, 32 n. 1 (3d Cir. 1987) ; where the position asserted is "colorable," *Indianapolis Colts v. Mayor & City Council*, 775 F.2d 177, 182 (7th Cir. 1985) ; where the issue is decided in a controlling opinion only after the presenter has asserted a plausible position, *Blackwell v. Department of Offender Rehabilitation*, 807 F.2d 914, 915 (11th Cir. 1987) , *International Ass'n of Machinists v. Boeing Co.*, 833 F.2d 165, 172 (9th Cir. 1987); or where the law is "not yet clearcut," *Fudge v. Penthouse Int'l, Ltd.*, 840 F.2d 1012, 1022 (1st Cir. 1988) . Accord *Forsberg v. Pacific Northwest Bell Tel. Co.*, 840 F.2d 1409, 1422 (9th Cir. 1988) ; *Knight v. H.E. Yerkes & Assoc.*, 675 F. Supp. 139, 146 n. 5 (S.D.N.Y. 1987) ; *Gaiardo v. Ethyl Corp.*, 835 F.2d 479, 483 (3d Cir. 1987) .

> *41. In this case, the majority of these factors weighs in favor of imposing a meaningful sanction against Dahiya. Dahiya's conduct has been willful in the relentless pursuit of the Trustee. As noted, Dahiya's conduct is not an isolated event, but a pattern of activity on his part in this case, as well as in other cases. Clearly, Dahiya intends to injure the Trustee and the Debtors' estates through his needless litigation, mendacious statements and dilatory tactics.*

> *42. Dahiya's Dismissal Motion 2 has also greatly increased administrative expenses. Dahiya claims to be an experienced bankruptcy lawyer and, thus, should have known that the Amended Complaint was well-pleaded. Only a significant monetary sanction will deter repetition of such conduct. 43. As of this date, the Law Offices of Robert L. Geltzer has expended $7,182.0 of legal fees and costs in defending against Dahiya's various motions. The Trustee respectfully requests that Dahiya reimburse the Law Offices of Robert L. Geltzer in the total amount of $7,182.00. 41.*

41.      Trustee accuses the undersigned of pattern of activity, but does not say what kind and in what matters. This Trustee is the one who has a clear pattern of intimidating debtors into submission and getting settlements. He files papers asking for revoking discharge and sues parties without realizing the difficulties of the families and people impacted by his actions. It is not a mystery, one attendance at the 341 meeting would show Robert Geltzer conduct and his intimidating tactics. Most of these debtors are a minority and are in fear of law

and authority with lot of them thinking that Robert Geltzer is a judge. It is not
acceptable, what these debtors are at times made to go through.  Lot of these
debtors, though have solid defenses, however not wanting to fight or because they
do not have money to hire lawyers quietly submit into settlements. Rights are
being chilled. Recently I had gone to attend a 341 meeting of creditors at SDNY
regarding 11-11363-alg Nathaniel Ajunwa and Regina Ajunwa, where Mr. Robert
Geltzer was the trustee.  His way of talking was very rude and belittling in front of
my colleagues.  He further in that open room stated that he will accept $13000
and if not, he will seek sanctions against me.   My colleagues asked me afterward
as to why he was so angry and why he would seek sanctions against me. There are
several motions that has been filed by him which were never necessary in different
actions regarding debtors or their attorneys. I do not wish to take the court
attention from the immediate focus of this case, however it was important to show
that there is something else behind these motions of the trustee.

44:  28 U.S.C.§1927 provides:
*Any attorney or other person admitted to conduct
cases in any court of the United States or any
territory thereof who so multiples the proceedings
in any case unreasonably and vexatiously may be
required by the court to satisfy personally the excess
costs, expenses, and attorney's fees reasonably
incurred because of such conduct.*

45. *"A bankruptcy court may impose sanctions pursuant to 28 U.S.C.
§1927 if it finds that '[a]n attorney's actions are so completely without
merit as to require the conclusion that they must have been undertaken for
some improper purpose such as delay.'" In re Cohoe Indus.
Terminal, Inc., 931 F.2d at 230 (quoting Oliveri v. Thompson 803 F.2d at
1273). To establish the right to obtain sanctions pursuant to 28 U.S.C.
§1927, a party must demonstrate that "an attorney has:
(1) multiplied proceedings; (2) unreasonably and vexatiously; (3) thereby
increasing the cost of the proceedings; (4) with bad faith or with
intentional misconduct." Veneziano v. Long Island
Fabrication & Supply Corp., 238 F. Supp. 2d 683, 693 (D.N.J. 2002).*

> *46. In the instant case, Dahiya knew that the Trustee had conducted a reasonable inquiry in connection with his investigation of the Transfer by the Debtors to Dahiya and/or DLG. Nevertheless, Dahiya filed his improper motions. Consequently, the Trustee had to defend himself against Dahiya's tactics and, in turn, move to sanction Dahiya for those same tactics. "[Section]1927 invites attention to a course of conduct, and imposes a continuing obligation on attorneys to avoid dilatory tactics." Ted Lapidus, S.A. v. Vann, 112 F. 3d 91, 96 (2nd Cir. 1997). As stated above, the tactics used by Dahiya were in bad faith and for the purpose of multiplying proceedings in this case with the result of delaying the Trustee's administration of the Debtors' estates.*
>
> *47. For all of the reasons set forth above, not only has Dahiya exposed himself to sanctions under Rule 9011, but also to sanctions under 28 U.S.C. §1927 for his violation thereof.*

42.    This motion was a nullity to begin with owing to the main relief asked for in this motion under Rule 11 without complying with procedural and substantive rule requirements. Here Robert Geltzer cites conclusionary allegations and the related law, however does not cite the particular conduct which rise to the level of sanctionable under Rule 1927

43.    Robert Geltzer does not satisfy the test of Rule 1927. The four elements prerequisite to the imposition of sanctions under § 1927 are: (1) multiplication of proceedings; (2) unreasonably and vexatiously; (3) thereby increasing the cost of the proceedings; (4) with bad faith or with intentional misconduct. *See, e.g., In re Beers*, 2010 U.S. App. LEXIS 22475 (3d Cir. Oct. 29, 2010) .

44.    Trustee has not brought out any indicia of bad faith in the said motion. The Second and Third Circuits have concluded that a finding of bad faith is a precondition to the imposition of attorneys' fees under § 1927. In *Oliveri v. Thompson*, 803 F.2d 1265 (2d Cir. 1986), the Second Circuit held that a § 1927 sanction "must be supported by a finding of bad faith similar to that necessary to invoke the court's inherent power." Id. at 1273 (citation omitted).

45.    Bad faith is personal to the offender. *Browning Debentures Holders' Comm. v. DASA Corp.*, 560 F.2d 1078, 1089 (2d Cir. 1977) . The bad faith criterion requires more than a showing that a party did not prevail on the merits of a claim, defense or position. It is not satisfied simply by evidence of a weak or legally inadequate case. Nor will mere negligence or improvidence trigger an inherent power sanction. *ViON Corp. v. United States*, 906 F.2d 1564, 1566-1567 (Fed. Cir. 1990); *Autorama*, 802 F.2d at 1287-1288 ; *Pantry Queen Foods, Inc. v. Lifschultz Fast Freight, Inc.*, 809 F.2d 451, 455 (7th Cir. 1987) .*Adams v. Carlson*, 521 F.2d 168, 170 (7th Cir. 1975) ("The standards for bad faith are necessarily stringent"). *R.B. Ventures, Ltd. v. Shane*, 2000 U.S. Dist. LEXIS 10170, at *7 (S.D.N.Y. July 19, 2000) (citing **Treatise**). There must be " 'clear evidence' that the challenged actions 'are without color and [are taken] for reasons of harassment or delay or for other improper purposes.' " *Weinberger v. Kendrick*, 698 F.2d 61, 80 (2d Cir. 1982) ; Accord *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 253 (2d Cir. 1985) ; *Autorama Corp. v. Stewart*, 802 F.2d 1284, 1287-1288 (10th Cir. 1986) ; *Campana v. Muir*, 615 F. Supp. 871 (M.D. Pa. 1985) ; *Weir v. Lehman Newspapers, Inc.*, 105 F.R.D. 574 (D. Colo. 1985) ; *Allen v. Consolidated Rail Corp.*, No. 81 C 1802 (N.D. Ill. Feb. 25, 1982). *Fidelity Nat'l Title Ins. Co. v. Intercounty Nat'l Title Ins. Co.*, 2002 U.S. Dist. LEXIS 11915, at *29-*30 (N.D. Ill. July 1, 2002) ("Bad faith conduct generally involves oppressive or vexatious conduct, or attempts to perpetrate a fraud on the court")

## Vesting of Property interest in New York

46.    The accepted view is that during the marriage neither spouse has a vested interest in the marital property apart from interests accompanied by legal title. However that does not dilute the fact that they are marital assets and with spousal right of equitable distribution.

## Married person's duty to support spouse

47.     Some Trustees and bankruptcy courts have this impression that there is no duty to support unless there is a separation or a divorce or some legal proceeding regarding the same. However that is an improper impression. Positive legal rules create rights and duties.  A legal rule creates a right (or claim-right) when it entitles A to be treated or not treated in some way by B, while imposing a correlative duty on B to treat or not treat A in that way.  In context of marriage, there is a natural duty to support.

48.     New York public policy prevents married couples from entering into support contracts in an attempt to supersede the husband's "natural" duty to support his wife. *Garlock v. Garlock,* 279 N.Y. 337, 340-41, 18 N.E.2d 521 (1939)

## Statutory Duty of Support.

49. A fundamental duty that arises out of the marital relationship is the duty to support one's spouse. See Garlock v. Garlock, 279 N.Y. 337, 340 (1939) ("Marriage is frequently referred to as a contract entered into by the parties, but it is more than a contract; it is a relationship established according to law, with certain duties and responsibilities arising out of it which the law itself imposes. The marriage establishes a status which it is the policy of the State to maintain. Out of this relationship, and not by reason of any terms of the marriage contract, the duty rests upon the husband to support his wife and his family, not merely to keep them from the poorhouse, but to support them in accordance with his station and position in life. . .". In modern times, the duty of one spouse to support the other has been recognized as a mutual obligation, and not just as one that flows from husband to wife. See, e.g., Brissett v. Ashcroft , 363 F.3d 130, 137 (S.D.N.Y.

23

2004) (recognizing that "one spouse [must] support [ ] the other").

50.    The New York Family Court Act codifies the long-standing principle that a spouse who is unable to support him or herself is entitled to support from the other. N.Y. FAM. CT. ACT § 412 ("A married person is chargeable with the support of his or her spouse and, if possessed of sufficient means or able to earn such means, may be required to pay for his or her support a fair and reasonable sum, as the court may determine, having due regard to the circumstances of the respective parties.").

51.    A spouse who has the ability to provide support must do so if the spouse in need is in danger of becoming a "public charge," that is, requiring the financial support of the state. *Id.* § 415. Similarly, if one spouse has become a public charge, the other spouse still has a duty to support. *Id.*

52.    Married spouses owe this duty from the inception of the marriage. *See Galietti v. Galietti*, 394 N.Y.S.2d 50 (2d Dep't 1977) (finding the duty to support arose even where duration of marriage was not long in duration).

53.    And it continues even if husband and wife live apart from one another. *See Steinberger v. Steinberger*, 18 N.Y.2d 492 (1966).

54.    The duty to support one's spouse continues even where the marriage has ceased; N.Y. GEN. OBLIG. LAW § 5-311 (McKinney 2003).

55.     Although the law allows married parties to structure many aspects of their marriage by contract, this duty may not be contracted away. *Id. See also Garlock*, 279 N.Y. at 341 (holding that the duty to support cannot be contracted away).

56.     The duty to support is "means-based." Thus, a spouse is entitled to support that is appropriate given the financial abilities of the other spouse. A spouse that enjoys a comfortable lifestyle cannot simply discharge his or her duty by furnishing the spouse in need with bare necessities. *See* Douglas J. Besharov, Practice Commentary to Section 412 of the Family Court Act, 29A *McKinney Consolidated Law of New York Annotated* at 36 (1999).

57.     For instance, a spouse who allegedly has failed to fulfill his or her duty of support is subject to summons by the Family Court to provide full disclosure of his or her current income, assets and expenses. *See* N.Y. DOM. REL. LAW § 236.

**Spouse's Right to Reimbursement for "Necessaries"**

58.     A spouse may be deemed responsible, by reason of marriage, for expenditures incurred by the other spouse for ordinary goods and services ("necessaries"). *See, e.g., Medical Bus. Assocs. v. Steiner*, 183 A.D.2d 86, 90 588 N.Y.S.2d 890, 892 (2d Dep't 1992) (defining "necessities" as "essential goods and services" including "food, clothing, shelter, and medical care"); Craig A. Bowman & Blake M. Cornish, *A More Perfect Union: A Legal and Social Analysis of Domestic Partnership Ordinances*, 92 COLUM. L. REV. 1164, 1211 n.20 ("Necessaries are those items reasonably appropriate for living, taking into account financial means available, such as food, clothing, a residence, and medical attention.") (citing Homer H. Clark, Jr. & Carol Glowinsky, DOMESTIC RELATIONS: CASES AND PROBLEMS 545 (4th ed. 1990)).

59.     Under the common law doctrine of necessaries, a person who extends
credit to an individual for necessary goods or services may seek to recover
payment from the individual's spouse, so long as such expenses are commensurate
with the spouse's means. *See Our Lady of Lourdes Mem'l Hosp., Inc. v. Frey*, 548
N.Y.S.2d 109 (3d Dep't 1989). "Although the [non-purchasing] spouse cannot be
charged with every expenditure the [purchasing] spouse may choose to make, the
[non-purchasing] spouse will be held responsible for all services and purchases
found to have been necessary to support the [purchasing spouse] in a style
consistent with the [purchasing spouse's] habits and the parties' means." Alan D.
Scheinkman, *New York Law of Domestic Relations* § 2.21, at 60 & n.178 (1996)
(citations omitted). This common law duty is separate and apart from the statutory
duty of support. Full compliance with an order of support, however, completely
discharges a nondebtor spouse from any further support obligations, including the
duty to provide necessaries. *See, e.g., Berkowitz v. Berkowitz*, 373 N.Y.S.2d 184
(2d Dep't 1975).

60.     The right of anyone who extends credit to an individual for necessaries to
recover directly from another person obligated by contract to support would
depend upon a finding that the supplier is a third party beneficiary of that contract.
*See Our Lady of Lourdes*, 548 N.Y.S.2d at 110 (citing *Star Vacuum Stores v.
Bisslessi*, 81 N.Y.S.2d 595 (N.Y. Mun. Ct. 1948))

61.     This common law cause of action originally arose with the now outmoded
legal doctrine that since a wife could not own property, and thus could not incur
any debts, the husband had a duty to pay her debts if such an occasion arose.

26

*Medical Bus. Assocs.*, 183 A.D.2d at 892.

62.    In its decision not to jettison the rule, the Second Department in *Medical Business Associates v. Steiner* observed that its sexist origins notwithstanding, the rule made for good policy: if each spouse is liable for the other, third parties such as medical care facilities will be more willing to provide medical care to a sick spouse, knowing that they can recover if misfortune befalls the ill spouse. 588 N.Y.S.2d. at 892.

63.    Individuals who contemplate marriage can set forth the extent of their support obligations in a pre-nuptial agreement.After the marriage ceremony, a married couple can define its support obligations in what sometimes is called a post-nuptial agreement. A prenuptial or post-nuptial agreement may be enforced like any other contract, provided that it is signed and acknowledged like a deed37 and is not the product of fraud or duress.  Such agreements may be upheld only if the support terms were "fair and reasonable at the time of the making of the agreement" and are not unconscionable. The agreement may not be structured, however, so as to relieve the other party of his or her duty of support if and to the extent that either spouse is in danger of becoming a "public charge. N.Y. GEN. OBLIG. LAW § 5-311; N.Y. FAM. CT. ACT § 463.

64.    A married person may seek a modification of the terms of such an agreement if there has been a substantial, unexpected change of circumstances, and he or she can show that extreme financial hardship will result if the original terms of the agreement are enforced. *See* N.Y. DOM. REL. LAW §326B(9).

65.    Common law doctrine of necessaries has been retained.  "We are persuaded that retaining the common-law rule and applying it in a gender neutral fashion would encourage the extension of credit to dependent spouses who, in an

individual capacity, might lack the ability to purchase necessities or to obtain adequate medical care. The necessaries doctrine has historically facilitated support of the family, and expansion of the doctrine to require spouses to mutually share the obligation of furnishing necessaries is fully consistent with the relatively recent statutory amendments enacted by the Legislature in 1980, which make the duty of a wife to support her husband equal to that of a husband to support his wife, and the duty of a mother to support her children equal to the duty of the father to support his children ( *see*, Domestic Relations Law § 32; Family Court Act §§ 412, 413). Accordingly, the Supreme Court properly refused to dismiss the plaintiff's claims against each of the defendants for medical services rendered to the other. " *Medical Business Associates, Inc. v. Steiner* 183 A.D.2d 86, 588 N.Y.S.2d 890.

66.    Husband cannot be charged with every expenditure that wife may choose to make during their separation, but husband is responsible to wife's creditors for all services and purchases found to have been necessary to support her in a life style consistent with her habits and his means, under New York law. See *Phillips, Nizer, Benjamin, Krim and Ballon v. Rosenstiel* 490 F.2d 509 C.A.N.Y. 1973.

67.    The principle behind the suit for necessaries is that until the marriage relationship is severed, the husband is liable to his wife or his wife's creditors for her support and the support of his children. DeBrauwere v. DeBrauwere, 203 N.Y. 460, 96 N.E. 722 (1911); Laumeier v. Laumeier, 237 N.Y. 357, 364, 143 N.E. 219, 221 (1924); Rudnick v. Tuckman, 1 A.D.2d 269, 271, 149 N.Y.S.2d 809, 811 (1st Dep't 1956); cf. Wanamaker v. Weaver, 176 N.Y. 75, 68 N.E. 135 (1903). Although he cannot be charged with every expenditure that she may choose to make, the husband will be held responsible to the wife's creditors for all services and purchases found to have been necessary to support her in a style consistent

28

with her habits and his means. Keller v. Phillips, 39 N.Y. 351, 354 (1868); DeBrauwere v. DeBrauwere, supra, 203 N.Y. at 464-465, 96 N.E. at 723; Garlock v. Garlock, 279 N.Y. 337, 340, 18 N.E.2d 521, 522 (1939); Grishaver v. Grishaver, 225 N.Y.S.2d 924, 935-936 (Sup.Ct. 1961); Tausik v. Tausik, 38 Misc.2d 11, 235 N.Y.S.2d 776 (Sup.Ct.1962). The wife can maintain her action for necessaries even after the couple separates, as long as she did not cause the separation by her misconduct. Pearson v. Pearson, 230 N.Y. 141, 146, 129 N.E. 349, 350 (1920); cf. Griston v. Rosenfield, 280 App.Dev. 273, 113 N.Y.S.2d 616 (1st Dep't 1952); Steisel v. Gratzer, 3 Misc.2d 816, 66 N.Y.S.2d 526 (Sup.Ct.1947). Only termination of the marriage or a judicial or private financial settlement will relieve the husband of his liability for necessaries under most circumstances. Winter v. Winter, 191 N.Y. 462, 84 N.E. 382 (1908); Turner v. Woolworth, 221 N.Y. 425, 429, 117 N.E. 814, 815 (1917); Elder v. Rosenwasser, 238 N.Y. 427, 432, 144 N.E. 669, 671 (1924); Ashmead v. Sullivan, 198 App.Div. 885, 888, 191 N.Y.S. 205, 206-207 (1st Dep't 1921); Rudnick v. Tuckman, supra; Marson v. Marson, 6 App.Div.2d 786, 175 N.Y.S.2d 82 (1st Dep't 1958), aff'd, 6 N.Y.2d 925, 190 N.Y.S.2d 990, 161 N.E.2d 212 (1959).

68.    Traditionally, the action for necessaries has included food, clothing, shelter, medical bills, and incidental living costs of various sorts, see Laumeier v. Laumeier, supra; Bloomingdale Bros. v. Benjamin, 200 Misc. 1108, 112 N.Y.S.2d 33 (City Ct., New York City, 1952); Abraham & Straus v. Teller, 37 Misc.2d 797, 236 N.Y.S.2d 435 (Civil Ct., New York Co., 1962). However, it has also been held to include necessary counsel fees that the wife may incur, Dravecka v. Richard, 267 N.Y. 180, 196 N.E. 17 (1935); Naumer v. Gray, 28 App.Div. 529, 51 N.Y.S. 222 (2d Dep't 1898); Friou v. Gentes, 11 App.Div.2d 124, 204 N.Y.S.2d 836 (2d Dep't 1960); Gallin v. Stafford, 10 A.D.2d 915, 200 N.Y.S.2d 498 (1st Dep't 1960), aff'd 9 N.Y.2d 894, 216 N.Y.S.2d 705, 175 N.E.2d 832 (1961). Such fees have been allowed as 'necessaries' for purposes ranging from the wife's

29

defense against criminal charges, see, e.g., Elder v. Rosenwasser, supra, to costs incurred in connection with the marital dispute itself, Goldberg v. Keller, 236 App.Div. 541, 260 N.Y.S. 65 (2d Dep't 1932).    Id.

69.    A spouse's duty to furnish necessaries to the other spouse raises an implied in law obligation to pay the supplier of the necessaries, Frank v Carter, 219 NY 35, 113 NE 549; De Brauwere v De Brauwere, 203 NY 460, 96 NE 722; Wanamaker v Weaver, 176 NY 75, 68 NE 135, or one who advances money for the purchase of necessaries, if the money is so applied, see Kenny v Meislahn, 69 AD 572, 75 NYS 81.

70.    Necessaries include shelter, food, clothing and may include whatever is necessary for the protection and support of the spouse "to preserve health, to promote comfort, either of body or mind, or to relieve distress," Lanyon's Detective Agency v Cochrane, 199 NYS 482, such as telephone, gas, electric charges, gratuities, see Altman v Altman, 136 Misc2d 320, 518 NYS2d 763; New York Telephone Co. v Teichner, 69 Misc2d 135, 329 NYS2d 689, and medical and psychiatric services, see Holtzman v Stutz, 125 AD2d 640, 510 NYS2d 10; Altman v Altman, supra.

71.    Whether the goods or services furnished are necessaries depends upon the circumstances of each case and cannot be determined by any hard and fast rule, Wickstrom v Peck, 163 AD 608, 148 NYS 596. The standard of living and the financial status of the husband and wife affect the determination of what constitutes necessaries, see Keller v Phillips, 39 NY 351; Wickstrom v Peck, supra. The spouse's obligation is to be measured by the husband's and wife's financial circumstances, De Brauwere v De Brauwere, 203 NY 460, 96 NE 722; see Medical Business Associates, Inc. v Steiner, 183 AD2d 86, 588 NYS2d 890;

Our Lady of Lourdes Memorial Hospital, Inc. v Frey, 183 AD2d 994, 583 NYS2d
323.

### Counsel fees as necessaries

72.    "Traditionally, the action for necessaries has included food, clothing,
shelter, medical bills, and incidental living costs of various sorts, see Laumeier v.
Laumeier, supra; Bloomingdale Bros. v. Benjamin, 200 Misc. 1108, 112 N.Y.S.2d
33 (City Ct., New York City, 1952); Abraham & Straus v. Teller, 37 Misc.2d 797,
236 N.Y.S.2d 435 (Civil Ct., New York Co., 1962). However, it has also been
held to include necessary counsel fees that the wife may incur, Dravecka v.
Richard, 267 N.Y. 180, 196 N.E. 17 (1935); Naumer v. Gray, 28 App.Div. 529, 51
N.Y.S. 222 (2d Dep't 1898); Friou v. Gentes, 11 App.Div.2d 124, 204 N.Y.S.2d
836 (2d Dep't 1960); Gallin v. Stafford, 10 A.D.2d 915, 200 N.Y.S.2d 498 (1st
Dep't 1960), aff'd 9 N.Y.2d 894, 216 N.Y.S.2d 705, 175 N.E.2d 832 (1961). Such
fees have been allowed as 'necessaries' for purposes ranging from the wife's
defense against criminal charges, see, e.g., Elder v. Rosenwasser, supra, to costs
incurred in connection with the marital dispute itself, Goldberg v. Keller, 236
App.Div. 541, 260 N.Y.S. 65 (2d Dep't 1932). " Id.

73.    Legal services furnished to a wife have been traditionally considered
necessaries which her attorney may recover in a plenary common law action
against the husband. E.g., Elder v. Rosenwasser, 238 N.Y. 427, 144 N.E. 669
(1924); Fernandes v. Rucker, 186 A.D.2d 171, 587 N.Y.S.2d 740 (2d Dep't 1992);
Sassower v. Barone, 85 A.D.2d 81, 447 N.Y.S.2d 966 (2d Dep't 1982); In order to
establish a necessaries claim, it must be shown that the services were reasonably
required, that the spouse to whom the services were furnished is unable to pay for

them, and that the other spouse is financially able to afford them. Irina Chatkhan could not afford it, Leonid Chatkhan could pay for it and he had a duty to do so. See Alter & Alter v. Friedman, 210 A.D.2d 105, 620 N.Y.S.2d 45 (1st Dep't 1994).

74.     While it is not necessary that the attorney establish that services were rendered in reliance upon the credit of the defendant spouse, it is essential that the plaintiff establish that the client spouse, as primary obligor, was unable to satisfy the obligation out of his or her resources. Fernandes v. Rucker, 186 A.D.2d 171, 587 N.Y.S.2d 740 (2d Dep't 1992). [FN5] Gilberg v. Lennon, 212 A.D.2d 662, 622 N.Y.S.2d 962 (2d Dep't 1995).

75.     Here legal fees were very necessary for the protection of home and as well as providing shelter for children. New York law applies the same standard in determining whether legal services are 'necessary' as it does in evaluating other services supplied to the wife. Weidlich v. Richards, 276 App.Div. 383, 94 N.Y.S.2d 546 (1st Dep't 1950). The services must be for the protection and support of the wife, and they must be reasonable and proper, see Lanyon's Detective Agency v. Cochrane, 240 N.Y. 274, 277, 148 N.E. 520, 521 (1925); Steuer v. Hart, 175 App.Div. 829, 162 N.Y.S. 489 (1st Dep't 1916); Rosenblatt v. Wolf, 17 A.D.2d 396, 236 N.Y.S.2d 68 (1st Dep't 1962). Id. Ballon v. Rosenstiel.

76.     In United States v. O'Neill, 478 F.Supp. 852, 854 (E.D.Penn.1979), the court required the wife to pay the legal fees for her husband's criminal defense even though the wrongful conduct of the husband occurred prior to the marriage. The trial occurred after the marriage. The Court relied on the common law in Pennsylvania. In Pennsylvania, "a wife can be liable for the costs of necessaries

32

provided to her husband so long as it is shown she is capable of bearing the financial burden." *Id.* at 854. The *O'Neill* court held that the legal services were necessary. Thus, the wife was responsible for the fees.

77.    Equally relevant here is the duty to support children. Chatkhans are married and have children. New York Family Court Act Section 413 ((a) Except as provided in subdivision two of this section, **the parents of a child under the age of twenty-one years are chargeable with the support of such child** and, if possessed of sufficient means or able to earn such means, shall be required to pay for child support a fair and reasonable sum as the court may determine.)

78.    Court has approved the undersigned retention here in this case. Robert Geltzer challenges it without it in a proper legal way. He is clearly tortiously interfering with the case. It has adversy impacted the proceeding of Ms. Irina Chatkhan case. Its highly improper to derail an ongoing Chapter 11 case by distracting such meritless litigation. Its unfair. There is an order, knowledge and obligation to respect here, Geltzer is ignoring that order is contumacious. Knowingly and willfully ignoring a court order is clearly a contempt of this court.

79.    Contempt is a statutory construction, there must be strictly complied any failure to comply requires dismissal forthwith. Trustee see the bankruptcy estate of the debtor, however does not see the family. Though, there might be two estate, there is only family here. A point " as important as it is easy to overlook" is that "the family unit does not simply co-exist without constitutional system" but " is an integral part of it," for our "political system is superimposed on and presupposes a social system of family units, not just of isolated indivudals. No assumption more deeply underlies our society . . ." See Moore v. East Cleveland, 431 U.S. 494 (1977).

80. Trustee has totally ignored the domestic relations laws and common law doctrines dictating support for the family. The debtor himself says that it is his religious duty to help his family.  Members of this family husband, wife and children consented to be bound by their own religious fate and faith. This principle cannot and should not be undermined by Trustee.  Trustee attacks the religious rights of husband by telling him that the payment of legal fees to the undersigned is fraudulent transfer.  Even under secular principles this retention fees was not fraudulent. Watson v. Jones, 80 U.S. (13 Wall) 679 (1872).

81.     Debtor feels obligated to take care of the family and that must be respected as it is his religious duty to support his family. Wener v. Wener, 301 N.Y.S.2d 237 (N.Y. Sup. Ct. 1969), aff'd, 312 N.Y.S.2d 815 (N.Y. App. Div. 1970).

**Bankruptcy Court does not Jurisdiction**

82.     Section 1927 applies to cases in all federal courts.  Bankruptcy courts have been held not to be "courts of the United States" in other statutory contexts. See, e.g., *In re Perroton*, 958 F.2d 889 (9th Cir. 1992) (28 U.S.C. § 1915). As a result, at least one Circuit--which has affirmed bankruptcy court sanctions issued under § 1927 without considering whether the bankruptcy court is a "court of the United States" within the definition of 28 U.S.C. § 451 ( *In re TCI, Ltd.*, 769 F.2d 441, 448-449 (7th Cir. 1985)--has subsequently reserved on the question whether a bankruptcy court judge may impose § 1927 sanctions. *Matter of Memorial Estates, Inc.*, 950 F.2d 1364, 1369 (7th Cir. 1991) . The lower court cases considering the power of bankruptcy judges to issue § 1927 sanctions are in conflict. Compare *In re Interstate Steel Setters, Inc.*, 65 B.R. 312 (B.R. N.D. Ill. 1986) (yes) with *In re Richardson*, 52 B.R. 527, 531-532 (B.R. W.D. Mo. 1985) (no). *In re Interstate Steel Setters, Inc.*, 65 B.R. 312 (B.R. N.D. Ill. 1986)

34

83.     The Tenth Circuit has concluded that bankruptcy courts are not "courts of the United States" because bankruptcy judges do not enjoy life tenure. *In re Courtesy Inns*, 40 F.3d 1084, 1086 (10th Cir. 1994) .

84.     Article III courts are court of limited jurisdiction and the Article III judiciary jealously guards its powers.  28 USC 1927 statutorily confines the powers to the "courts of United States."  Bankruptcy courts are Article I court.  Power under 1927 is clearly a judicial power and it is being asked for in a matter, on which this court does not have constitutional power to enter a final judgment as per the Supreme Court.  It clearly would be running afoul of constitutional scheme of separation of powers.  The underlying dispute (fraudulent transfer) in this matter is not dealing with public rights  so as assignable to Article I courts, its clearly one within the Article III.  Article III is "an inseparable element of the constitutional system of checksand balances" that "both defines the power and protectsthe independence of the Judicial Branch." *Northern Pipeline Constr. Co.* v. *Marathon Pipe Line Co.*, 458 U. S. 50 (1982)"The 'judicial Power of the United States' . . . can no more be shared" with another branch than "the Chief Executive, for example, can share with the Judiciary the veto power, or the Congress share with the Judiciary the power to override a Presidential veto." *United States* v. *Nixon*, 418 U. S. 683, 704 (1974) (quoting U. S. Const., Art. III, §1). *Stern v. Marshall, 2011 U.S. LEXIS 4791* (Jun. 23, 2011) 2011 U.S. LEXIS 4791

85.     Wherefore, with tremendous respect to this court and to the legal principles that which governs us, it is humbly submitted that this motion is not proper under any circumstances.

Dated: July 5, 2011
New York New York

/s/karamvir.s. dahiya

Karamvir S. Dahiya, Esq.

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**
----------------------------------------------------------X Case 10-46775-CEC

IN RE:

      **LEONID CHATKHAN**

                                      CHAPTER 7

----------------------------------------------------------X Adversary No. 11-1011

ROBERT S. GELTZER.

                         Plaintiff,

v.

KARAMVIR DAHIYA

DAHIYA LAW GROUP, LLC

                         Defendants.

----------------------------------------------------------X

## <u>AFFIDAVIT OF DEBTOR LEONID CHATKHAN.</u>

I, the undersigned debtor respectfully object to the Trustee Robert Geltzer conduct. I submit:

1.    I am Leonid Chatkhan.

2.    I filed for bankruptcy protection to save my business and get out of very expensive loans.

3.    I was exploited by my own creditors.  I had to  pay interest rate over 25% . I had to pay extra 25% interest on arrears. I had to pay interest over interest. I just could not last in that arrangement for long.

1

4. I sought bankruptcy for protection, but here I find my very basic rights are being violated.

5. My right to support my family, take care of my wife and children is affected.

6. My religious rights are being violated by Robert Geltzer. I am not sure if there is any religion that tells men to not to take care of their wives.

7. I need Justice.

8. I gave a sum of around 15,000 dollars to Karam Dahiya my family lawyer to help us, because we were afraid of loosing our home. I had saved that money for family help.

9. This was to save our marriage properties. I wanted to keep roof over my children.

10. I am deeply offended that Robert Geltzer has filed a law suit against Mr. Karam.

11. Mr. Karam tells me that Robert Geltzer wants that money back what I gave to him. I am in a shock that Robert Geltzer calls it fraudulent to care of wife and children.

12. It is unbelievable that I cannot support my own family. It is unbelievable that I cannot protect my own assets. I did not have any assets to hide. In fact by paying $15,000 to Mr. Dahiya as a retainer I was trying to save from immediate foreclosure my children's home, my home, the home of my wife Irina. She is the one who gave me over $350,000 for my business from the money she borrowed from Mr. Narovlianski and another $200,000 from the money she borrowed from Mr. Rozowski. She is the one who personally guaranteed my business loans to Alliance Laundry.

13. There is no law that prevents me from taking care of my wife and children and protect my home.

14. It is my religious duty to take care of my wife and support her.

15. There is no law that tells me not to practice my religion.

16. Robert Geltzer wants to destroy my family.

2

17. Robert Geltzer wants to take away my wife right too. She has right to get a lawyer.

18. My religion tells me *"What God unites, let man not separate."*

19. I am guided by inner religious call. I have a command to take care of my wife. *"Husbands, love your wives as Christ loved the Church and gave Himself up for her."*

20. Home and family to me is what Christ was to Church. Robert Geltzer has tried to interfere in my religious rights, my home and has brought a rift in the family. I need justice for that.

21. I want my peers to decide if I do not have duty to support my wife or practice my religion.

22. Mr. Geltzer is abusing his powers. He is government officer. There is no law that tells that he could interfere in domestic life.

Wherefore, we want a jury trial and a declaration that Mr. Geltzer is violating my religious rights to take care of my family.

ACKNOWLEDGMENT

STATE OF *New York*          }ss.
COUNTY OF *Erie*

on the 22 day of *June* in the year 2011
before me personally came *Leonid Chatkhan*

to me known and known to me to be the person(s) described in and who executed the above instrument, and __he (they) jointly and severally acknowledged to me that __he (they) executed the same.

Leonid Chatkhan  husband of Irina Chatkhan

Notary Public

IRENE M. FELICETTI
Lic. #01FE5036352
Notary Public-State of New York
Qualified in   ERIE COUNTY
My Commission Expires   FEB. 21, 2015

3

**WAYNE M. GREENWALD, P.C.**
*Attorneys for the Debtor*
**475 Park Avenue South - 26ᵗʰ Floor**
**New York, New York 10016**
**(212) 983-1922**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------x

In re:                                                      Chapter 7

     **LEONID CHATKHAN,**                      Case 10-46775-CEC

                **Debtor,**
--------------------------------------------------------x

**ROBERT S. GELTZER, as Trustee,** *etc.*,

              **Plaintiff,**      **Adversary No. 11-1011-CEC**

-against-

**KARAMVIR DAHIYA,**
**DAHIYA LAW GROUP, LLC,**

              **Defendants.**
--------------------------------------------------------x

## DECLARATION OF LEONID CHATKHAN

**TO:  HON. CARLA E. CRAIG,**
       **UNITED STATES CHIEF BANKRUPTCY JUDGE:**

Leonid Chatkhan declares:

## PRELIMINARY STATEMENT

1.    I am the Debtor in this case and have personal knowledge of the facts stated

      herein.

2.    I hereby withdraw my affidavit, sworn to on June 22, 2011, which was filed
in this adversary proceeding (the "Affidavit").

3.    I learned, yesterday, that my attorney did not see or pass on the Affidavit
before I signed it.

4.    Erroneously,  I thought he had.

5.    Since I thought that he approved the Affidavit and some of its statements
had a "ring of truth," I signed the Affidavit and returned it to Mr. Dahiya.

6.    Nevertheless, the Affidavit should be withdrawn.

7.    I offer this declaration to set the record straight.

## THE RETAINER PAYMENT TO MR. DAHIYA

### The Foreclosure on the Family Home

8.    Irina Chatkhan is my wife.

9.    My wife, children and I resided at apartments numbered 14 H and I and 18 I
and J, located at 1311 Brightwater Avenue Brooklyn New York (the
"Apartments").

10.    Some of the Apartments were subject to a foreclosure proceeding.

11.    I was my family's sole source of support and income.

12.    I also thought that,as the family's breadwinner, I was required to support my
family.

- 2 -

Case 1:13-cv-03079-DLI    Document 1-10    Filed 05/24/13    Page 87 of 133 PageID #: 254

13.    Therefore, I had to do something to protect my family's home.

### *The Bankruptcy Decision*

14.    My wife, Irina, owned the Apartments.

15.    My seeking bankruptcy relief would do nothing to remedy the foreclosure
proceedings.

16.    Therefore, Irina filed for Chapter 13 protection.

### *Enter Mr. Dahiya*

17.    During my wife's bankruptcy case, we realized that she needed the
assistance of an attorney.

18.    We learned of Mr. Dahiya and asked him to represent my wife in her
bankruptcy case.

19.    He agreed.

20.    While he represented my wife, Mr. Dahiya also gave me some legal advice
concerning my situation.  None of that advice was contrary to my wife's
interests.

21.    The Affidavit referred to Mr. Dahiya as "my family lawyer."

22.    I cannot say whether my family has a "family lawyer."

- 3 -

23.    However, having entrusted my family's fate to Mr. Dahiya, I may have considered him my family's lawyer.

### *Mr. Dahiya's Retainer Payment*

24.    My wholly owned corporation Hill 135, Inc. ("Hill 135") paid Mr. Dahiya his retainer for representing my wife in her bankruptcy case.

25.    At the time, Hill 135 paid for my family's expenses.

26.    My understanding is that those payments were later treated as income to me on Hill 135's and my tax returns.

27.    Also, my wife loaned or otherwise provided me and my corporations, including Hill 135, with approximately $500,000.

28.    Thus, whether the $15,000 paid to Mr. Dahiya's was my paying support or Hill 135 repaying a loan, I believed and believe that my wife was owed or entitled to that payment.

29.    I saw no difference in paying the money to Irina for her to pay Mr. Dahiya or paying Mr. Dahiya directly.

30.    My wife received a portion of what was due to her.

Case 1:12-cv-02070-CBA  Document 1-19  Filed 05/24/13  Page 89 of 133 PageID #: 256
Case 1-11-01017-cec  Doc 25-1  Filed 07/13/11  Entered 07/13/11 18:08:07

## APOLOGIES TO MR. GELTZER

31.  Yesterday, I reviewed the Affidavit with my attorney.

32.  I realized that the Affidavit said or inferred some unkind things about the
Trustee, Mr. Geltzer.

33.  After conferring with my attorney, I understand better what Mr. Geltzer is
doing and its relationship to the bankruptcy process.

34.  In addition to retracting the Affidavit, I apologize to Mr. Geltzer for any
offense taken.

I declare the foregoing statement of facts to be true and correct to the best of my

knowledge information and belief, under penalties of perjury, pursuant to 28

U.S.C. § 1746.

Dated: Buffalo, New York
        July 13, 2011

/s/ Leonid Chatkhan
Leonid Chatkhan

- 5 -

Case 1-11-01520-ess    Doc 15-3    Filed 03/24/12    Entered 03/24/12 08:54:48
Case 1:13-cv-03079-DLI   Document 1-10   Filed 05/24/13   Page 90 of 133 PageID #: 257
Case 1:11-mc-00524-SLT    Document 1-3    Filed 07/13/11   Page 1 of 21 PageID #: 9

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------X Case: **10-46775 (CEC)**

IN RE:

      **LEONID CHATKHAN**             **Chapter 7**

       **Debtor.**
--------------------------------------------------------X Adversary: **11-1017**

**ROBERT GELTZER**

     **Plaintiff,**

**v.**

**KARAMVIR S. DAHIYA,**

**DAHIYA LAW OFFICES, LLC,**

     **Defendants.**


---------------------------------------------------X

**REQUEST FOR WITHDRAWAL OF REFERENCE**
**BASED ON**
**JURISDICTIONAL GROUNDS AND CONSTITUTIONAL ISSUES.**

Karamvir S. Dahiya of Dahiya Law Offices LLC  respectfully appearing pro se as defendant in the above mentioned proceedings submit the following requesting withdrawal of reference.



Brief Facts:

Case 1-11-01520-ess    Doc 15-3    Filed 03/24/12    Entered 03/24/12 08:54:48
Case 1:13-cv-03079-DLI    Document 1-10    Filed 05/24/13    Page 91 of 133 PageID #: 258
Case 1:11-mc-00524-SLT    Document 1-3    Filed 07/13/11    Page 2 of 21 PageID #: 10

1.      Debtor, Leonid Chatkhan, along with his wife Ms. Irina Chatkhan acquired three real properties and some Laundromats. The Home Apartments are owned by Irina Chatkhan and Laundromats by Leonid Chakthan in their respective names, though they are both marital assets. The wife was about to lose her properties in foreclosure and the husband in order to save the properties retained Dahiya Law Offices for rendering legal services including prosecuting a chapter 11 case in the bankruptcy court. This Chapter 11 case is pending in the bankruptcy court (09-51286). The husband gave a sum of $15,000 as legal fees for the wife's case. After a gap of few months the husband personally filed Chapter 11 case to save his Laundromats and in order to avoid the law suits from the landlord etc. This case was converted to Chapter 7 (10-46775 (CEC). Robert Geltzer was appointed as the Trustee and he has sued the undersigned personally and the office alleging that the fees paid by husband for essential legal services was fraudulent transfer. Robert Geltzer ignores New York State Laws regarding spouse duty to support and other necessary obligations of the spouses under New York Domestic Relations Laws.

2.      We request withdrawal of reference, as we invoke the right to have an adjudication by an Article III court and further jury trial under the same court is requested. Bankruptcy Court has no jurisdiction over the defendants, for the following reasons. Significant and novel questions of non-bankruptcy federal (religious right to support a family, a right to counsel of choice and right to avail an Article III judicial process) and state law (whether the debtor has a common law duty to support his family) permeate this case and mandate withdrawal of the reference

        Section 157(d) of Title 28 of the United States Code provides:

        "The district court may withdraw, in whole or in part, any case or

Case 1-11-01520-ess    Doc 15-3    Filed 03/24/12    Entered 03/24/12 08:54:48
Case 1:13-cv-03079-DLI    Document 1-10    Filed 05/24/13    Page 92 of 133 PageID #: 259
Case 1:11-mc-00524-SLT    Document 1-3    Filed 07/13/11    Page 3 of 21 PageID #: 11

proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown. The district court shall, on timely motion of a party, so withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce."   28 U.S.C. § 157(d).

3.      Pursuant to 28 U.S.C. § 157(d), this Court may *sua sponte* withdraw the reference for a wide variety of reasons . The nature of the questions raised by the debtor affidavit and the Trustee, and their application to the Dahiya case generally, constitute such a reason. Finding mandatory and permissive withdrawal of core bankruptcy claims appropriate because claims involved significant issues of first impression of bankruptcy and New York Domestic Relations Law, New York Family Court Act, Common law duty to support wife and "Doctrine of Necessaries"  that impacts big part of consumer bankruptcy laws and Trustee's powers or its abuse.

4.      In addition, "a litigant can *mandate* withdrawal of the bankruptcy reference where the movant shows that, absent the withdrawal, the bankruptcy judge would be obliged 'to engage in significant interpretation, as opposed to simple application, of federal laws apart from the bankruptcy statute.'" *HSBC*, 2011 U.S. Dist. LEXIS 44126, at *6-7 (citing *City of New York v. Exxon Corp.*, 932 F.2d 1020, 1026 (2d Cir. 1991)); *see also Picard v. JP Morgan Chase & Co.*, 11 Civ. 0913, slip op. at 6 (S.D.N.Y. May 23, 2011) (same); *Enron Power Mktg., Inc. v. Cal. Power Exch. Corp.*, No. 04 Civ. 8177, 2004 WL 2711101, at *2 (S.D.N.Y. Nov. 23, 2004) (providing that the reference of any proceeding that involves "substantial and material consideration" of non-bankruptcy federal law must also be withdrawn) (quoting *Shugrue v. Air Line Pilots Ass'n Int'l*, 922 F.2d 984, 995

Case 1-11-01520-ess    Doc 15-3    Filed 03/24/12    Entered 03/24/12 08:54:48
Case 1:13-cv-03079-DLI    Document 1-10    Filed 05/24/13    Page 93 of 133 PageID #: 260
Case 1:11-mc-00524-SLT    Document 1-3    Filed 07/13/11    Page 4 of 21 PageID #: 12

(2d Cir. 1990)).

5.      Further, where there appears to be a conflict between the Bankruptcy Code and other federal laws, mandatory withdrawal also is required.  Here in the given scene the wife of the debtor had a right to be supported by the debtor her husband and he is under duty to furnish necessaries  and support his family.   Husband claims he has religious duty to support his wife and trustee action in filing a law suit to recover based on fraudulent theory of section 548 of the bankruptcy code violates his religious rights.

6.      Trustee law suit asserts that the fees paid by the debtor to his wife for legal services  in her case is fraudulent. Trustee positions violates New York State family laws and common law protection given to the spouses as well religious rights of the spouses.  A note on the relevant New York laws dictating duties on the spouses is attached herewith.

7.      The defendants here demands a jury trial and right to have this dispute heard by an Article III court.  I have provided a detailed background of legal issues involved and power of the bankruptcy  court vis-à-vis the demands of the defendants. This was necessary to convince this court that power to adjudicate the aforesaid case lies only with this Article III.

**Reasons**

8.      Briefly put, I request for said relief based on the following:

        a.      The grounds, fraudulent transfer (11 U.S.C § 548) asserted
                here in the complaint by Plaintiff Robert Geltzer ("Geltzer")
                does not fall within one of the "exceptional categories"

identified by the Northern Pipeline plurality (involving territorial courts, military tribunals, and public rights) or within its "adjunct" theory. <u>Northern Pipeline Constr. Co. v. Marathon Pipeline Co.</u>, 458 U.S. 50 (1982).

b.    The claim raised and rights asserted here are not the type which are integrated with regulatory scheme. Thomas v. Union Carbide, 473 U.S. 568 (1985).

c.    It does not and cannot satisfy the balancing test applied in Schor Case and there is no consent by the undersigned to jurisdiction here. Commodity Futures Trading Comm'n v. Schor, 478 U.S. 833 (1986).

d.    Statute of fraudulent transfer codified under 11 U.S.C. 548 and labeled as "Core" codified pursuant to 28 USC 157 is immaterial and does not vest such jurisdiction with an Article I court like Bankruptcy Court. Stern v. Marshal 2011 U.S. LEXIS 4791.

e.    Scope of Judicial Review is limited, further, the constitutional claims raised requisitions necessitate broader adjudication .

f.    There is a demand for Jury Trial and thus necessitating an Article III adjudication as Article III and Seventh Amendment tests are coextensive.

Case 1-11-01520-ess    Doc 15-3    Filed 03/24/12    Entered 03/24/12 08:54:48
Case 1:13-cv-03079-DLI    Document 1-10    Filed 05/24/13    Page 95 of 133 PageID #: 262
Case 1:11-mc-00524-SLT    Document 1-3    Filed 07/13/11    Page 6 of 21 PageID #: 14

g.   Defendants invokes right to adjudication by an Article III
Judge. Neither the Defendant nor the incoming parties have
filed a proof of Claim of in this matter.

h.   The germane issue to this case raises independent questions
of New York State common law, NY Domestic Relations
Law and New York Family Laws.

i.   The Supporting Affidavits, the related parties filing
Intervenor applications raises serious constitutional questions,
especially Debtor's Right to religious practice.

j.   The wife of the debtor invoking her right to have an counsel
of her choice.

k.   Request for relief under Barton's doctrine for pressing
counter claims against the Trustee for violating constitutional
rights of the parties and for abuse of process.

l.   Requesting for a broader reliefs as delineated below.

## Exceptional Categories—Marathon Pluarlity Decision.

9   Article III of the Constitution establishes and defines the authority of the
federal judiciary. However, Congress controls (subject to the constitutional
limitation) the jurisdiction of the federal courts. It does so by regulation of
jurisdiction with the help of legislation altering the normal  jurisdictional
structure with respect of certain kind of cases. It also accomplishes this by

Case 1-11-01520-ess    Doc 15-3    Filed 03/24/12    Entered 03/24/12 08:54:48
Case 1:13-cv-03079-DLI    Document 1-10    Filed 05/24/13    Page 96 of 133 PageID #: 263
Case 1:11-mc-00524-SLT    Document 1-3    Filed 07/13/11    Page 7 of 21 PageID #: 15

creation of so called "legislative courts," which replaces Article III courts as primary adjudicators of questions or claims over which Article III courts would otherwise exercise jurisdiction.

10. Supreme Court as well as other federal courts have held several of these regulation of federal court jurisdiction as constitutional. See for example Yakus v. United States, 321 U.S. 414 (1944), where it upheld constitutionality of the jurisdictional restriction included in the Emergency Price Control Act of 1942, sustain it against due process, Sixth Amendment and separation of power challenge. Similarly the Court upheld the Voting Rights Act's jurisdictional olimitation in *South Carolina v. Katzenbach*, 383 U.S. 301 (1966). The Court upheld the 1940 Selective Services Act in Falbor v. United States, 320 US 549 (1944). The Second Circuit in 1948, upheld the constitutionality of the Portal to Portal Act in the matter of *Battaglia v. General Motors Corp*, 169 F.2d 254. The Court upheld the 1996 Death Penalty Statute because it concluded that the Act did not deprive the Court of authority to entertain original habeas petitions. *Felker v. Turpin*, 518, U.S. 651, 658 (1996).

11. However it would be a mistake to consider Congress with unlimited powers to restrict the federal judicial jurisdiction—it has limitations.

12. Federal Judiciary is the constitutional guardian, as such its role cannot be diluted by depriving it of that power by alluding limitless powers to the Congress.

13. Federal courts acting as the Constitutional Guardian have clear jurisdiction to determine whether withdrawal of any claims from its direct jurisdiction pass muster under the Constitution. "We are not at liberty to inquire into the motives of the legislature. We can only examine into its power under the

Case 1-11-01520-ess    Doc 15-3    Filed 03/24/12    Entered 03/24/12 08:54:48
Case 1:13-cv-03079-DLI    Document 1-10    Filed 05/24/13    Page 97 of 133 PageID #: 264
Case 1:11-mc-00524-SLT    Document 1-3    Filed 07/13/11    Page 8 of 21 PageID #: 16

Constitution; and the power to make exception to the appellate jurisdiction of this court is given by express words." Ex. parte McCardle, 74 U.S. (7 Wall.) 506, 514 (1868).

14. The Constitution is the grundnorm—the litmus test for giving effect or voiding any of the  Congress enactments. Marbury v. Madison, 5 U. S. (1 Cranch) 137, 178 (1803).

15. Congress power to alter or withdraw the Judicial powers is checked intrinsically by Article III's definition of Congress authority to control jurisdiction and extrinsically Congress role only as legislative body under the Constitution.

  a.  The external limitations are for examples those limitation as contained the Bill of Rights  and of Article 1 § 9: Prohibiton on access to courts on the basis of race, religion, gender or political affiliation etc. First Amendment, the Equal Protection Clause

  b.  More fundamental to check Congress power is internal limitation presented by Article III itself.

  c.  "Courts created by statute, can have no jurisdiction but such as the statute confers."  Christianson v. Colt Industries Operating Corp., 486 US 800 818 (1988)

Case 1-11-01520-ess    Doc 15-3    Filed 03/24/12    Entered 03/24/12 08:54:48
Case 1:13-cv-03079-DLI    Document 1-10    Filed 05/24/13    Page 98 of 133 PageID #: 265
Case 1:11-mc-00524-SLT    Document 1-3    Filed 07/13/11    Page 9 of 21 PageID #: 17

16. To decide the fraudulent transfer issue here in the Bankruptcy Court would be violative of Article III limits.

     a.     To what extent could Congress may exercise its power conferred under Article I, § 8 to create legal forums/tribunals to resolve claims falling under the subject matter jurisdiction of the Article III courts unencumbered by the tenure limitation and justiciability requirements of Article III—Supreme Court has not resolved it in definite terms.

## Territorial Courts:

     b.     Territorial courts were the first one in which the Supreme Court considered the constitutionality of federal courts where judges were appointed without life tenure. There is allowance for such delegation to Article I Courts. "Although admiralty jurisdiction can be exercised in the states, in those courts only which are established in pursuance of the third article of the constitution." Congress could, in providing for a judicial system for the Florida territory, rely upon its power under Article IV, §3 and allow the territorial legislature to lodge **admiralty jurisdiction courts** not meeting Article III tenure requirements. Chief Justice Marshall, American Insurance Co. v. Canter, 26 U.S. (1 Pet.) 511, 546 (1828).

     i.     This opinion established the constitutionality of courts where judges are appointed for fixed terms and coined the phrase "legislative courts."

     ii.     Here Justice Marshall, however cautioned that though the territorial court could adjudicate a case listed in the Article III catalogue, but it would not exercise "the judicial power conferred by the Constitution." That power, he insisted , was reserved for Article III courts and legislative courts were "incapable of receiving it." id. Canter, 26 U.S. at 546.

Case 1-11-01520-ess    Doc 15-3    Filed 03/24/12    Entered 03/24/12 08:54:48
Case 1:13-cv-03079-DLI    Document 1-10    Filed 05/24/13    Page 99 of 133 PageID #: 266
Case 1:11-mc-00524-SLT    Document 1-3    Filed 07/13/11    Page 10 of 21 PageID #: 18

**Public Rights:**

      c.     In Murray's Lessee v. Hoboken Land and Improvement, Justice Curtis writing for the  unanimous court, focusing on the nature of rights involved rather than the terms of Article III, held that "there are matters **involving public rights**, which may be presented n such form  that judicial power is capable of acting on the,  and which are susceptible of judicial determination, but which congress may or may not bring within the cognizance  of the courts of the untied states, as it may deem either withdraw from judicial cognizance  any matter, which , form its nature, is the subject of a suit at common law, or in equity, or admiralty; nor on the other hand, can it bring under the judicial power a matter which, from its nature, is not a subject for judicial determination"  59 U.S. (18 How. ) 272, 284 (1855).

      i.     Under the public rights doctrine, many disputes between the government and private citizens are decided, at least initially, in administrative agencies or Article I courts. Tax Court is an example of such a court, where judges sit for fifteen years term.

      ii.     In Crowell v. Benson, the Court affirmed Congress powers to make an administrative agency's factfinding binding on a reviewing court, except with respect to "jurisdictional" and "constitutional" facts. Here the court  acknowledged  that an employee compensation  case " is one of private rights, that is, the liability of one individual to another under the law as defined, " and that such cases  were usually tried in state or federal district courts, but insisted  that, in order to maintain the essential attributes of the judicial power, all determination of a fact in constitutional courts must be made by judges." Crowell, 285 U.S. 22 (1932).

Case 1-11-01520-ess    Doc 15-3    Filed 03/24/12    Entered 03/24/12 08:54:48
Case 1:13-cv-03079-DLI    Document 1-10    Filed 05/24/13    Page 100 of 133 PageID #: 267
Case 1:11-mc-00524-SLT    Document 1-3    Filed 07/13/11    Page 11 of 21 PageID #: 19

iii. Crowell allowed legislative courts for private law disputes but set limits on their use. It required that such tribunals be subject to close oversight in Article III courts. Also, in Crowell, the commission could be viewed as an adjunct to federal courts because the commission had no independent authority to enforce its compensation order.

iii.    In Freytag v. Commission of Internal Revenue, the Court underscored "the importance of the [Supreme] Court's time honored reading of the Constitution as giving Congress wide discretion to assign the task of adjudication in cases arising under federal law to federal tribunals." 501 U.S. 868 (1991).

17. Justice Brennan writing for the plurality in the matter of Northern Pipeline pulled back the such allowances to the structural edifice of Article III. Justice Brennan, unequivivocally rejected the idea that the Court's precendent supported a "broad departure from the constitutional command that the judicial power of the United States must be vested in Article III Courts." He confined the precedents to three narrow exceptions to that command: territorial courts, courts martial, and non-Article III t adjudicating public rights. He further articulated that the Public Rights cases arose "between the government and others" and did not implicate "the liability of one individual to other under the law as defined." Justice Brennan used the distinction between "public" and "private" rights—first coined in Murray's lessee v. Hoboken Land and Improvement Co., --to restrict Congress' power , arguing that so-called private rights' cases could not be removed from Art. III courts and delegated to legislative court or administrative agencies," even if judicial review in an Article III court were provided thereafter.    Northern Pipeline Construction v. Marathon Pipe Line Co., 458 U.S. 50 (1982)

a.    The Court here invalidated the Bankruptcy Act
of 1978, holding the Act unconstitutionally
granted Article III judicial power to bankruptcy
court judges who lacked life tenure and
protection against salary diminution.

b.    The court here distinguished between matters
which are inherently judicial (Private rights
disputes), thus to be decided by Article III court
and others (Public Rights) between government
and private citizens amenable to adjudication by
legislative courts. Id.

c.    Justice Brennan, clearly, in order to avoid
casting a constitutionally shadow across the
host of agencies vested with adjudicatory
authority over cases arising between private
parties—starting with workers compensation, as
in Crowell—was forced to reconceptualize
agencies as "adjuncts" to Article III courts
which had been delegated certain "limited
factfinding responsibilities.

d.    However it must be noted that a legislative
court could be considered an adjunct of the
federal district court if the former lacks the
ability to enforce its own judgments and if there
is de novo reviews of its decision by an Article

III judge.  The plurality in this case emphasized that unlike Crowell and Raddatz [United States v. Raddatz 447 U.S. 667 (1980)], the bankruptcy court could not be characterized as adjuncts of Article III courts.

      e.     Court did not find bankruptcy court dealing with specialized  areas having particularized needs and warranting distinctive treatment.

      c.     It is clear here that the Justices in the Northern

18.    Pipe Line were moved in large part by a desire to draw constitutional lines precluding Congress from diminishing the role of Article III courts as guardians of legal rights.

## Regulatory Scheme

19.    However, in a subsequent matter of Thomas v. Union Carbide Agricultural Products Co., the Court explained that "an absolute construction of Article III is not possible:  and noted its longstanding recognition that  "Congress is not barred from acting pursuant to its powers under Article I to vest decision making authority in tribunals that lack the attributes of Article III courts."  Here Justice O'Connor noted that the Northern Pipeline Court had been "unable to agree on the precise scope and nature of Article III's limitations." The Court here drawing lesson from  Crowell case  emphasize that "practical attention to substance rather than doctrinaire reliance on formal categories should inform application of Article III." Justice Brennan concurred in the judgment  n the ground that the rights at

Case 1-11-01520-ess    Doc 15-3    Filed 03/24/12    Entered 03/24/12 08:54:48
Case 1:13-cv-03079-DLI    Document 1-10    Filed 05/24/13    Page 103 of 133 PageID #: 270
Case 1:11-mc-00524-SLT    Document 1-3    Filed 07/13/11    Page 14 of 21 PageID #: 22

stake were "pubic" ones that Congress could permissibly delegate to an administrative agency for resolution.  473  U.S. 568 (1985).

      a.    The court here distinguished Northern Pipeline because here the claim rested on federal law,  and distinguished  Crowell because the federal claim did not replace a pre-existing state law right to compensation. Although the liability of one private party to another was at stake, the right to compensation under FIFRA " is not a purely 'private' right but bears many of the characteristics of a public right dispute, apparently because it arose under a complex regulatory scheme. Id.

      b.    Here the Court concerned about the regulatory aspect of a dangerous product, found that the administrative scheme represented "a pragmatic solution to the difficult problem of spreading the costs of generating adequate information regarding the safety, health,  and environmental impact of a potentially danger product." The arbitration mechanism "incorporates its own system of internal sanctions and relies only tangentially, if at all on the Judicial Branch for enforcement.  The danger of Congress or the Executive encroaching on the Article III judicial powers is at minimum when no unwilling defendant is subjected to judicial enforcement * * *." Finally, "FIFRA limits but does not preclude review of the arbitration proceeding by an Article III court," since awards can be set aside for "fraud, misconduct or misrepresentation" and "review of constitutional error is preserved." Id.

**<u>Balancing Test:</u>**

20. Adhering to the lesson of Crowell, the Supreme Court in the matter of Schor rejected  "any attempt to make determinative for Article III purposes of distinction between public and private rights."  Commodity Futures Trading Commission v. Schor 478 U.S. 833 (1986).

Case 1-11-01520-ess    Doc 15-3    Filed 03/24/12    Entered 03/24/12 08:54:48
Case 1:13-cv-03079-DLI    Document 1-10    Filed 05/24/13    Page 104 of 133 PageID #: 271
Case 1:11-mc-00524-SLT    Document 1-3    Filed 07/13/11    Page 15 of 21 PageID #: 23

21. Under Schor, the Court did not focus on the terms of the Article III's Vesting Clause, bur rather on "the purposes underlying the requirement of Article III." Under this approach, the Court found that, for several reasons, "the congressional authorization of limited CFTC jurisdiction over a narrow class of common law claims as an incident to the CFTC's primary, and unchallenged, adjudicative function does not create a substantial threat to the separation of powers." Id at 854. First, the CFTC exercised narrow authority of Article III counterclaims in a particularized area of law." Id at 852 (quoting Northern Pipeline, 458 U.S. at 85). Second, the scheme left Article III courts with considerable authority to check the agency decisions and denied the agency certain key attributes of Article III powers. Third, invocation of the agency forum depended wholly on the initiative of the parties, mitigating concerns about ay intrusion upon Article III. See Id. 855.

      a.     In both case of Thomas and Schor, the Court distinguished Northern Pipeline and upheld the Constitutionality of the tribune. The Court here adopted the approach that Justice White advocated in his dissent in Northern Pipeline: balancing the adverse impact on Article III values with the justification for use of a legislative court.

      b.     It should be noted here that Schor balancing analysis rested on the waiver of any personal right to an Article III tribunal.

      c.     However, that the balancing approach of Schor is clearly hard to square with the rigid view of the constitutionally mandated separation of power adopted in INS v. Chadha, 462 U.S. 919 (19830 (holding legislative veto provisions constitutionally invalid), and Bowsher v. Synar, 478 U.S 714 (1986) (invalidating a statute designed to trigger federal budgets cuts on

Case 1-11-01520-ess    Doc 15-3    Filed 03/24/12    Entered 03/24/12 08:54:48
Case 1:13-cv-03079-DLI    Document 1-10    Filed 05/24/13    Page 105 of 133 PageID #: 272
Case 1:11-mc-00524-SLT    Document 1-3    Filed 07/13/11    Page 16 of 21 PageID #: 24

the ground that it vested executives in an employee potentially subject to congressional influence).

22.     It seemed that Thomas and Schor decisions had definitely rejected the categorical approach of the Northern Pipeline plurality and the distinction of public and private rights. Justice Brennan resurrected this distinction between "public" and "private" rights that Thomas and Schor seemingly had laid to rest in the case of Granfinanciera, S.A. v. Nordberg. 492 U.S. 33 (1989).

a.     Though this case concerned the Seventh Amendment right to jury trial, the decision had notable implications for Article III as well and ultimately the decision turned on Article III rather than Seventh Amendment.

b.     Court here held that, if a legal cause of action involves "private rights," then Congress is forbidden by Article III from placing adjudicative authority over that cause of action in an non-Article III tribunal: if a cause of action "is not a 'public right' for Article III purposes, then Congress may not assign its adjudication to a specialized non-Article III court lacking the essential attributes of the judicial power." 492 US. At 53 (quoting Crowell v. Benson, 285 U.S. 22, 51 (1932).

Case 1-11-01520-ess    Doc 15-3    Filed 03/24/12    Entered 03/24/12 08:54:48
Case 1:13-cv-03079-DLI    Document 1-10    Filed 05/24/13    Page 106 of 133 PageID #: 273
Case 1:11-mc-00524-SLT    Document 1-3    Filed 07/13/11    Page 17 of 21 PageID #: 25

    c.      Thus, according to the Granfinanciera majority, Congress cannot assign common-law tort, contract and other claims to a non-Article III tribunal; neither can Congress assign statutory rights of its creations to such a tribunal, unless the statutory right either belongs to or exist against the Federal Government or unless the statutory right is "closely intertwined with a federal regulatory program [that] Congress has power to enact." Id. 492 U.S. at 54.

    d.      The right to recover a fraudulent conveyance was a private right, legal in nature, which carried with it the Seventh Amendment right to a jury trial.

23. Here in context of bankruptcy court, the magnitude of intrusion on the Judicial Branch cannot be termed as de minimis. The Plaintiff have asked for relief fraudulent transfer actions and as well as common law, which are traditionally domain of either State Court or the power reserved to Article III judges.

24. Congress amended the impugned bankruptcy Act of 1978 to make the bankruptcy courts adjuncts of Article III courts when they adjudicate state law matters. See The bankruptcy Amendments and Federal Judgeship Act of 1984, Pub. L. No. 98-353, 98 Stat. 333, 28 U.S.C. § 152.

25. However the same is not possible taking into the consideration, the powers wielded by the bankruptcy courts in terms of adjudication and enforcement of claims.

Case 1-11-01520-ess   Doc 15-3   Filed 03/24/12   Entered 03/24/12 08:54:48
Case 1:13-cv-03079-DLI   Document 1-10   Filed 05/24/13   Page 107 of 133 PageID #: 274
Case 1:11-mc-00524-SLT   Document 1-3   Filed 07/13/11   Page 18 of 21 PageID #: 26

26. The trustee labels his complaint and claims under the rubric of "Core Proceedings." However the same does not become a core proceeding of 28 USC 157, by virtue of such label or labeling them as Core cannot be a ground for impermissibly vesting Non-Article III Judge with powers to enter judgment against the defendants.

27. We have to be mindful what Chief Justice Robert reminded us of in the case of Stern v. Marshall ---It is clear that the Bankruptcy Court in this case exercised the "judicial Power of the United States" in purporting to resolve and enter final judgment on a state common law claim, just as the court did in *Northern Pipeline*. No "public right" exception excuses the failure to comply with Article III in doing so, any more than in *Northern Pipeline*." *Stern v. Marshal* 2011 U.S. LEXIS 4791.

28. Plaintiff complaint is of genre or such that which are not easily resolvable by processing of Proofs of Claim.

29. The court further found that, "[N]or can the bankruptcy courts under th 1984 Act be dismissed as mere adjuncts of Article III courts, any more than could the bankruptcy courts under the 1978 Act. The judicial powers the courts exercise in cases such as this remain the same, and a court exercising such broad powers is no mere adjunct of anyone." Id.

## **RIGHT TO AN ARTICLE III ADJUDICATION**

30.      Karamvir S. Dahiya has a constitutional right to have these claims

Case 1-11-01520-ess    Doc 15-3    Filed 03/24/12    Entered 03/24/12 08:54:48
Case 1:13-cv-03079-DLI    Document 1-10    Filed 05/24/13    Page 108 of 133 PageID #: 275
Case 1:11-mc-00524-SLT    Document 1-3    Filed 07/13/11    Page 19 of 21 PageID #: 27

adjudicated by an independent Article III judiciary and not by Bankruptcy Referees/Judges without constitutional assurance of independent Article III Judiciary.

31.      The 1984 amendments to the Code do not require the district courts to refer bankruptcy cases to the bankruptcy courts but allows them to do so. **28 U.S.C.** § 157(a) provides: "Each district court may provide that any or all cases under title **11** and any or all proceedings arising under title **11** or arising in or related to a case under title **11** shall be referred to the bankruptcy judges for the district." The fact that referral is not mandatory, and that non debtor is involuntarily placed before a non-Article III tribunal, he or she has a right to have the matter heard by the court with original jurisdiction.

32.      Further there is no consent by the undersigned to an adjudication by a bankruptcy judge. There is no proof of claim filed by the undersigned, even if the proceeding is one under section 548, it cannot be finally adjudicated barring the consent of the undersigned.

## DEMAND FOR JURY TRIAL.

33.    It is clear that where a party makes a valid jury demand and does not consent to the jurisdiction of the bankruptcy court, a bankruptcy court's determination that the demanding party is entitled to a jury trial mandates withdrawal of the jurisdictional reference to the district court for trial.

34.     By disentitling the undersigned a right to have the matter withdrawn from the bankruptcy court would result in conferring a distinct jurisdiction on the bankruptcy court which clearly violates the balance of power.

35.     The trustee might say that let bankruptcy court handle the pre trial stage and when the case is ripe, it could go to District Court. However that violates the basic premise of constitutional law and is clearly contrary to the holdings of Northern Pipeline and Granfinanciera.

36.     The Right to an Article III adjudication and demand for jury trial are co-extensive.

37.     Once a demand for an Article adjudication is made, it is must be met at all stages of proceedings.

38.     The judicial power to withdraw the reference initially granted to bankruptcy courts is pivotal in complying with Article III, and Federal Rule of Bankruptcy Procedure 5011, as promulgated by the Supreme Court, specifically provides that a *district court judge* must determine whether to withdraw the reference from the bankruptcy court.

## CONCLUSION

The Trustee law suit  and the conflict with the rights and duties  of the debtor along with the right of the undersigned to have this dispute heard by an Article III court  and a jury demand have raised numerous issues that require significant interpretation of  Constitutional rights, New York Domestic Relations

Case 1-11-01520-ess    Doc 15-3    Filed 03/24/12    Entered 03/24/12 08:54:48
Case 1:13-cv-03079-DLI    Document 1-10    Filed 05/24/13    Page 110 of 133 PageID #: 277
Case 1:11-mc-00524-SLT    Document 1-3    Filed 07/13/11    Page 21 of 21 PageID #: 29

Laws, and their relationship with the Bankruptcy Code. These issues are of great consequence for hundreds of consumer debtors seeking bankruptcy protection in New York everyday and are confronted with the said issues and need protection of the courts.The reference of this adversary proceeding, therefore, is subject to mandatory withdrawal to the District Court.

Dated: New York, New York
May July 12, 2011

DAHIYA LAW OFFICES, LLC DAVIS POLK

By: /s/ KARAMVIR S. DAHIYA
KARAMVIR S. DAHIYA, ESQ. PRO SE
350 BROADWAY SUITE 412
New York, New York 10013
Telephone: (212) 766 8000
Facsimile: (212) 766 8001

**WAYNE M. GREENWALD, P.C.**
*Attorneys for the Debtor*
**475 Park Avenue South - 26ᵗʰ Floor**
**New York, New York 10016**
**(212) 983-1922**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------x
In re:                                                    Chapter 7

     **LEONID CHATKHAN,**                    Case 10-46775-CEC


          **Debtor,**
-------------------------------------------------------x
**ROBERT S. GELTZER, as Trustee,** *etc.,*


             **Plaintiff,**    **Adversary No. 11-1011-CEC**

-against-

**KARAMVIR DAHIYA,**
**DAHIYA LAW GROUP, LLC,**

-------------------------------------------------------  **Defendants.**
-------------------------------------------------------x

## DECLARATION OF  LEONID CHATKHAN

**TO:  HON.  CARLA E. CRAIG,**
      **UNITED STATES CHIEF BANKRUPTCY JUDGE:**


Leonid Chatkhan declares:

## PRELIMINARY STATEMENT

1.    I am the Debtor in this case and have personal knowledge of the facts stated

    herein.

Case 1-11-01520-ess    Doc 15-3    Filed 03/24/12    Entered 03/24/12 08:54:48

Case 1:13-cv-03070-DLI    Document 1-19    Filed 05/24/13    Page 112 of 133 PageID #: 279
Case 1-11-01017-cec    Doc 25    Filed 07/13/11    Entered 07/13/11 18:08:02

2.  I hereby withdraw my affidavit, sworn to on June 22, 2011, which was filed in this adversary proceeding (the "Affidavit").

3.  I learned, yesterday, that my attorney did not see or pass on the Affidavit before I signed it.

4.  Erroneously, I thought he had.

5.  Since I thought that he approved the Affidavit and some of its statements had a "ring of truth," I signed the Affidavit and returned it to Mr. Dahiya.

6.  Nevertheless, the Affidavit should be withdrawn.

7.  I offer this declaration to set the record straight.

## THE RETAINER PAYMENT TO MR. DAHIYA

### The Foreclosure on the Family Home

8.  Irina Chatkhan is my wife.

9.  My wife, children and I resided at apartments numbered 14 H and I and 18 I and J, located at 1311 Brightwater Avenue Brooklyn New York (the "Apartments").

10. Some of the Apartments were subject to a foreclosure proceeding.

11. I was my family's sole source of support and income.

12. I also thought that,as the family's breadwinner, I was required to support my family.

- 2 -

13.    Therefore, I had to do something to protect my family's home.

### *The Bankruptcy Decision*

14.    My wife, Irina, owned the Apartments.

15.    My seeking bankruptcy relief would do nothing to remedy the foreclosure proceedings.

16.    Therefore, Irina filed for Chapter 13 protection.

### *Enter Mr. Dahiya*

17.    During my wife's bankruptcy case, we realized that she needed the assistance of an attorney.

18.    We learned of Mr. Dahiya and asked him to represent my wife in her bankruptcy case.

19.    He agreed.

20.    While he represented my wife, Mr. Dahiya also gave me some legal advice concerning my situation.  None of that advice was contrary to my wife's interests.

21.    The Affidavit referred to Mr. Dahiya as "my family lawyer."

22.    I cannot say whether my family has a "family lawyer."

23.    However, having entrusted my family's fate to Mr. Dahiya, I may have considered him my family's lawyer.

### *Mr. Dahiya's Retainer Payment*

24.    My wholly owned corporation Hill 135, Inc. ("Hill 135") paid Mr. Dahiya his retainer for representing my wife in her bankruptcy case.

25.    At the time, Hill 135 paid for my family's expenses.

26.    My understanding is that those payments were later treated as income to me on Hill 135's and my tax returns.

27.    Also, my wife loaned or otherwise provided me and my corporations, including Hill 135, with approximately $500,000.

28.    Thus, whether the $15,000 paid to Mr. Dahiya's was my paying support or Hill 135 repaying a loan, I believed and believe that my wife was owed or entitled to that payment.

29.    I saw no difference in paying the money to Irina for her to pay Mr. Dahiya or paying Mr. Dahiya directly.

30.    My wife received a portion of what was due to her.

## APOLOGIES TO MR. GELTZER

31.    Yesterday, I reviewed the Affidavit with my attorney.

32.    I realized that the Affidavit said or inferred some unkind things about the

Trustee, Mr. Geltzer.

33.    After conferring with my attorney, I understand better what Mr. Geltzer is

doing and its relationship to the bankruptcy process.

34.    In addition to retracting the Affidavit, I apologize to Mr. Geltzer for any

offense taken.

I declare the foregoing statement of facts to be true and correct to the best of my

knowledge information and belief, under penalties of perjury, pursuant to 28

U.S.C. § 1746.

Dated: Buffalo, New York
        July 13, 2011

/s/ Leonid Chatkhan
Leonid Chatkhan

- 5 -

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------X Case: **Case Nos. 10-46775**
IN RE:

       LEONID CHATKHAN          Chapter 7


       Debtor.
--------------------------------------------------------X Adversary: **Adv. Pro. No. 11-1017**

ROBERT GELTZER

       Plaintiff,

v.

KARAMVIR S. DAHIYA,

DAHIYA LAW OFFICES, LLC,

       Defendants.
---------------------------------------------------X


### RIGHT TO ADJUDICATION BY ARTICLE III
### AND
### JURY TRIAL DEMANDED

#### <u>NOTICE</u>

BOTH DEFENDANTS KARAMVIR S. DAHIYA AND DAHIYA LAW OFFICES, LLC IS NOT
VOLUNTARILY FILING THIS ANSWER IN BANKRUPTCY COURT, BUT IS BEING
FILED UNDER PROTEST AS THIS COURT HAS NO JURISDICTION AND ANSWER TO
THIS COMPLAINT SHALL BE NOT BE CONSTRUED AS A CONSENT TO THE
JURISDICTION OF THIS COURT. ANSWER IS BEING FILED FOR THE PURPOSES OF
ARTICLE III ADJUDICATION.

#### <u>JURISDICTION  AND VENUE</u>


1.     The bankruptcy court does not have jurisdiction of this matter.

1

2.    Pursuant to Section 157 of Title 28, a motion is being filed to withdraw the reference to the District Court, including but not limited to the following reasons:

A.    The defendants has a right to right to Jury Trial.  See Granfianciera, S.A. Nordberg, 492 U.S. 33 (1989) and the Seventh Amendment.

B.    The defendants are entitled to an Article III adjudication of the underlying dispute.

C.    The defendants wants Jury Trial in a "Court of United States," presided by Article III adjudicator, thus do not consent to a jury trial before bankruptcy court.

D.    Judicial efficiency is served by withdrawing the reference with regard to all of the proceedings.

E.    There are constitutional issues raised in this case by the impacted parties.

F.    The plaintiff has embarked on an abuse of authority and thus, defendants along with likely intervenors and would request relief under the Barton Doctrine for counter claims.

G.    The defendants have not filed proof of claim in the instant case, thus jurisdictional objections is not waived

H.    For such other reasons, set forth in defendant's motion to withdraw the reference from bankruptcy court as being filed.

2

Answering the complaints, the defendants state as follows:

**Jurisdiction and Venue**

1.  State of Jurisdiction stated in Paragraph 1 of the complaint is admitted.

2.  Legal statement made in Paragraph numbered 2 is denied.

3.  Statements of authority made in paragraph numbered 3 are denied as explained in Affirmative defenses.

4.  Paragraphs numbered 4, 5, 6, 7 and 8, 10 and 11 are admitted.

5.  Paragraph numbered "9" of the complaint needs no response as it is the prayer of the Plaintiff.

6.  Paragraph numbered 12 is denied as a wrong proposition of law.

7.  Paragraph numbered 13 is denied as a wrong statement.

8.  Paragraph numberd 14 needs no response as it is statement of law.

9.  Paragraph numbered 15 and 16 are denied.

10. Paragraph numbered 17 and 18 are admitted.

11. Paragraph numbered 19  and its contents are denied as wrong proposition of law

12. Paragraphs numbered 20, 21, 22 and 23 are denied.

**FIRST AFFIRMATIVE DEFENSE.**

13. Defendants repeat and reallege each of the allegations contained in paragraphs 1 through 12 of this Answer.

14. Bankruptcy Court has no jurisdiction to entrain this controversy.

3

**SECOND AFFIRMATIVE DEFENSE**

15.     The claims in the Complaint are barred, in whole or in part by the doctrines of waiver and/or estoppel.

**THIRD AFFIRMATIVE DEFENSE**

16.     The plaintiff does not have cause of action and or equitable basis under federal or common law to file this proceeding.

**FOURTH AFFIRMATIVE DEFENSE.**

17.     The Trustee fails in fact and law to state any basis of claim against the defendants.

**FIFTH AFFIRMATIVE DEFENSE**

18.     The Debtor has a continuing obligation to support his wife and thus under the New York Domestic Relations Laws and Common Law Doctrine of Necessaries, obligatory payments and or payments of legal fees for his wife case for preserving and filing legal claims is not a fraudulent transfer.

**SIXTH AFFIRMATIVE DEFENSE**

19.     The Debtor derived benefit of preserving marital assets with his equitable claims to such properties.

**SEVENTH AFFIRMATIVE DEFENSE**

20.     The defendants' client Ms. Irina Chatkhan had contributed more than $500,000 towards the debtor business, thus payment of $15,000 is not a fraudulent transfer.

4

## EIGHTH AFFIRMATIVE DEFENSE

21.     Trustee might label this proceeding as a core proceeding, this court does not have jurisdiction to decide the controversy. First calling a claim as Core is not enough to vest the bankruptcy court with jurisdiction. The purportedly fraudulently transferred property is not property of the estate until a court determines it was fraudulently transferred, thus its not amenable to turnover before such declaration. *In re Colonial Realty Co.* FDIC v. Hirsch (*In re* Colonial Realty Co.), 980 F.2d 125, 131 (2d Cir. 1992) (citing *In re Saunders*, 101 B.R. at 305).

22.     The Complaint fails for lack of proper and necessary parties.

## REQUEST FOR RELIEF
## FROM
## BARTON DOCTRINE SHIELD & COUNTER CLAIMS

23.     The Defendants Request the United State District Court, Eastern District of new York (Court of original jurisdiction and thus an appointee of Trustee under the Barton's Doctrine) relief to seek compensation against the Trustee for abuse of process and tortiously interfering with attorney client relationship. Barton Doctrine, which provides that, as a general matter, "before suit is brought against a receiver leave of the court by which he was appointed must be obtained." Barton v. Barbour, 104 U.S. 126, 128 (1881) ; Lebovits v. Scheffel, 101 F.3d 272, 276 (2nd Cir. 1996) (noting that courts have "required leave of the appointing court before a suit may go forward in another court against the trustee.").

5

Case 1-11-01520-ess    Doc 15-3    Filed 03/24/12    Entered 03/24/12 08:54:48
Case 1-11-01017-cec    Doc 18    Filed 07/05/11    Entered 07/05/11 22:27:35

Case 1:13-cv-03079-DLI    Document 1-10    Filed 05/24/13    Page 7 of 23 PageID #: 288

24.         The sum of compensation for counterclaims is to be decided in
the trial. However the Defendants are not in any matter
consenting to the bankruptcy court jurisdiction, should it be
found that the Bankruptcy Court is the appointing authority of
this Trustee.

**DEMAND FOR JURY TRIAL**

Defendants  and counterclaimants hereby demand a jury trial on all issues in the
Complaints and Counterclaims.

Dated: July 5, 2011
New York New York

/s/Karamvir s. Dahiya

BY:_____
            Karamvir S. Dahiya, Pro Se
            And for Dahiya Law Offices, LLC

6

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------X Case 10-46775-CEC
IN RE:

    **LEONID CHATKHAN**

                                CHAPTER 7

------------------------------------------------------------X Adversary No. 11-1011

ROBERT S. GELTZER.

                    Plaintiff,

v.


KARAMVIR DAHIYA

DAHIYA LAW GROUP, LLC

                    Defendants.

------------------------------------------------------------X


**<ins>AFFIDAVIT OF DEBTOR LEONID CHATKHAN</ins>.**


I, the undersigned debtor respectfully object to the Trustee Robert Geltzer conduct. I submit:

1.     I am Leonid Chatkhan.

2.     I filed for bankruptcy protection to save my business and get out of very expensive loans.

3.     I was exploited by my own creditors.  I had to  pay interest rate over 25% . I had to pay extra 25% interest on arrears. I had to pay interest over interest. I just could not last in that arrangement for long.

1

4.    I sought bankruptcy for protection, but here I find my very basic rights
      are being violated.

5.    My right to support my family, take care of my wife and children is
      affected.

6.    My religious rights are being violated by Robert Geltzer. I am not sure if
      there is any religion that tells men to not to take care of their wives.

7.    I need Justice.

8.    I gave a sum of around 15,000 dollars to Karam Dahiya my family lawyer
      to help us, because we were afraid of loosing our home. I had saved that
      money for family help.

9.    This was to save our marriage properties. I wanted to keep roof over my
      children.

10.   I am deeply offended that Robert Geltzer has filed a law suit against Mr.
      Karam.

11.   Mr. Karam tells me that Robert Geltzer wants that money back what I
      gave to him. I am in a shock that Robert Geltzer calls it fraudulent to care
      of wife and children.

12.   It is unbelievable that I cannot support my own family. It is unbelievable
      that I cannot protect my own assets. I did not have any assets to hide. In
      fact by paying $15,000 to Mr. Dahiya as a retainer I was trying to save
      from immediate foreclosure my children's home, my home, the home of
      my wife Irina. She is the one who gave me over $350,000 for my business
      from the money she borrowed from Mr. Narovlianski and another
      $200,000 from the money she borrowed from Mr. Rozowski. She is the
      one who personally guaranteed my business loans to Alliance Laundry.

13.   There is no law that prevents me from taking care of my wife and children
      and protect my home.

14.   It is my religious duty to take care of my wife and support her.

15.   There is no law that tells me not to practice my religion.
16.   Robert Geltzer wants to destroy my family.

2

17. Robert Geltzer wants to take away my wife right too. She has right to get a lawyer.

18. My religion tells me *"What God unites, let man not separate."*

19. I am guided by inner religious call. I have a command to take care of my wife. *"Husbands, love your wives as Christ loved the Church and gave Himself up for her."*

20. Home and family to me is what Christ was to Church. Robert Geltzer has tried to interfere in my religious rights, my home and has brought a rift in the family. I need justice for that.

21. I want my peers to decide if I do not have duty to support my wife or practice my religion.

22. Mr. Geltzer is abusing his powers. He is government officer. There is no law that tells that he could interfere in domestic life.

Wherefore, we want a jury trial and a declaration that Mr. Geltzer is violating my religious rights to take care of my family.

ACKNOWLEDGMENT
STATE OF New York
COUNTY OF Erie } SS.

On this 22 day of June in the year 2011

before me personally came Leonid Chatkhan

to me known and known to me to be the person(s) described in and who executed the above instrument, and ...he (they) jointly and severally acknowledged to me that ...he (they) executed the same.

Leonid Chatkhan  husband of Irina Chatkhan

Notary Public

IRENE M. FELICETTI
Lic. #01FE5030362
Notary Public-State of New York
Qualified in  ERIE COUNTY
My Commission Expires  FEB. 21, 2015

3

Case 1:12-cv-02078-DLI   Document 1-20   Filed 05/24/12   Page 125 of 133 PageID #: 292
Case 8-09-08315-ast    Doc 32-1    Filed 02/19/10    Entered 02/19/10 15:52:37

Dahiya Law Offices LLC
350 Broadway
Suite 412
New York, NY 10012
Karamvir S. Dahiya (KD 9738)
Attorney for the Defendants.

**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
AT CENTRAL ISLIP**

---

In re:

**MOHAMMED P. SHAIKH,**

　　　　　　**Debtor.**

**CHAPTER 7**
　　**Case No.: 08-72840-AST**

---

**R. KENNETH BARNARD, as Trustee of
The Estate of Mohammer P. Shaikh,
　　　　Plaintiff,**

　　　　-against-

**MOHAMMED ARIF and
LAILUN N. SHAIKH,**

　　　　**Defendants.**

Adv. Pro. No. **09-08315-ast**

**ANSWER AND
COUNTERCLAIMS**

---

　　　　Note: It is respectfully submitted that this answer is filed under protest with Bankruptcy Court, since the defendants have the right to have their case adjudicated by an Article III Judge or by a State Court. The issue of adjudication as decided by Hon. Judge J. Seybert is being appealed with the Second Circuit Court of Appeal. Filing of this answer is not voluntary submission to this jurisdiction of the bankruptcy court and is without prejudice to the rights as being asserted in the Appeal.

1

Case 1-11-01520-ess    Doc 15-4    Filed 03/24/12    Entered 03/24/12 08:54:48

Case 1:12-cv-00978-JBW    Document 1-10    Filed 02/19/10    Entered 02/19/10 15:52:37    PageID #: 293
Case 8-09-08316-las    Doc 31-1    Filed 02/19/10    Entered 02/19/10 15:52:37

Defendants, Mohammed Arif (hereinafter "Arif") and Lailun N. Shaikh ("Shaikh") (together, "Defendants"), by and through their undersigned attorney, hereby present the following Answer and Counterclaims to Plaintiff's Complaint:

## ANSWER

1. The first part of Plaintiff's paragraph 1 states a conclusion of law to which Defendants offer no denial or admittance.  Defendants specifically deny the second part of this paragraph.

2. Paragraph 2 states a conclusion of law to which Defendants offer no denial or admittance.

3. Paragraph 3 states a improper conclusion of law  as state fraudulent actions are not core proceedings as mentioned under 544 of Title 11 .

4. Paragraph 4 states a conclusion of law to which Defendants offer no denial or admittance.

5. Defendants admit the allegations in paragraph 5 to the extent of their knowledge.

6. Defendants admit the allegations in paragraph 6 to the extent of their knowledge.

7. Defendants admit the allegations in paragraph 7.

8. Defendants admit the allegations in paragraph 8.

9. Paragraph 9 states a conclusion of law to which Defendants offer no denial or admittance.

10. Defendants deny in general the allegations in paragraph 10.

11. Defendants deny in general the allegations in paragraph 11.

12. Defendants offer no answer to this as it is a matter of public record.

13. Defendants deny in general the allegations in paragraph 13.

2

14. Defendants deny in general the allegations in paragraph 14.

15. Defendants deny in general the allegations in paragraph 15.

16. Defendants deny allegation of paragraph 16.

17. Defendants deny in general the allegations in paragraph 17.

18. Defendants specifically deny the allegations in paragraph 18.

19. Defendants specifically deny the allegations in paragraph 19.

20. Defendants deny in general the allegations in paragraph 20.

21. Defendants deny in general the allegations in paragraph 21.

22. Defendants specifically deny the allegations in paragraph 22.

23. Defendants have insufficient knowledge of the information stated in paragraph 23 to offer a denial or admittance.

24. Defendants specifically deny the allegations in paragraph 24.

25. Defendants deny in general the repeated and realleged allegations in paragraph 25.

26. Defendants deny allegation of paragraph 26.

27. Paragraph 27 allegations are denied.

28. Paragraph 28 states a conclusion of law of which Defendants have no knowledge. Furthermore, Defendants specifically deny the allegations in paragraph 28.

29. Defendants deny in general the repeated and realleged allegations in paragraph 29.

30. Defendants have insufficient knowledge of the information stated in paragraph 30 to offer a denial or admittance. Furthermore, Defendants deny in general the allegations in paragraph 30.

3

Case 1-11-01520-ess    Doc 15-4    Filed 03/24/12    Entered 03/24/12 08:54:48

Case 1:12-cv-02078-DLI    Document 1-20    Filed 02/19/10    Page 129 of 133 PageID #: 295
Case 8-09-08315-ast    Doc 32-1    Filed 02/19/10    Entered 02/19/10 15:52:37

31. Paragraph 31 states is denied as the plaintiff alleges improper conclusions of law.

32. Paragraph 32 states a conclusion of law of which Defendants have no knowledge. Furthermore, Defendants specifically deny the allegations in paragraph 32.

33. Paragraph 33 allegations are denied as once again the plaintiffs are speculating wildly without realizing or trying to the know the underlying realities.

34. Defendants deny in general the repeated and realleged allegations in paragraph 34.

35. Defendants have insufficient knowledge of the information stated in paragraph 35 to offer a denial or admittance. Furthermore, Defendants deny in general the allegations in paragraph 35.

36. Paragraph 36 states improper conjectures and ad hominem guestimates as the plaintiff did not do his homework. Debtor received more than his entitlement.

37. Paragraph 37 is denied as the plaintiff once again attempts to reach conclusion of law of which has not foundation in the underlying factual situations.

38. Paragraph 38 states a conclusion of law of which Defendants have no knowledge. Furthermore, Defendants specifically deny the allegations in paragraph 38.

39. Paragraph 39 states an improper conclusions of law and is without any basis under the underlying facts. Furthermore, Defendants specifically deny the allegations in paragraph 39.

40. Defendants deny in general the repeated and realleged allegations in paragraph 40.

41. Paragraph 41 states a conclusion of law of which Defendants have no knowledge. Furthermore, Defendants specifically deny the allegations in paragraph 41.

4

42. Paragraph 42 states a conclusion of law of which Defendants have no knowledge. Furthermore, Defendants specifically deny the allegations in paragraph 42.

43. Paragraph 43 states a conclusion of law of which Defendants have no knowledge. Furthermore, Defendants specifically deny the allegations in paragraph 43.

44. Defendants deny in general the repeated and realleged allegations in paragraph 44.

45. Paragraph 45 states a conclusion of law of which Defendants have no knowledge. Furthermore, Defendants specifically deny the allegations in paragraph 45.

46. Paragraph 46 states a conclusion of law of which Defendants have no knowledge. Furthermore, Defendants specifically deny the allegations in paragraph 46.

47. Defendants deny in general the repeated and realleged allegations in paragraph 47.

48. Defendants specifically deny the allegations in paragraph 48.

49. Paragraph 49 states a conclusion of law of which Defendants have no knowledge. Furthermore, Defendants specifically deny the allegations in paragraph 49.

50. Paragraph 50 states a conclusion of law of which Defendants have no knowledge. Furthermore, Defendants specifically deny the allegations in paragraph 50.

51. Paragraph 51 states a conclusion of law of which Defendants have no knowledge. Furthermore, Defendants specifically deny the allegations in paragraph 51.

## AFFIRMATIVE DEFENSES

### Statement of Facts Applicable to Affirmative Defenses

52. Defendant Shaikh is the mother of Defendant Arif and the Debtor, Mohammed P. Shaikh.

5

53. Arif and the Debtor together care for their mother and all three live in the same residence.

54. Debtor did not make any payment towards the purchase of the residence and is not an obligor to the note securing the mortgage then and now.

55. Prior to the Debtor's filing for relief under the Bankruptcy Code, Defendants lent the Debtor more than $60,000 for the purpose of developing a business owned by the Debtor.

56. The Debtor was put on the deed to encourage him to be more responsible and to make payments towards his stay in the stay in the house and contribute his share, which he could not do. Since he could not make payments, he asked his name to be taken off the deed.

57. Defendants allowed the Debtor to remain living at the residence (since it is a joint family and culturally a unique family concept of ancient Indian culture) without making any monetary contributions to the mortgage and/or maintenance of the residence.

### First Affirmative Defense
#### (Failure to State a Claim Upon Which Relief Can be Granted)

Plaintiff's Complaint fails to state a cause of action against Defendants, upon which the relief he seeks can be granted.

### Second Affirmative Defense
#### (Consideration Paid by Defendants)

Plaintiff's Complaint fails to sufficiently allege a Fraudulent Conveyance because the Debtor received tremendous amount of help in terms of money, assistance and

social help (considerations). There cannot be a fraudulent transfer for something that was received in-gratis by the transferor.

### Third Affirmative Defense
### (Repayment of Debt)

Plaintiff's Complaint fails to sufficiently allege a Fraudulent Conveyance because the Debtor transferred his interest in the deed because he could not make mortgage payments and could not contribute anything to the household and hence out of respect he quit his name from the deed.

### Fourth Affirmative Defense
### (No Interest to the Estate)

Plaintiff's Complaint fails to sufficiently allege a Fraudulent Conveyance because the Debtor's interest in the deed was insufficient as the Debtor did not pay any part of the purchase price nor make any payments towards the mortgage.

### <u>COUNTERCLAIMS</u>

### Allegations Common to All Counterclaims

58. The Plaintiff conducted a Section 341 meeting with the Debtor and therefore had ample time to question Debtor about the transfer of any property outside of the estate.

59. At the 341 meeting, the Plaintiff did not ask any questions regarding the transfer of the Debtor's interest in the deed.

60. Had Plaintiff duly questioned the Debtor regarding said deed, Plaintiff would have discovered that the value of the property is way less than $450,000.

7

### Violation of Due Process

61. By his failure to question the Debtor about the transfer of his interest in the deed, the Plaintiff has violated the procedure provided in the Bankruptcy Code to protect the interests of a debtor. Thus, the Plaintiff has violated the Debtor's right to due process.

### Harassment and Intimidation

62. By bringing a claim for Fraudulent Conveyance against the Defendants, Plaintiff is acting in a manner to harass and intimidate. Plaintiff's actions are calculated to cause fear in the Defendants and extract money from them based upon that fear.

### Improper Performance of Duty as Trustee

63. Because Plaintiff failed to question Debtor about his interest in the deed at the 341 meeting, Plaintiff did not discover the facts underlying Defendants' Affirmative Defenses. Had Plaintiff done so, he would not have made the false allegations in his Complaint.

64. Plaintiff's failure to question the Debtor about his interest in the deed was an improper performance of his duties as the Trustee.

### Improper Inflation of Value of Property

65. Plaintiff has improperly inflated the value of the property. As stated above, the value of the property is actually way less than $500,000.

### Abuse of Process

66. Plaintiff is resorting to the use of New York state law to circumvent the procedural rules of the Bankruptcy Code and obtain money from the Defendants.

8

67. Plaintiff's actions are an abuse of process.

## REQUEST FOR LEAVE OF COURT TO PROCEED AGAINST PLAINTIFF
## ON COUNTERCLAIMS ASSERTED BY DEFENDANTS

68. Defendants hereby respectfully request this Court to grant leave pursuant to the
Barton Doctrine to proceed against the Plaintiff on the Counterclaims asserted
herein. *Barton v. Barbour*, 104 U.S. 126 (1881).

**WHEREFORE**, Defendants respectfully request as follows:

1. Dismissal of Plaintiff's Complaint and entry of a judgment in Defendants'
favor on all counts contained therein;

2. Entry of a judgment in favor of Defendants on all counts contained in their
Counterclaims;

3. Granting of leave of court to pursue Defendants' Counterclaims against
Plaintiff; and

4. Such other and further relief as this Court deems just and proper.

Dated: New York, New York
February 19, 2010

Dahiya Law Offices LLC
Attorneys for Defendants

*Karamvir s. dahiya*

By: _____
Karamvir S. Dahiya
350 Broadway
Suite 412
New York, NY 10012

9